# Exhibit B
# Deposition of Plaintiff Michael Guzman

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| JESUS LOZA, ANTONIO ORTIZ, JOHN GIBBS, JULIO SANCHEZ, MICHAEL A. GUZMAN, SR., JUAN TORRES, REY SILVA, | ) ) ) ) ) ) | |
| PLAINTIFFS, | ) ) | CIVIL ACTION |
| VS. | ) ) ) | NO.: 4:08 cv 2977 |
| ARROW TRUCK SALES, INC., | ) ) | |
| DEFENDANTS. | ) | |

------------------------------------

ORAL AND VIDEOTAPED DEPOSITION OF

MICHAEL ANGEL GUZMAN, JR.

AUGUST 26, 2009

Volume 1

------------------------------------


ORAL AND VIDEOTAPED DEPOSITION OF MICHAEL ANGEL
GUZMAN, JR., produced as a witness at the instance of
the Defendant, and duly sworn, was taken in the
above-styled and numbered cause on the 26th day of
August, 2009, from 9:02 a.m. to 3:28 p.m., before Kevin
J. Bruzewski, CSR in and for the State of Texas,
reported by machine shorthand, at the law offices of
Shook, Hardy & Bacon, LLP, JPMorgan Chase Tower, 600
Travis, Suite 1600, Houston, Texas  77002, pursuant to
the Federal Rules of Civil Procedure and the provisions
stated on the record or attached hereto.

Page 2

```
 1        A P P E A R A N C E S
 2
 3   FOR THE PLAINTIFFS:
 4     MS. CONNIE CORNELL
       Cornell, Smith & Mierl, LLP
 5     1607 West Avenue
       Austin, Texas  78701
 6     512.328.1540
 7     MR. TOMMY SANCHEZ
       1617 Fannin, Suite 1904
 8     Houston, Texas  77002-7652
       713.650.1114
 9
     FOR THE DEFENDANT ARROW TRUCK SALES, INC.:
10
       MR. JUSTIN JOHL
11     Shook, Hardy & Bacon, LLP
       2555 Grand Boulevard
12     Kansas City, MO  64108-2613
       816.474.6550
13
     ALSO PRESENT:
14     Mr. Mike Stricker
       Mr. Jay McClain, Videographer
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1              INDEX
 2                           PAGE
 3   Appearances.............................. 2
 4   Stipulations............................. 4
 5   MICHAEL ANGEL GUZMAN
       Examination by Mr. Johl................. 5
 6
 7   Signature and Changes.................206
 8
     Reporter's Certificate................208
 9
10           EXHIBITS
11   NO. DESCRIPTION                     PAGE
     1  Copy of Plaintiffs' Original Complaint   10
12
     2  Copy of Plaintiff Michael Guzman's     131
13   Objections and Answers to Defendant's First
     Set of Interrogatories
14
     3  Copy of 2004 US tax return       173
15
     4  Copy of 2005 W-2 wage statement     173
16
     5  Copy of 2006 US tax return       175
17
     6  Copy of 2008 US tax return       175
18
     7  Copy of November 2006 On Target Awards   176
19   Target Points
20   8  Copy of November 2006 On Target Awards   184
     Professional Sales Consultants
21
     9  Copy of November 2005 On Target Awards   185
22   Professional Sales Consultants
23   10 Copy of Application for Employment  185
24   11 Copy of Termination Form         191
25   12 Copy of Employee Separation Report   192
```

Page 4

```
 1   13  Copy of Disciplinary Action       194
 2   14  Copy of On Target Awards - Professional   197
     Sales Associates
 3
 4
         REQUESTED DOCUMENTS/INFORMATION
 5
     NO.  DESCRIPTION                     PAGE
 6
     1   Contact information for Hales       172
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
 1            P R O C E E D I N G S
 2        VIDEOGRAPHER:  We're on the record.  It's
 3   two minutes after 9:00 a.m.  Today is Wednesday, August
 4   the 26th, 2009.  This is the beginning of videotape
 5   No. 1.
 6            Would the court reporter please swear in
 7   the witness?
 8        COURT REPORTER:  Stipulations for the
 9   record?
10        MR. JOHL:  None.
11            **********
12        MICHAEL ANGEL GUZMAN, witness,
13   having been first duly sworn, testified as follows,
14   to-wit:
15            EXAMINATION
16   BY MR. JOHL:
17      Q.  Would you please state your full name for the
18   record?
19      A.  Michael Angel Guzman, Junior.
20      Q.  And how do you spell your middle name?
21      A.  Angle, A-N-G-E-L.
22      Q.  And can I call you "Mike" during the course of
23   this deposition?
24      A.  That's fine, sir.
25      Q.  Can you please state your home address?
```

2  (Pages 2 to 5)

3a3e1dd9-a14e-467b-80c3-b8f6cecbda5c

Page 42

1      A. Uh-huh, during those six months.
2      Q. Let me ask you this. Do you believe that if
3   Jim Brancato was requesting or requiring his sales
4   people to make sales calls that just because you were
5   salesmen of the month you would not have that same
6   responsibility?
7      A. When you are salesman of the month, when you're
8   selling trucks, your primary objective is to get the
9   deals going, close them, deliver them. Making phone
10  calls for new business is only a small part. It's, you
11  know, second stage to what you were doing for the
12  business at hand.
13     Q. But if Mr. Brancato was telling all the sales
14  people to make additional sales calls, do you believe
15  that you're not part of that group or shouldn't have
16  that same responsibility that your manager tells you to
17  do?
18     A. The responsibility is there.
19     Q. Prior to the time that you were terminated by
20  Jim Brancato, had he spoken to you and told you that you
21  were not making enough phone calls?
22     A. If my memory serves me well, possibly once.
23  You know, the -- he might have called me into the office
24  to say I need to make more phone calls, you know, should
25  you do --

Page 43

1      Q. So you were aware -- I'm sorry.
2         You were aware prior to the date of your
3   termination that Jim Brancato was concerned that you
4   weren't making enough phone calls?
5      A. Yes. Everybody for that matter.
6      Q. And during the time period that you worked at
7   Fontana, did Jim Brancato terminate other employees
8   because of their job performance?
9      A. He did. He did several.
10     Q. And some of those were not -- strike that.
11        He fired both Hispanic and nonHispanics who
12  were not satisfactory performing their jobs?
13     A. Yes.
14     Q. Now, you went back to work in L.A. sometime at
15  the beginning of January 2002.
16        And you stayed there till when?
17     A. Till middle of January 2007.
18     Q. So approximately five years?
19     A. Yes.
20     Q. And during that five years that you were
21  employed in the Los Angeles branch of Arrow Truck, did
22  you ever feel that you were discriminated against for
23  any reason by Mr. Brancato or anyone else at Arrow
24  Truck?
25     A. No, sir. Mr. Brancato is too nice to do that.

Page 44

1      Q. Okay. Did you feel that any of your
2   co-employees who worked there at anytime from January of
3   2002 through the middle of January of 2007 had ever been
4   discriminated against by Mr. Brancato or anyone else at
5   Arrow Truck?
6      A. No. Not Mr. Brancato, no.
7      Q. Okay.
8      A. Not to anyone.
9      Q. When you say not Mr. Brancato, did you believe
10  there were other people at Arrow Truck in management
11  that you were discriminating against the employees at
12  the Los Angeles branch during that time period?
13     A. There was nobody else in management. He was --
14  he had no assistant manager.
15     Q. Well, what about the people in Kansas City
16  that's -- let me ask you for this question.
17        It's my understanding that the corporate
18  headquarters for Arrow Truck is in Kansas City?
19     A. Correct.
20     Q. Did you feel that anyone at the corporate
21  headquarters in Kansas City had any policy or position
22  to discriminate against Hispanics or anyone else based
23  upon national origin, age or gender?
24     A. Not that I'm aware of.
25     Q. Did any of your co-workers during that

Page 45

1   five-year time period that you worked at the Los Angeles
2   branch of Arrow Truck ever express to you a concern that
3   the management in Kansas City had a policy to
4   discriminate against employees based upon age, gender,
5   national origin or any other reason?
6      A. I don't recall.
7      Q. Certainly if it had happened, Mr. Guzman, that
8   was something that you probably you would have recalled,
9   isn't it?
10     A. You see, some people talk, some people keep
11  quiet when things happen to them or -- and I don't
12  remember if anybody ever came to me and said, you know,
13  I was discriminated, I wanted to do a position, I wanted
14  to do something and I was not able to get it, but that's
15  why I said I really don't remember anything --
16     Q. Okay.
17     A. -- concrete.
18     Q. Well, let me ask it this way: During the five
19  years that you worked for the L.A. branch from
20  January of 2002 through January of 2007, you never
21  observed Bruce Brancato or anyone from management in
22  Kansas City discriminate against any Arrow Truck
23  employee based upon age, gender, national origin or any
24  other reason; is that true?
25     A. That's true.

12  (Pages 42 to 45)

Page 50

1   9:55 a.m. This is the end of videotape No. 1.
2        (Recess from 9:55 to 10:08 a.m.)
3        VIDEOGRAPHER: We're back on the record.
4   It's eight minutes after 10:00 a.m. This is the
5   beginning of tape No. 2.
6   BY MR. JOHL:
7        Q. Mr. Guzman, we're back on the record after a
8   short break.
9        Is there anything from the previous
10  testimony that you have given us that you would like to
11  change or alter in any way?
12       A. No, sir.
13       Q. All right. Let me ask you some questions.
14  From January of 2002 through January of 2006, how many
15  times had you met Mike Stricker?
16       A. 2007.
17       Q. I meant 2006 is what I asked you. Up to
18  2006 and --
19       A. Never.
20       Q. -- during that four year time period.
21       You had never met Mike Stricker from 2002
22  through January of 2006?
23       A. No, sir.
24       Q. Had you ever spoken to Mike Stricker from
25  January 2002 through January of 2006?

Page 51

1        A. No, sir, that I recall.
2        Q. From January of 2002 through January of 2007,
3   did you know Mr. Ortiz or Mr. Loza?
4        A. Just from them being fellow workers at Arrow.
5        Q. Had you ever met either Mr. Loza or Mr. Ortiz
6   at any time from January 2002 through January of 2007?
7        A. Yes. December 6, 2006 I came to the store for
8   the first time ever.
9        Q. In December of 2006, was that the first time
10  you ever met or -- go ahead. Do you want to change your
11  testimony?
12       A. Yes, sir. I was in Houston in May of 2006 and
13  I visited on a Friday, I believe it was, during that
14  week in my stay in Houston, the store. And I spoke with
15  Mr. Stricker and I believe I met all -- the gentlemen
16  were there at the time.
17       Q. Okay. So I'm going to just try to clarify in
18  my mind.
19       May of 2006 would have been the first time
20  you ever met or spoke with Mr. Stricker; is that
21  correct?
22       A. Yes.
23       Q. And would May of 2006 be the first time you
24  ever met or spoke with either Mr. Loza or Mr. Ortiz?
25       A. Met personally?

Page 52

1        Q. Yes.
2        A. Spoke to on the phone about deals possibly.
3        Q. Well, when you spoke with Mr. Loza or Mr. Ortiz
4   on the phone prior to May of 2006, was it only about
5   deals that you were trying to do in Houston or Los
6   Angeles?
7        A. Exactly.
8        Q. And any time prior to May of 2006 when you
9   spoke with Mr. Ortiz or Mr. Loza, did they ever tell you
10  that Mike Stricker or anyone else in the Houston office
11  discriminated against them for any reason?
12       A. No, sir.
13       Q. Did Mr. Loza or Mr. Ortiz tell you during those
14  phone conversations prior to your meeting in May of 2006
15  that Mike Stricker or anyone else in Arrow Truck's
16  management had discriminated against either employees of
17  Arrow Truck before that date?
18       A. No, sir.
19       Q. Did Mike -- strike that.
20       Did Mr. Ortiz or Mr. Loza tell you that
21  Mr. Stricker discriminated against Mr. Gibbs,
22  Mr. Sanchez or Mr. Torres at any time prior to meeting
23  them on May of 2006?
24       A. No, sir. Our conversation was related to
25  business so nothing was said.

Page 53

1        Q. When you met Mr. Ortiz and Mr. Loza in May
2   of 2006, did you speak with them?
3        A. I said hi, so you are Jessie, you are -- okay.
4   You are -- okay, you know. And you're the famous Mike,
5   you know, some of the guys said.
6        Q. When you said you are the famous Mike, are you
7   referring to Mike Stricker?
8        A. No, to me. They told me.
9        Q. So you were the famous Mike that they heard
10  about from the Los Angeles branch?
11       A. Yeah.
12       Q. And how long did your conversation or meeting
13  with Mr. Ortiz and Loza take place over in May of 2006?
14       A. It was short. Just hi, you know, how's it
15  going, that's it. Next guy, next guy, next guy.
16       Q. And when was the next time you met Mr. Loza or
17  Mr. Ortiz?
18       A. I saw them again at the store on December 6,
19  2006.
20       Q. And in between May of 2006 and December 6th of
21  2006, did you continue to have telephone conversations
22  with Mr. Ortiz and Mr. Loza about your work and about
23  deals you were working on?
24       A. I'm sure conversation might have crossed
25  because when you meet people from one dealer to the

14 (Pages 50 to 53)

3a3e1dd9-a14e-467b-80c3-b8f6cecbda5c

Page 66

1  did you feel that you were sometimes given preferential
2  treatment by Mr. Brancato or Mr. MacDaniel?
3      A. Your top sales people are always special to the
4  branch as a rule. Now, Mr. Brancato was rather
5  impartial but still when you ask for a truck to be put
6  on hold even without the $1,000 deposit check, it was
7  put on hold for you because you're selling trucks and
8  what you say normally carries more weight than somebody
9  who is not selling them trucks.
10     Q. So you would not have been surprised to have
11 heard that Mr. Stricker treated his top salesmen better
12 than he did people who weren't selling trucks?
13     A. That's typical, yes.
14     Q. Now, when did you come to the decision that you
15 wanted to leave Los Angeles and move to another city?
16     A. When -- could have been March of 2006. My
17 sister came back from Houston, April, and said that she
18 liked the houses that you could get and she liked what
19 she saw. My wife and I said we've been thinking about
20 already, we're tired of L.A., let's go take a look and
21 see what is this Houston all about, so we came here in
22 May for a week.
23     Q. So in May of 2006, would it be correct to state
24 it was just more of an exploratory type of visit here to
25 see whether or not you were even interested in moving to

Page 67

1  Houston?
2      A. Right. Right. To see what was available and
3  to see what all this fuss was about.
4      Q. And after you came to Houston in May of 2006,
5  did you and your wife say, okay, we want to move to
6  Houston but only if we're able to sell our house in Los
7  Angeles?
8      A. Right. Especially because when I spoke with
9  Mr. Stricker said someone like you with your experience,
10 you've been diamond before, I don't need to train, you
11 ought to be given a position anywhere you go in America
12 where there is an Arrow. And he said I have a job, I
13 can sell my house, I can buy a cheaper nicer house here.
14     Q. Was your house in Los Angeles up for sale in
15 May of 2006?
16     A. No. Until I came back to Los Angeles I put it
17 for sale.
18     Q. Did you have any family, you or your wife have
19 any family or friends that lived in the Houston area in
20 May of 2006?
21     A. My cousin in Sugar Land.
22     Q. That's the only relative?
23     A. Yes.
24     Q. So you were just packing up and just moving out
25 to see what was going to happen in Houston; correct?

Page 68

1      A. Yes.
2      Q. When you met with Mr. Stricker in May of 2006,
3  was that the first time you talked to him about being
4  employed in the Houston branch?
5      A. Yes.
6      Q. You did not call him before coming to Houston
7  and telling him you were going to be in the area, did
8  you?
9      A. I don't remember. I possibly could have called
10 him to say you know what, I'm going to be in Houston and
11 I'm there to see about houses. And I could have said,
12 you know, I would like to see if you would have time to
13 see me. And I think --
14     Q. Do you recall whether you had that
15 conversation?
16     A. I think I might have had it because coming all
17 the way from L.A., it would make sense to let the
18 manager know, you know, I plan to be there.
19     Q. Did you ever send Mr. Stricker an email at any
20 time confirming any of your conversations that you had
21 with him?
22     A. There is a possibility, but I don't remember.
23 Emails are so many to so many people, I can't.
24     Q. Well, when you came to -- let me ask you this
25 way. The first time you can recall actually talking to

Page 69

1  Mr. Stricker for any reason would have been at his
2  office in May of 2006; is that a correct statement?
3      A. Person to person, yes.
4      Q. But I'm talking about --
5      A. On the phone, possibly before that --
6      Q. Okay.
7      A. -- to let him know I was coming.
8      Q. But you can't recall whether or not you did
9  have a conversation with Mr. Stricker on the phone prior
10 to coming to Houston, can you?
11     A. My mind tells me that I probably did because it
12 makes sense that I called him to let him know, you know,
13 I made this decision to go and visit and I would like to
14 go and come in and see it you.
15     Q. Can you recall anything that Mr. Stricker may
16 have said to you during that telephone conversation
17 before your May visit to the Houston branch?
18     A. Maybe he said something sure, come on down,
19 we'll talk.
20     Q. At any time during the conversation you had
21 with Mr. Stricker before your visit in May of 2006, did
22 he promise you a job if you moved to the Houston branch?
23     A. Just what I said, that you ought to be given a
24 position at any Arrow if you move, you know, because of
25 your experience.

18  (Pages 66 to 69)

KEVIN J. BRUZEWSKI, CSR
NELL McCALLUM & ASSOCIATES, INC.

3a3e1dd9-a14e-467b-80c3-b8f6cecbda5c

Page 70

1    Q. Did Mr. Stricker tell you on that telephone
2 conversation that if you came to Houston there was a job
3 position available that he could give you?
4    A. If the position that he would -- say that
5 again.
6    Q. Did Mr. Stricker tell you in this phone
7 conversation that you can't recall that if you moved to
8 Houston there would be a job -- there was a job
9 available for you?
10    A. On the phone conversation, no.
11    Q. All right.
12    A. When I visited him, specifically I have a job
13 for you if you move here?
14    Q. Yes.
15    A. I don't recall.
16    Q. All right. So when you came to Houston and met
17 Mr. Stricker for the first time, how long did your
18 meeting with Mr. Stricker last?
19    A. I was talking very little, a lot of people were
20 coming in and business was being transacted, so I didn't
21 want to detract from that so...
22    Q. Well, how long is your best recollection the
23 meeting lasted?
24    A. 15 minutes, 20 minutes.
25    Q. Did Mr. Loza or Mr. Ortiz were they present at

Page 71

1 any time in Mr. Stricker's office while you were meeting
2 with him?
3    A. I don't recall. Salesmen came in and out.
4    Q. Would it be correct to state that the only two
5 people who were in Mr. Stricker's office the entire time
6 were you and Mr. Stricker during that meeting?
7    A. On a couple of times I stepped out for phone
8 calls or something that he needed to.
9    Q. But you didn't bring anybody else with you to
10 attend that meeting, did you?
11    A. No, I came alone.
12    Q. All right. And you didn't ask anybody to sit
13 in with you during the entire meeting that you had with
14 Mr. Stricker, did you?
15    A. No, sir.
16    Q. What can you recall Mr. Stricker saying to you
17 during that meeting in May of 2006?
18    A. Why you want to leave L.A., why you want to
19 move here. I told him, like I said, I don't -- I've had
20 enough of Los Angeles. I liked the prices of the houses
21 here. I like what you can get here. I'm looking for a
22 little more peace and quiet, you know, slower life. If
23 I recall anything else...
24    Q. Did you tell Mr. Stricker that you could not
25 start work until such time that you sold your house in

Page 72

1 Los Angeles?
2    A. Yes, I mentioned that.
3    Q. And tell me again, when did you sell your house
4 in Los Angeles?
5    A. I sold it six months later. It would have been
6 in -- from May, six months later, November.
7    Q. Now, during your conversation that you had with
8 Mr. Stricker during that 15 or so minutes, can you tell
9 us what you recall Mr. Stricker telling you during that
10 conversation?
11    A. Apart from what he said on, you know, because
12 you sold -- before you work at Arrow right now, you got
13 experience, beyond that, about when do you plan to move
14 here. I said when I sell my house and not until then.
15 When you do, keep in touch, let me know, we'll sit down
16 or we'll go over it then, something like -- similar to
17 that fact.
18    Q. All right. Was there anything that
19 Mr. Stricker said during that meeting with you that you
20 felt was inappropriate or offensive in any manner?
21    A. No.
22    Q. When Mr. Stricker told you to contact him when
23 you were ready to move to Houston, did you feel that was
24 an appropriate response by Mr. Stricker?
25    A. It made sense to me.

Page 73

1    Q. All right. Did you -- you certainly didn't
2 leave that meeting with Mr. Stricker with any feelings
3 that he had done anything inappropriate toward you, did
4 you?
5    A. No.
6    Q. Did Mr. -- you said Mr. Stricker told you to
7 keep in touch so that when you did sell your house in
8 Los Angeles you could contact him to see whether or not
9 there was a job open at that time?
10    A. Don't know about if the job opened at that
11 time, but to see what we can do, you know, or maybe -- I
12 don't recall the exact wording.
13    Q. So you understood that when you left the office
14 in May of 2006, you did not have a guarantee of a job at
15 the Houston branch at that time; is that correct?
16    A. Actually I felt quite strongly, and that's why
17 I decided to go ahead and put my house for sale to make
18 a move here.
19    Q. You felt quite strongly that Mr. Stricker --
20    A. Would take me.
21    Q. -- told you you had the experience but he
22 didn't tell you at that meeting there was an open
23 position for you at that time, did he?
24    A. Well, at that time, if there were, I couldn't
25 take it, you know.

19  (Pages 70 to 73)

KEVIN J. BRUZEWSKI, CSR
NELL MCCALLUM & ASSOCIATES, INC.

3a3e1dd9-a14e-467b-80c3-b8f6cecbda5c

Page 74

1    Q.  So would you agree with me that you would have
2  to wait to contact Mr. Stricker when you sold the house
3  before you could determine if there was a position open
4  for you?
5    A.  It would be a logical conclusion, right.
6    Q.  And you understood that?
7    A.  Yes.  And -- but I was not afraid of moving and
8  coming here and selling my house and uproot everybody
9  away from the family and everything.
10    Q.  No.  You weren't afraid of moving to Houston,
11  but you understood that until you sold your house and
12  were able to move to Houston, there was no way for
13  anyone to say there would be a job available for you
14  when you got there?
15    A.  That was my plan to actually sell my house
16  first.
17    Q.  All right.  Did Mr. Stricker tell you at any
18  time during that May meeting that he would keep a
19  position open for you no matter how long it took for you
20  to sell your house and move to Houston?
21    A.  No, he did not promise that.
22    Q.  Did you go back and tell Mr. MacDaniel or
23  anyone at the Los Angeles branch after the May meeting
24  that Mr. Stricker had guaranteed you a job in the
25  Houston office if and when you sold your house in Los

Page 75

1  Angeles?
2    A.  Now, see, you're asking the question in a
3  different manner.  Basically he did not guarantee me
4  because I was not guaranteed the sale of my house at the
5  point -- at that point in time.  But I did mention to
6  Larry MacDaniel I want to move to Houston.
7    Q.  Did Mr. MacDaniel ever do anything to try to
8  persuade you not to move to the Houston branch?
9    A.  No.  He told me -- I knew it was a busy branch.
10  I was looking forward to selling at a busy branch that
11  had enough people walking in because we died.  We were
12  really, really slow.
13    Q.  You're talking about the Los Angeles --
14    A.  The Los Angeles branch.
15    Q.  -- was really slow.
16         Was the Fontana branch really slow at that
17  time, too?
18    A.  They took a lot of our customers so they were
19  not as slow as us.
20    Q.  Did you observe that the sales of used trucks
21  in late 2006 were slowing down because of the economy
22  and for other reasons?
23    A.  There was -- they were slower than before, yes.
24    Q.  Okay.
25    A.  It was my slower year of the years prior and,

Page 76

1  yes, I noticed that.
2    Q.  You actually had your worst year --
3    A.  Uh-huh.
4    Q.  -- from a income standpoint in 2006 than you
5  had in the previous four years at Arrow Truck?
6    A.  Correct.
7    Q.  And that was because of the economy and other
8  factors --
9    A.  Right.
10    Q.  -- that were affecting the sale of used trucks?
11    A.  Selling my house and all these things, you
12  know.  Larry mentioned you need to focus some more, you
13  know, but it's hard to be in two places at once maybe is
14  what happened to me.
15    Q.  While you worked for Arrow Truck, did you ever
16  make more than $60,000 --
17    A.  Yes.
18    Q.  -- at the Los Angeles branch?
19    A.  Yes, I did.
20    Q.  What was the most compensation you ever made
21  while working at Arrow Truck at the Los Angeles branch?
22    A.  I believe it was 73,000.
23    Q.  Do you know what year?
24    A.  Possibly 2003.  I have not -- double check.
25    Q.  Can we agree that from 2003 through 2006 your

Page 77

1  salary decreased each year from the $73,000?
2    A.  Yes.
3    Q.  Between May of 2006 when you met in
4  Mr. Stricker's office --
5    A.  Okay.
6    Q.  -- and December 6, 2006, did you have any other
7  communications with Mr. Stricker?
8    A.  On the phone, yes.
9    Q.  Do you know how many times you had those
10  communications?
11    A.  Let's say, I might have called him three months
12  later and said I haven't sold my house yet.  And I
13  believe I might have called him again, still nothing.
14  So it would have been the -- the third time I would have
15  said I sold my house.
16    Q.  Okay.
17    A.  So possibly two or three times.
18    Q.  All right.  So the first time -- I just want to
19  get clear in my mind, Mike.
20         The first time that you would have had any
21  kind of communication with Mr. Stricker for any reason
22  would have been when you might have called him to tell
23  him you were coming to Houston in May of 2006; correct?
24    A.  Correct.
25    Q.  Then the second conversation you had on the

20  (Pages 74 to 77)

KEVIN J. BRUZEWSKI, CSR
NELL MCCALLUM & ASSOCIATES, INC.

3a3e1dd9-a14e-467b-80c3-b8f6cecbda5c

**Page 78**

1  phone with Mr. Stricker would have been in August of
2  2006 when you told him you just hadn't sold your house
3  yet?
4      A. It wouldn't have been August. It would have
5  been like October, I haven't sold my house yet,
6  approximately.
7      Q. All right. Did you say anything else to
8  Mr. Stricker in that October 2006 conversation other
9  than you had not been able to sell your house at that
10  time?
11      A. I might have said that I'm still interested in
12  moving to Houston. I'm still interested in selling my
13  house and when it does I'm moving.
14      Q. All right. What can you recall, if anything,
15  that Mr. Stricker said to you during this conversation
16  in October of 2006?
17      A. That he had hired some people. I don't
18  remember specifically. That he -- let's visit when --
19  let's talk when you sell your house. You know, let me
20  know when you sell your house.
21      Q. Anything else that you can recall?
22      A. Not really.
23      Q. Okay. Once again, would you agree that
24  Mr. Stricker did not guarantee you a job during your
25  conversation in October of 2006?

**Page 79**

1      A. He did not.
2      Q. He told you that he had hired some people since
3  May of 2006 up through the time that you called him?
4      A. Uh-huh.
5      Q. Is that "yes"?
6      A. That's correct.
7      Q. Did you find it inappropriate that Mike
8  Stricker had hired anyone between May and October of
9  2006?
10      A. It's his branch. I couldn't.
11      Q. All right. And basically what Mr. Stricker
12  told you was that when you sold or if you were able to
13  sell your house in Los Angeles and were then making the
14  move to Houston to give him a call and talk to him at
15  that time?
16      A. Yes.
17      Q. And then the next time you would have had any
18  communication whatsoever with Mr. Stricker would have
19  been sometime in November of 2006 when you told him that
20  you had finally sold your house?
21      A. Correct.
22      Q. Okay. What did Mr. Stricker tell you during
23  that November conversation?
24      A. I have too many sales people. I told him I was
25  coming into town in December.

**Page 80**

1      Q. Okay. Other than telling you that he had too
2  many sales people at that time, did he say anything else
3  to you?
4      A. When you coming to town, let's see what happens
5  or let's talk or lets --
6      Q. So certainly Mr. Stricker didn't tell you
7  anything during that November telephone conversation to
8  persuade you not to come apply for a job when you did
9  come to town? Bad question.
10          When you talked to Mr. Stricker in November
11  of 2006, he told you to come see him when you finally
12  moved to Houston?
13      A. No. I told him I was coming in to an appraise
14  and he said when you do, come see me. You know, but
15  that -- he neither encouraged me nor discouraged me.
16      Q. But during that conversation, he did not tell
17  you that there would be no reason for you to meet with
18  him about a position when you did move to Houston?
19          Do you understand the question because it's
20  probably not very good? Let me ask it this way.
21      A. Okay.
22      Q. Did you understand in November of 2006 that
23  there was not a job position open at the Arrow Truck
24  branch at that point in time in the Houston area?
25      A. Right. Because he said I have too many sales

**Page 81**

1  people.
2      Q. Did you have any reason to disbelieve him at
3  that time?
4      A. No. I have no reason to disbelieve, no.
5      Q. Did you ask Mr. MacDaniel in the Los Angeles
6  branch to check and see whether or not the Houston
7  branch had too many sales people at that time?
8      A. I didn't have to. There's a sheet of paper
9  that shows all the names of all the people at all the
10  stores.
11      Q. So you knew that the Houston branch had a
12  large --
13      A. Yes.
14      Q. -- number of sales people in November of 2006?
15      A. Yes.
16      Q. Okay. So when you told Mr. Stricker that you
17  were going to come to Houston in December of 2006 for an
18  appraisal on a house, you realized you did not have a
19  job with the Arrow Truck branch at that point in time?
20      A. Nothing guaranteed, no.
21      Q. Okay. Did you ever ask Mr. Stricker to
22  contact Mr. MacDaniel and give a reference for you?
23      A. No, I never did.
24      Q. Did you ever ask anybody in management in
25  Kansas City to call Mr. Stricker to help you get a job

21  (Pages 78 to 81)

KEVIN J. BRUZEWSKI, CSR
NELL MCCALLUM & ASSOCIATES, INC.

3a3e1dd9-a14e-467b-80c3-b8f6cecbda5c

Page 82

1  in the Houston branch?
2      A. No, sir. I never contacted Kansas City for
3  anything.
4      Q. At some point in time before you left the --
5  your employment with the L.A. branch, did you talk to
6  either Mr. Wallace, Courson, or Kosic and tell them that
7  you were moving to the Houston area or you had planned
8  to moved to the Houston area?
9      A. Not -- only Ken Kosic.
10     Q. Was that -- did you have a actual face-to-face
11  conversation with Mr. Kosic?
12     A. Face-to-face.
13     Q. Was that in the Los Angeles branch?
14     A. At the branch, yes.
15     Q. Do you recall when that was?
16     A. Could have been between the time I sold the
17  house and the time that I drove to or came to Houston or
18  possibly November, December sometime.
19     Q. So November or December 2006?
20     A. Uh-huh.
21     Q. Is that "yes"?
22     A. That's correct.
23     Q. I'm sorry.
24         And just so it's clear, you never spoke
25  with Mr. Courson or Mr. Wallace about your plans to move

Page 83

1  to the Houston area?
2      A. No, sir.
3      Q. When you spoke with Mr. Kosic in November or
4  December of 2006, what did he say about your move to the
5  Houston area?
6      A. You're going to like it there, it's a nice
7  city; you know, it's good for the children, it's good
8  for the family.
9      Q. Did he say anything about your employment at
10  the Houston branch?
11     A. Nothing. But being like I am, I didn't even
12  question why he was not telling me, hey, I'm going to
13  help you, you know, get a position at the Houston store.
14     Q. Did you ask Mr. Kosic to help you get a
15  position at the Houston store?
16     A. Not directly.
17     Q. Did you ask him indirectly?
18     A. Yes.
19     Q. How?
20     A. Just, you know, said I want to move to Houston,
21  I want to work at the Arrow in Houston. That was my
22  plan all along, and I believe he was aware of that.
23     Q. Did Mr. Kosic tell you anything that you felt
24  was inappropriate about trying to get a job at the
25  Houston branch?

Page 84

1      A. What he said was, why don't you try, and he
2  gave me two leads of people. He said call this
3  gentleman and call this gentleman he said.
4      Q. The two leads that Mr. Kosic gave you were for
5  companies that were not Arrow Truck; correct?
6      A. Correct, they were not Arrow.
7      Q. They were for other companies in the Houston
8  area that sold used trucks similar to Arrow Truck?
9      A. Yes. A Freightliner dealer and Truck Nation.
10     Q. Did Mr. Kosic at any time that you spoke to him
11  ever guarantee you a job at the Houston branch if you
12  moved to Houston?
13     A. No, he did not.
14     Q. Did you only have that one conversation with
15  Mr. Kosic about your plan to move to Houston?
16     A. I might have mentioned it on the previous visit
17  a few months earlier that I had -- that I had plans that
18  I put my house for sale and that I wanted to move to the
19  Houston branch.
20     Q. Do you recall whether or not you had that
21  earlier conversation?
22     A. I think I did, but I don't really recall, you
23  know.
24     Q. Okay. Can we agree that if you did have the
25  earlier conversation, you only spoke with Mr. Kosic on

Page 85

1  two times when you told him of your plans to move to
2  Houston?
3      A. Yes.
4      Q. Would you also agree with me that during
5  neither of the two times you spoke with Mr. Kosic did he
6  ever promise you or guarantee you a job if you moved to
7  Houston at the Houston Arrow Truck branch?
8      A. No. And I -- I guess I was not even
9  considering him as somebody who I can say, hey, get me a
10  position in Houston.
11     Q. During either of the two conversations that you
12  had with Mr. Kosic, did he say anything inappropriate or
13  offensive to you in any manner?
14     A. No, sir. I liked the gentleman very much. He
15  gave me a nice hug, like every time and, you know, said
16  you're a good man is what he used to tell me as he saw
17  me, pat my back, gave me a hug.
18     Q. Do you think it was nice of Mr. Kosic to give
19  you the names of two other companies in the Houston area
20  to apply for a job once you moved there?
21     A. I felt disappointed that he was giving me names
22  of somebody else instead of saying, you know, I'll get
23  you into Houston. But my mind was not thinking along
24  those terms that, you know, that he could maybe call
25  Mr. Stricker and say, you know what, let's get Michael

22  (Pages 82 to 85)

KEVIN J. BRUZEWSKI, CSR
NELL MCCALLUM & ASSOCIATES, INC.

3a3e1dd9-a14e-467b-80c3-b8f6cecbda5c

Page 86

1    in there. But I said thank you for giving me something.
2    I was thankful for that definitely.
3         Q. And certainly you never asked Mr. Kosic to
4    contact Mr. Stricker to help you a job?
5         A. No, I didn't.
6         Q. Did you ever contact before December 6, 2006
7    either the Freightliner or Truck Center dealership in
8    Houston to inquire about employment?
9         A. I mentioned that I was coming into town, you
10   know, on the first week of December and I said I'd like
11   to come in and, you know, see you to both, you know,
12   dealers.
13        Q. So prior to coming to Houston in December
14   of 2006 you contacted both the Freightliner and the
15   Truck Center dealerships?
16        A. Uh-huh.
17        Q. Is that "yes"?
18        A. Correct.
19        Q. And you spoke to someone there about the fact
20   that you're going to be moving to Houston and you
21   inquired about whether or not you could find employment
22   at either of those facilities?
23        A. Correct.
24        Q. And what were you told by the Freightliner
25   dealership?

Page 87

1         A. When you come into town, come see me.
2         Q. And on that December 6th visit to Houston, did
3    you go see the Freightliner dealer?
4         A. I saw Mr. -- I went to Arrow first and then I
5    went to the Freightliner dealer and then I went to Truck
6    Nation or maybe Truck Nation first and Freightliner
7    later, but I always -- I went to Arrow first.
8         Q. During that December 6th meeting with either
9    Freightliner for Truck Center, were you offered a job
10   there?
11        A. I was not offered a job at the Freightliner
12   dealer. I was told I would love to have you, but I got
13   too many sales people. Truck Nation said I would hire
14   you when I move to a new place. It's coming down, you
15   know, in three or so months. Or I think at the time he
16   was wanting to move in a couple of months.
17        Q. Okay. So you did follow-up on Mr. Kosic's
18   suggestion to go apply or contact Freightliner and Truck
19   Nations about possible employment?
20        A. Yes. I didn't even go anywhere else but I did
21   that. Exactly, I went to those two places, the three
22   companies and Arrow.
23        Q. So let's talk about your meeting with
24   Mr. Stricker when you came to the Houston office on
25   December 6, 2006.

Page 88

1              Had you contacted him before you came to
2    the branch to tell him that you were going to be there
3    on that date?
4         A. Yes. Just like I contacted the others, I had
5    to contact him.
6         Q. And when did you contact Mr. Stricker and tell
7    him that you would like to come by on December 6, 2006?
8         A. End of November. You know, possibly a week
9    earlier.
10        Q. Was that the conversation you told us about
11   with Mr. Stricker?
12        A. Yes.
13        Q. Okay.
14        A. I believe it is.
15        Q. All right. So December 6, 2006, how long was
16   your meeting with Mr. Stricker?
17        A. Short, 15 minutes maybe; maybe not even that,
18   10 minutes.
19        Q. Where did you meet with Mr. Stricker?
20        A. I went to his office.
21        Q. Did the entire meeting take place in
22   Mr. Stricker's office?
23        A. Yes.
24        Q. Was there anyone else in that meeting besides
25   you and Mr. Stricker?

Page 89

1         A. No, just the people that again came in and out
2    as he transacted business.
3         Q. And I forgot to ask you this question, Mike.
4              At any time when you were having these
5    conversations with Mr. Stricker or Mr. Kosic, did you
6    ever make any notes or diaries about your conversations
7    with either of those people?
8         A. No, I did not.
9         Q. And tell me what Mr. Stricker said to you
10   during the time that you met with him in his office on
11   December 6th of 2006?
12        A. I got too many sales people. As I mentioned to
13   you before, you know, I hired some guys, I got too many
14   sales people.
15        Q. Anything else?
16        A. It's hard to remember anything else.
17        Q. Well --
18        A. What stuck with me is that.
19        Q. Okay. But as we sit here today, you can't
20   recall anything that Mr. Stricker told you during that
21   meeting in his office other than that he has too many sales
22   people and he has too many sales people working for him?
23        A. And I said, well, I'm not moving here yet. I'm
24   going to go close, you know. Everything -- this needs
25   to close and I'm still working at the Arrow, you know,

KEVIN J. BRUZEWSKI, CSR
NELL MCCALLUM & ASSOCIATES, INC.

3a3e1dd9-a14e-467b-80c3-b8f6cecbda5c

Page 90

1  in Los Angeles so I need some time to -- it's actually
2  some time is going to happen, transpire, before I move
3  into town. And I knew that. So he said and I think I
4  will be here, I said, in a month, let's visit in January
5  then.
6      Q. Did Mr. Stricker say anything during that
7  December meeting in his office to discourage you from
8  coming back in January when you finally moved to Houston
9  to apply for a job?
10     A. No. Just tell us visit in January when you get
11 into town.
12     Q. And what Mr. Stricker told you in December
13 of 2006 was similar to what he told you over the phone
14 in November and that is at that time they had too many
15 sales people?
16     A. Yes.
17     Q. And before we take our break, at any time
18 during that conversation with Mr. Stricker in his office
19 on December 6, 2006, did he say anything about you being
20 Hispanic or about your national origin in any manner?
21     A. No, sir.
22     Q. Okay. Let's take a break.
23         VIDEOGRAPHER: We're off the record. It's
24 six minutes after 11:00 a.m. This is the end of
25 videotape No. 2.

Page 91

1         (Recess from 11:06 to 11:19 a.m.)
2         VIDEOGRAPHER: We're on the record. It's
3  11:19 a.m. This is the beginning of videotape No. 3.
4  BY MR. JOHL:
5      Q. Mr. Guzman, we're back on the record after
6  another short break.
7         Is there anything from the previous
8  testimony that you've given us today that you would like
9  to change or amend in any manner?
10     A. The part when you asked me about if I had heard
11 from Ortiz or from Loza anything negative and -- about
12 Mr. Stricker. And I would say, because you reminded as
13 I -- when you asked me about Mr. Meyer, that I heard
14 some, you know, from other people, from several people
15 at this store on December 6th.
16     Q. Okay.
17     A. But beyond that, you know...
18     Q. Well, before December 6, 2006 when you came to
19 the Arrow Truck branch, you had not heard anything
20 negative about Mr. Stricker?
21     A. Not in May, no.
22     Q. Okay. Between May and when you came to the
23 store in December of 2006, had you heard anything
24 negative about Mr. Stricker?
25     A. Yes. It was brought up by couple of people who

Page 92

1  said, you know, so and so gets preferential treatment or
2  some guys here get preferential treatment.
3      Q. All right. Who brought it up to you that
4  certain people were getting preferential treatment by
5  Mr. Stricker?
6      A. That's what I'm trying to remember. I can't
7  say it was Ortiz. I can't say it was Loza. I can't say
8  it was Sanchez or a combination of them and someone
9  else. Several people told me.
10     Q. When you say several, can you recall the names
11 of anybody specifically?
12     A. It could have been any one of these three, but
13 I can remember somebody else. Seeing people once or
14 twice a year does not make it easier.
15     Q. Well, had you seen Mr. Ortiz, Mr. Sanchez or
16 Mr. Loza at any time between May and December of 2006?
17     A. No. I was in Los Angeles, they were here.
18     Q. So when those comments if they came from
19 Sanchez, Loza or Ortiz have been in a phone call?
20     A. No. That was when I was at the store in
21 December.
22     Q. All right. So I guess I had asked you this
23 question and the answer is inconsistent --
24     A. Yes.
25     Q. -- I believe, to what you told us.

Page 93

1         Between May when you came to the Houston
2  branch for the first time of 2006 and when you came to
3  the office in December of 2006, during that time period
4  before you came back to the Houston office on a second
5  occasion, had Mr. Sanchez, Mr. Ortiz, Mr. Loza or
6  anyone else told you any comments about Mr. Stricker?
7      A. No.
8      Q. So when you came to the office in December
9  of 2006 that's when these comments were made to you by
10 some unknown person?
11     A. Some guys, several of them, on their own said
12 things. I don't remember who, but they said you know
13 what, these things, you know, are not fair or, you know,
14 like you said, some people get preferential treatment.
15 And it wasn't related to being the top sales, it was
16 related to the way deals were handled or how people were
17 preferred over others for deals that were being done
18 that some had no deposit yet, they were being put on
19 hold over someone who had a deposit and trucks sold to
20 somebody that that was not top sales.
21     Q. Were you told who the people were that were
22 getting the preferential treatment from Mr. Stricker?
23     A. Pryor --
24     Q. No.
25     A. -- is that the name? No. No. The last name

24  (Pages 90 to 93)

KEVIN J. BRUZEWSKI, CSR
NELL MCCALLUM & ASSOCIATES, INC.

3a3e1dd9-a14e-467b-80c3-b8f6cecbda5c

Page 98

1  Mr. Stricker discriminated against Latinos in some way?
2      A. Yeah. Just they -- several of the guys, you
3  know, mentioned that but I -- the names, it could have
4  been Loza, it could have been Ortiz and it could have
5  been Sanchez, it could be somebody else, I can't
6  remember who else that worked there that mentioned, but
7  that's the whole extent of what I --
8      Q. Well, let me ask you this: When you say
9  several, was it more than one person who told you this?
10     A. Yeah.
11     Q. All right. Now, how long were you at the Arrow
12  Truck branch on December 6, 2006 before you met with
13  Mr. Stricker?
14     A. 20 minutes -- 15, 20 minutes.
15     Q. Okay. And during that 15 or 20 minutes, did
16  you meet as a group with Mr. Loza, Ortiz and
17  Mr. Sanchez?
18     A. No. I kind of went to each of their cubicles,
19  you could say, say hi and things.
20     Q. Did Mr. Sanchez, Loza or Ortiz know that you
21  were coming into the store on December 6, 2006 to meet
22  with Mr. Stricker?
23     A. No, they didn't know.
24     Q. So if I understand your testimony correctly,
25  Mr. Guzman, that when you met with each these people

Page 99

1  separately --
2      A. Uh-huh.
3      Q. -- they each brought up to you that
4  Mr. Stricker was discriminating against them because
5  they were Hispanic?
6      A. Something along those lines, yes.
7      Q. Each one just came out on --
8      A. They just told me.
9      Q. -- the phone and said, hey, guess what about
10  Mr. Stricker, he discriminates against Hispanics?
11     A. Well, not discriminates against Hispanics like
12  that but, you know, these things are happening, you
13  know.
14     Q. Well, didn't you find that unusual that each of
15  these people separately on their own would tell you
16  during the short conversation that Mr. Stricker was
17  discriminating against Hispanics?
18     A. I -- I didn't think much of it. I mean,
19  nothing unusual. I mean, it's kind of interesting how
20  these guys are going about like this.
21     Q. And despite the fact that these three or more
22  individuals told you that Mr. Stricker was
23  discriminating against Hispanics, you still wanted to go
24  to work for Arrow Truck in the Houston office?
25     A. That was my primary desire when I left Los

Page 100

1  Angeles.
2      Q. I understand that.
3          But for the first time ever, according to
4  your testimony today, you find out on December 6, 2006
5  after you sold your home that Mr. Stricker discriminated
6  against Hispanics. Didn't that bother you?
7      A. Yes and no. Because I -- I didn't -- as a
8  rule, I gave people the benefit of the doubt so...
9      Q. Well, did you have any reason to believe that
10  as of December 6, 2006 Mr. Loza, Ortiz or Sanchez would
11  have reason to believe -- I mean, strike that.
12          Did you have any reason to believe that as
13  of December 6th, 2006 Mr. Loza, Ortiz or Sanchez would
14  lie to you about Mr. Stricker?
15     A. I saw no reason for anybody to lie. I mean...
16     Q. When you talked to Mr. Stricker after you had
17  heard these negative comments about him from Sanchez,
18  Loza or Ortiz, did you ask him about your concerns?
19     A. No, I did not.
20     Q. Would you agree with me that at no time when
21  you had spoken with Mr. Stricker up through December 6th
22  and through the end of the day on December 6th that he
23  ever mentioned anything about you being Hispanic or
24  Latino?
25     A. No. I believe I even told him where I was from

Page 101

1  before. If not that day, before, possibly May.
2      Q. Other than you bringing up the fact where you
3  were from, did Mr. Stricker say anything to you to
4  inquire about your national origin or background?
5      A. Not that I recall.
6      Q. Had he said anything to you that made you
7  believe that he was discriminating you by not hiring you
8  on that date because you were Hispanic?
9      A. I didn't get the feeling he was doing that, no.
10     Q. When did you form the opinion that Mr. Stricker
11  had discriminated -- had not -- strike that.
12          When did you form the opinion that you
13  weren't hired at Arrow Truck in the Houston branch
14  because you were Hispanic?
15     A. I don't recall that.
16     Q. Have you ever formed that opinion?
17     A. Well, I was -- I was disappointed that I was
18  not able to get a job. I had no idea why. I --
19     Q. But what I'm asking you, Mr. Guzman, have you
20  ever formed the opinion that the reason you weren't
21  hired by Mike Stricker in the Houston office was because
22  you were Hispanic?
23     A. I wasn't sure of it, thought of it, but it
24  would have been in the subsequent months, you know,
25  after January when I -- when I knew then that I couldn't

KEVIN J. BRUZEWSKI, CSR
NELL MCCALLUM & ASSOCIATES, INC.

3a3e1dd9-a14e-467b-80c3-b8f6cecbda5c

Page 102

1   work there.
2       Q. Right.
3       A. For sure it was a fact now that I had to go to
4   work and I was in town, I had to pay bills and I was not
5   working at there but...
6       Q. Have you ever formed the opinion that the
7   reason -- the only reason you weren't hired at Arrow
8   Truck in Houston was because you were Hispanic?
9       A. Not -- not the only reason, no.
10      Q. When you went back -- strike that.
11          On December 6th after you spoke with
12  Mr. Stricker, you understood that there wasn't a job
13  available at that time in the Houston office?
14      A. Exactly.
15      Q. And Mr. Stricker told you that when you finally
16  moved to Houston to come back and interview with him?
17      A. Exactly.
18      Q. And that if there was a job position open at
19  that time, he would talk to you about that open
20  position?
21      A. Yes.
22      Q. When you went -- when you left Mr. Stricker's
23  office, you then went to either Freightliner or Truck
24  Nation to apply for a job?
25      A. That's right.

Page 103

1       Q. And that is because you understood that you
2   didn't have a job at Arrow Truck at that time?
3       A. That I had to do something, yes.
4       Q. And did you?
5       A. Look at alternatives.
6       Q. Right. Did you get a job offer from either
7   Freightliner or Truck Nation on December 6, 2006?
8       A. Freightliner said no. If you -- when you move
9   here, come back and see how many people I have because I
10  have too many sales people so he said no.
11          The other gentleman said I could probably
12  use you when we move to the new place so I said, well,
13  at least I have something that I could possibly use.
14      Q. So you understood from at least Mr. Stricker
15  and someone from Freightliner that until you actually
16  came to Houston and were leaving there, it was difficult
17  to give you a job?
18      A. Yes, that's what I understood.
19      Q. Now, when you met with Mr. Stricker on
20  December 6, 2006, did he give you the names of any
21  places in the Houston area where you could look to apply
22  for a job?
23      A. I believe he mentioned this gentleman from
24  Freightliner and might have given me another couple of
25  names.

Page 104

1       Q. Did you think that was very helpful of
2   Mr. Stricker to give you names of other places to go
3   look for a job in Houston when you were talking to him?
4       A. Yes, I did.
5       Q. Did you follow-up on Mr. Stricker's suggestions
6   and contact those places that he gave you?
7       A. I told him that Ken had already given me, you
8   know, Freightliner's number and I was going to try --
9   you know, I think I might have mentioned to him that I
10  was going to try Truck Nation because that's -- being
11  how I am, I probably mentioned it. That day, though, I
12  didn't go anywhere else.
13      Q. But in addition to the names of Freightliner
14  and Truck Nation, you told us that Mr. Stricker gave you
15  a couple of other names of companies to go apply to?
16      A. Not in December. I think that happened in
17  January when he gave me the other name because I --
18      Q. Once you got back to L.A., did you talk to
19  Mr. MacDaniel about your conversations with Mr. Stricker
20  on December 6, 2006?
21      A. I believe I may have and said, you know, how he
22  told me that he didn't have room for me. But I said
23  since I sold my house and I bought a house over there,
24  I'm moving one way or another.
25      Q. Right. You were going to move regardless of

Page 105

1   whether or not you had a job at Arrow Truck; is that
2   correct?
3       A. Yeah, I had already committed by purchasing a
4   home.
5       Q. Did you ask Mr. MacDaniel to contact
6   Mr. Stricker after the December 6th meeting to help you
7   get a job at the Houston branch?
8       A. No, sir, I did not.
9       Q. Did you contact Mr. Kosic and ask him after
10  your December 6th meeting to see whether or not he could
11  help you get a job at the Houston branch?
12      A. No, I did not.
13      Q. Between the December 6th meeting and when you
14  moved to Houston in January of 2007, did you have any
15  telephone conversations with Mr. Stricker?
16      A. No, sir. I don't recall calling him, no, not
17  until I was in town.
18      Q. Okay. And when did you move with your family
19  to Houston?
20      A. As a matter of fact, my house -- my family
21  moved -- I brought them and left them and I went back to
22  Los Angeles for a couple of weeks. So they were here at
23  the beginning about of the year when I came on the 21st.
24      Q. Did the move kind of coincide with your family
25  to Houston on Christmas break?

27 (Pages 102 to 105)

Page 106

1      A. Exactly.
2      Q. So that they could start school at the
3   beginning of the new year?
4      A. Right. I was thinking of that.
5      Q. When do you recall that you officially moved to
6   Houston and were available for employment?
7      A. Personally I moved on the 21st of January.
8      Q. 2007?
9      A. Yes.
10     Q. And then once you moved to Houston on
11   January 21st, 2007, how long after that before you
12   contacted Mr. Stricker about employment?
13     A. I think it was toward the end of January. The
14   30th, if you want to put a date or, you know, at the end
15   of January, possibly the first week of February --
16     Q. Okay.
17     A. -- you know.
18     Q. And did you call Mr. Stricker on the phone
19   and --
20     A. Yes.
21     Q. -- talk to him?
22     A. I called him on the phone.
23     Q. Did you actually go back in to Arrow Truck in
24   January or February 2007 and meet with Mr. Stricker?
25     A. In February I went back.

Page 107

1      Q. So let's talk about January. The January --
2   late January 2007 call would have been the only
3   conversation you had with Mr. Stricker after your
4   December 6 meeting; is that correct?
5      A. Right.
6      Q. All right. So what was said during this late
7   January 2007 telephone call with Mr. Stricker?
8      A. Well, I'm in town now, I -- I remember saying
9   and I'd like to come in and see, you know, if we can
10   talk or something along those lines.
11     Q. Okay. Is that all you can recall saying to
12   Mr. Stricker?
13     A. I believe that's basically what I could have
14   said.
15     Q. And what did Mr. Stricker say to you during
16   that telephone conversation?
17     A. Come and see me then, you know, when you can,
18   when you got settled and --
19     Q. Did Mr. Stricker say or do anything to persuade
20   you not to come see him after you moved to Houston?
21     A. No, he did not.
22     Q. Between December 6 and when you moved to
23   Houston on January 21st, 2007, did you have any other
24   conversations with Mr. Sanchez, Mr. Ortiz or Mr. Loza in
25   any manner?

Page 108

1      A. No. I didn't have their numbers or anything,
2   no.
3      Q. When you came to Houston on January 21st, 2007
4   did you call any of those three individuals about
5   finding or seeking employment at the Arrow Truck
6   location?
7      A. No.
8      Q. So other than Mr. Stricker telling you on this
9   phone call in late January or early February 2007 to
10   come in and see him when you get settled, did he say
11   anything else during that conversation to you that you
12   can recall at this time?
13     A. He might have said I still have plenty of
14   salesmen.
15     Q. Had anyone said anything to you or told you
16   that Arrow Truck didn't have too many salesmen at that
17   time?
18     A. No. He didn't ask anybody about that.
19     Q. So you had no reason to --
20     A. Dispute.
21     Q. -- not believe Mr. Stricker when he told you
22   that, did you?
23     A. Exactly, no reason.
24     Q. So you went and met with Mr. Stricker.
25        When did that meeting take place?

Page 109

1      A. Could have been second week of February or
2   maybe a few days after I talked to him.
3      Q. Was this the last meeting you would have had
4   with Mr. Stricker in person, this meeting in February of
5   2007?
6      A. No, because I visited on a few other occasions.
7      Q. Okay. And the second week of February, did you
8   meet with Mr. Stricker once again in his office at the
9   Arrow Truck branch?
10     A. Yes, I did.
11     Q. And was anyone present during that meeting
12   besides you and Mr. Stricker?
13     A. No, nobody else.
14     Q. Did you make any notes or written documentation
15   of your conversation with Mr. Stricker on that date?
16     A. No, I did not.
17     Q. How long did that meeting with Mr. Stricker in
18   February of 2007 last?
19     A. 15, 20 minutes. I mean, maybe 10.
20     Q. Was Mr. Stricker polite to you?
21     A. He was.
22     Q. Did he say --
23     A. I mean, he was never impolite so...
24     Q. Did Mr. Stricker say or do anything during your
25   meeting with him in February of 2007 that you felt was

28 (Pages 106 to 109)

## Page 110

1  inappropriate or offensive in any manner?
2    A. I don't recall anything being, you know,
3  offensive or inappropriate, no.
4    Q. What did Mr. Stricker tell you during that
5  February 2007 meeting?
6    A. He told me, again, as you know, I still have
7  many salesmen and if you want to -- that's when I was
8  saying that he told me about other places that, you
9  know, I can try and see if anybody would hire or people
10  would be hiring.
11    Q. Did he say anything else that you can recall?
12    A. No, I don't remember anything else.
13    Q. So Mr. Stricker volunteered to call other
14  places on your behalf to help you find employment?
15    A. That's right.
16    Q. Do you think that was very helpful?
17    A. Yes, I thought so.
18    Q. Do you think it was very nice of Mr. Stricker
19  to offer to do that?
20    A. Yes.
21    Q. Do you know whether or not Mr. Stricker made
22  those calls on your behalf to other places?
23    A. I believe he called someone while I was there.
24    Q. And do you know whom or who Mr. Stricker
25  called?

## Page 111

1    A. No, sir, I don't remember. I don't recall.
2    Q. Did that call result in a lead for you to go
3  someplace to look for a job?
4    A. I think they were not hiring anybody or, if I
5  recall that.
6    Q. And in February of 2007, was the used truck
7  business pretty much in a decline at that time?
8    A. It was.
9    Q. And a lot of companies were laying off their
10  sales people because of the decline in sales?
11    A. No, not at the time. I think it was too early
12  to do that. They were not hiring.
13    Q. And that just wasn't Arrow Truck, there were
14  other companies who weren't hiring any sales people
15  because of the decline in sales of used trucks; correct?
16    A. Most of them were just like that, not hiring.
17    Q. And that's because the used truck business was
18  in decline at that point in time?
19    A. Compared to previous years, it was not -- we
20  were not selling as much as the previous years. Still
21  selling well but the previous years were so good.
22    Q. But you observed that companies weren't hiring
23  new sales people at that time because of how business
24  had declined from previous years?
25    A. Yes.

## Page 112

1    Q. Now, did Mr. Stricker in addition to making
2  this phone call to you for a prospective employer also
3  give you the names of companies you could contact to
4  look for a job?
5    A. I believe he mentioned, but I don't remember
6  who or -- but I know that he could have told me I know
7  other people that I could try and see if they would be
8  hiring.
9    Q. Did you follow-up on the leads that you
10  received from Mr. Stricker and contact those companies
11  about seeking employment?
12    A. I believe I may have. It's so long ago, I
13  don't recall exactly, but I wanted to find out and see,
14  you know, if they were so...
15    Q. And if you had contact with the people or
16  companies that Mr. Stricker had told you about, where
17  you told that those companies weren't hiring new sales
18  people either?
19    A. Basically that's what I was told, they were not
20  hiring.
21    Q. How long after you moved to Houston before you
22  found your first job?
23    A. I went to Truck Nation and I said I'm here now
24  and said, well, we're not moving yet. And -- but if --
25  but if -- you know, if you want to, you can go ahead and

## Page 113

1  come and start. So I started toward the latter part of
2  February, about a week later after possibly me seeing
3  him so...
4    Q. So basically after you moved to Houston and
5  were ready to start looking for a job, there was about a
6  two-week time period where you didn't have a job?
7    A. Right.
8    Q. And when you started working for Truck Nation,
9  you were making about $4,000 a month?
10    A. Yeah, because he was giving me a thousand a
11  week.
12    Q. So if he was giving you a thousand a week, can
13  we agree that's about $52,000 a year?
14    A. Total, yes.
15    Q. All right. Now, when you went back to the
16  Houston office on -- in February of 2007, did you have
17  any other conversations with Mr. Loza, Ortiz or Sanchez
18  on that date about Mr. Stricker?
19    A. I believe I did. And that's when I was sitting
20  here while I was talking to you, I said timeline wise.
21  If -- because I went so many times to the store, always
22  said hi to these guys. It blurs the dates as if those
23  things were said to me in December or in February or in
24  March, you know, or a combination of a follow-up to or
25  so it's hard to say, okay, in February for sure they

29 (Pages 110 to 113)

Page 126

1    A. I don't recall asking them if they would tell
2  me where could I, you know, get a job if I --
3    Q. Do you recall them volunteering the names of
4  any places for you to go look for employment?
5    A. I think one or two guys said have you tried,
6  you know --
7    Q. Do you recall?
8    A. -- this place, have you tried this place but
9  that's --
10    Q. Do you recall which of those gentlemen would
11  have told you where to apply and where they told you to
12  apply?
13    A. Either Loza or Ortiz. And I don't know if
14  Texas Truck Center was one of them or -- so many names
15  and I don't remember any specifics.
16    Q. From February of 2007 through September
17  of 2007, did Mr. Loza, Ortiz ever mention to you
18  Mr. Gibbs, Mr. Torres or Mr. Sanchez?
19    A. No, I believe not.
20    Q. Would it be correct that prior to the filing of
21  this lawsuit you had never heard about John Gibbs, Julio
22  Sanchez or Juan Torres?
23    A. That is correct.
24    Q. In September of 2007, if you had a conversation
25  with Mr. Stricker, did that take place at his office?

Page 127

1    A. If we did, it would be at his office, yes.
2    Q. And how long did that conversation take place?
3    A. Five minutes, two minutes.
4    Q. And during that conversation, what did
5  Mr. Stricker tell you?
6    A. I think I -- if I recall, I was not asking for
7  a job but asking for anybody that I could go ahead and
8  contact perhaps --
9    Q. Okay.
10    A. -- or if that was the extent of the
11  conversation.
12    Q. Do you recall ever asking Mr. Stricker during
13  that September 2007 conversation if he would hire you?
14    A. I don't recall asking if he would hire me.
15    Q. Did Mr. Stricker give you the names of other
16  places that you might go apply for a job in the used
17  truck industry?
18    A. I think it was American Truck Center or
19  something like that that I think I went because he
20  mentioned it.
21    Q. Did Mr. Stricker say anything during this
22  conversation of September of 2007 that you felt was
23  offensive or inappropriate in any manner?
24    A. No.
25    Q. Was Mr. Stricker being helpful in your opinion

Page 128

1  when you talked to him in September of 2007?
2    A. Yes, he was.
3    Q. Wasn't it true, Mr. Guzman, that each and every
4  time you spoke with Mr. Stricker he was polite and
5  courteous to you?
6    A. Yes.
7    Q. To the best of your knowledge between
8  February 2007 and September of 2007, had Arrow Truck
9  hired any other employees?
10    A. I was not aware of who was hired or who was
11  not. I knew that -- that Chet Lawrence had come in and
12  I seen some other guy that was there what I went by, so
13  I knew that guys were hired. I wondered why I was not
14  hired but --
15    Q. Did you ever --
16    A. -- but that was the whole extent of it. I
17  didn't think --
18    Q. Did you ever ask Mr. Stricker why you weren't
19  being hired?
20    A. I don't recall asking him, no.
21    Q. When you moved from L.A. to Houston, did your
22  customer base also move with you to the Houston area?
23    A. No, sir. Those remain wherever you leave them.
24    Q. So you understood that when you moved to the
25  Houston area and got involved in the used truck sales,

Page 129

1  you would have to build up your business from scratch?
2    A. Correct.
3    Q. And from the very bottom?
4    A. Uh-huh.
5    Q. To where you could develop your own customer
6  list?
7    A. Yes.
8    Q. And you understood that because you were going
9  to have to develop your own customer list, that your
10  income, at least initially, wouldn't be as good as when
11  you had your own customer base and customer list in the
12  Los Angeles area?
13    A. Right. I have to agree, yes.
14    MR. JOHL: My hour of time -- let's take a
15  break. I need to feed myself.
16    VIDEOGRAPHER: We're off the record. It is
17  12:13 p.m. This is the end of videotape No. 3.
18    (Lunch Recess from 12:13 to 1:14 p.m.)
19    VIDEOGRAPHER: We're on the record. It is
20  1:14 p.m. This is the beginning of videotape No. 4.
21  BY MR. JOHL:
22    Q. Mr. Guzman, we just took a lunch break.
23    Is there anything from the testimony you
24  previously gave us this morning that you would like to
25  change or amend in any manner?

33  (Pages 126 to 129)

3a3e1dd9-a14e-467b-80c3-b8f6cecbda5c

Page 130

1    A. No, sir.
2    Q. We were talking about the time period between
3  February and the end of June 2007.
4        Do you recall that?
5    A. Yes.
6    Q. During that time period of February to June
7  of 2007, did Mr. Loza, Ortiz or Sanchez ever tell you
8  that the reason you weren't hired by Mike Stricker or
9  Arrow Truck in the Houston branch was because you were
10 Hispanic?
11   A. I don't recall.
12   Q. During the time period of February through
13 June 6, 2007, did you ever form the opinion that Mike
14 Stricker didn't hire you because you were Hispanic?
15   A. I had no reason to, so I did not.
16   Q. With respect to -- you told us after you were
17 terminated from your employment at Sweeten Trucks you
18 contacted Mike Stricker and you had a conversation with
19 him for about two to five minutes?
20   A. Okay.
21   Q. Did you ever meet or talk to Mike Stricker
22 after that conversation again about employment?
23   A. No. And I believe that conversation was not
24 about employment then.
25   Q. Would it be correct to say then that after

Page 131

1  February of 2007, you never spoke with Mike Stricker or
2  anyone else at Arrow Truck in the Houston branch where
3  you asked to obtain a job or to be employed?
4    A. To the best of my recollection, that's correct.
5    Q. You state in your lawsuit, sir, in paragraph
6  25, the last sentence in paragraph 25, soon thereafter
7  defendants, Arrow's branch manager, hired a white
8  salesman.
9        Do you know who that white salesman would
10 be?
11   A. No, not by name.
12   Q. Do even know whether or not Arrow Truck hired a
13 white salesman after February of 2007?
14   A. I knew people were there when I came in.
15   Q. When you say they were there, were they --
16   A. Additional people from people who I didn't know
17 that from previous visits.
18   Q. But you don't know when those people had been
19 hired?
20   A. Not specifically, sir, no.
21   Q. I'm going to show you, sir, what the court
22 reporter is going to mark as Guzman deposition
23 Exhibit 2.
24       (Exhibit No. 2 marked.)
25 BY MR. JOHL:

Page 132

1    Q. Mr. Guzman, I'm going to represent to you that
2  deposition Exhibit 2 it's your answers and objections to
3  Arrow Trucks first set of interrogatories.
4        Do you see that?
5    A. Yes, sir.
6    Q. And then if you turn to Page 12 of deposition
7  Exhibit 2, is that your signature?
8    A. Yes, sir.
9    Q. And these are your sworn answers to the
10 interrogatory questions that were served upon you by
11 Arrow Truck?
12   A. Yes, sir.
13   Q. And the answers are dated March 19, 2009?
14   A. Correct.
15   Q. Did you review your interrogatory answers
16 before you signed the verification page?
17   A. As I recall, I did.
18       MS. CORNELL: I'm going to interrupt just a
19 minute, Justin. Ours has notes on it.
20       MR. JOHL: Oh, can I have that back then?
21       MR. STRICKER: So does mine.
22       THE WITNESS: So does this.
23       MR. STRICKER: So did your first --
24       MR. JOHL: Okay. My first one did?
25       MR. STRICKER: Yeah.

Page 133

1        MR. JOHL: Let me -- there's nothing there.
2  I'm sorry about that. I apologize. Okay. Go to plan
3  B.
4        MR. STRICKER: Should we call Kevin right
5  now?
6        MR. JOHL: No.
7  BY MR. JOHL:
8    Q. I'm going to ask you some questions about your
9  interrogatory answers.
10       You do recall receiving them and signing a
11 verification page?
12   A. Yes, sir.
13   Q. And I'm going to withdraw deposition Exhibits 1
14 and 2 and I will replace them with copies that do not
15 have anything written on there.
16       MR. JOHL: Is that all right with Counsel?
17       MR. SANCHEZ: That's fine.
18 BY MR. JOHL:
19   Q. You stated in your interrogatory answers that
20 when you worked for the Los Angeles branch that you were
21 earning approximately 5,000 to $6,000 a month in
22 commissions.
23       Would it be correct to say that as of the
24 time your employment was terminated with Arrow Truck,
25 you were only earing about $4,000 a month from Arrow

Page 142

1    A. No, I did not say that.
2    Q. Okay. At the time that you told Mr. Stricker
3  that Mr. Loza and Mr. Ortiz had contacted you, did you
4  feel personally that Mr. Stricker had done anything
5  wrong towards you?
6    A. I actually didn't like the fact that I didn't
7  get to work at Houston. Didn't quite understand why.
8  And after speaking to my wife, I says it is not
9  Mr. Stricker here, you know, it would be Arrow, I said
10 we ain't got the case, you know.
11   Q. Okay. But other than the fact that you think
12 it's Arrow not Mr. Stricker, as of the time you had that
13 conversation with Mr. Sticker and you told him that
14 Mr. Ortiz and Mr. Loza wanted you to file a lawsuit, did
15 you feel that Mr. Stricker had done anything wrong to
16 you personally?
17   A. Well, when he told me that I ought to get hired
18 no matter where I went in America wherever Arrow had a
19 office or a branch because of my experience, I thought
20 that I should have been hired.
21   Q. Right. And did you tell us repeatedly this
22 morning that Mr. Stricker had told you that they had
23 hired people during the time period you were still
24 working in Los Angeles and that you believed him?
25   A. Yes.

Page 143

1    Q. And that they had hired sales people and they
2  had too many sales people on staff at the time you were
3  finally able to move to Houston?
4    A. Yes, but salesmen come and go all the time.
5    Q. Okay. And isn't it true, sir, that after you
6  were told by Mr. Stricker in February of 2007 that there
7  wasn't a job available at that time, you never contacted
8  Mr. Stricker again about employment at Arrow Truck in
9  the Houston branch?
10   A. Not that I recall.
11   Q. What was it that stopped you to going back to
12 Mr. Stricker at Arrow Truck after you were terminated
13 from your employment at Nations Truck?
14   A. Because I got the offers from Sweeten Truck
15 Center immediately.
16   Q. So you decided to take the offer from Sweeten
17 Trucks because it had a guaranteed salary, didn't you?
18   A. Yes.
19   Q. And you wanted to have a guaranteed salary
20 rather than go to work for a company like Arrow Truck
21 where the majority of your compensation would be based
22 upon commissions; is that correct?
23   A. At this point in time I would have worked at
24 Arrow if Arrow had hired me because I knew what I was up
25 against.

Page 144

1    Q. But how could Arrow hire you if you don't go
2  apply for a job after February of 2007?
3    A. That's what I'm trying to remember. If I
4  absolutely did not go any more or if I did because --
5    Q. Well, you've told us repeatedly that you did
6  not go back.
7    A. That I did not.
8    Q. So the answer to my question is --
9    A. Yes.
10   Q. -- how could they hire you if you don't apply
11 for a job?
12       MR. SANCHEZ: Wait. Wait. Wait. Let him
13 finish his answer.
14       MR. JOHL: Okay.
15   A. I just -- I can't remember if I actually
16 specifically in one of those occasions that I visited
17 the store I said, hey, have you got anything.
18 BY MR. JOHL:
19   Q. You can't recall, as we sit here, actually
20 making that statement, can you, Mr. Guzman?
21   A. Specifically after February, I know that I was
22 working at this place I did not, but after or in between
23 Truck Nation and Sweeten, did I ask him? I can't really
24 recall if I specifically asked him.
25   Q. Well, why would you contact Mr. Stricker for a

Page 145

1  job after Truck Nations when you had already been
2  offered a job at Sweeten?
3    A. No. Not Sweeten I not -- Sweeten wasn't
4  immediate. I went to Sweeten because they had asked me
5  a couple of weeks before and I was let go at Truck
6  Nation so in between that time because I didn't work at
7  Sweeten immediately or three weeks later so, I -- in
8  that three week period.
9    Q. Okay. As we sit here, and you're under oath,
10 can you recall contacting Mr. Stricker at Arrow Truck
11 between the time you were let go at Truck Nations and
12 the time you took a job at Sweeten?
13   A. I don't really recall --
14   Q. Okay.
15   A. -- specifically.
16   Q. After you were terminated from your employment
17 with Sweeten Trucks, did you go back to Mr. Stricker and
18 ask him for a job?
19   A. I don't think I did.
20   Q. When you were terminated from the Honda
21 dealership, did you go back to Arrow Truck and ask for a
22 job?
23   A. No. I quit Sterling McCall. I did not --
24   Q. Okay.
25   A. -- go to Arrow.

37 (Pages 142 to 145)

Page 146

1    Q. We do know that when you were employed by
2  Empire Waste you felt comfortable enough to go back and
3  ask Mr. Striker if Arrow Truck would change its account
4  over to you while you were working at Empire Waste; is
5  that correct?
6    A. Yes. I went to many businesses in the
7  neighborhood and I stopped in there.
8    Q. After you -- your employment ended with Empire
9  Waste, did you go back to Mike Stricker and ask for a
10 job?
11   A. Not that I recall.
12   Q. Prior to filing your lawsuit, had you ever
13 contacted anyone at Arrow Truck in management and told
14 them that you felt the reason you hadn't been hired by
15 Mike Stricker in the Houston office was because you were
16 Hispanic?
17   A. No, I did not contact anyone.
18   Q. You stated -- if you look at interrogatory
19 No. 7 which is Page 6, sir, of deposition Exhibit 2.
20   A. Okay.
21   Q. You stated that you had attempted for so long
22 to get onboard in Houston only to be put off over and
23 over again. You lost your confidence.
24      Isn't it true, sir, that the only time that
25 you were able to take a job in the Houston office would

Page 147

1  have been in late January, early February of 2007 after
2  you had moved to the Houston area with your family?
3    A. I could have taken it before but....
4    Q. You couldn't have started work before, you told
5  us, before you sold your house --
6    A. Sold, yeah.
7    Q. -- and moved your family; is that correct?
8    A. So it would have been in December.
9    Q. Right. But you didn't move --
10   A. Until January.
11   Q. Right. So you couldn't have started work until
12 late January, early February of 2007; isn't that true?
13   A. Yes.
14   Q. And when you said that you were being put off
15 over and over again, Mr. Stricker never put you off
16 before late January or early February of 2007, you just
17 weren't available to start work before then; isn't that
18 a true statement?
19   A. Before then, yes.
20   Q. Okay. You could not have started work?
21   A. I couldn't have.
22   Q. Pardon me?
23   A. I could not have started.
24   Q. When you bought your home in the Houston area,
25 I think you said you closed in December of 2006?

Page 148

1    A. The house was going to close, but it didn't
2  close until the first week of January or so.
3    Q. When you decided to buy the home the first week
4  of January -- strike that.
5       When you decided to sign a contract to
6  purchase the home in Houston --
7    A. Uh-huh.
8    Q. -- you did not have a job anywhere in the
9  Houston area; is that true?
10   A. Right. I was not working.
11   Q. And you had not been offered a job by anyone in
12 the Houston area?
13   A. I was just told that I could possibly get a
14 job.
15   Q. Right. And that's -- you were told that by
16 Mr. Stricker?
17   A. At that point in time by Mr. Stricker, yes, and
18 by Truck Nation.
19   Q. All right. And you understood that when you
20 signed that contract there was only a possibility that
21 you could get a job and not a guarantee that you had a
22 job?
23   A. Right.
24   Q. You said that you lost your confidence.
25      Has your confidence been restored?

Page 149

1    A. A little bit, you would say.
2    Q. Well --
3    A. But it's been difficult living in Houston.
4    Q. Wasn't your confidence restored when you were
5  hired by Truck Nations in early February of 2007?
6    A. You could say yes; not what I was looking for,
7  you know. It's not what I knew, it's not what I was
8  comfortable with, it's not a setting that I wanted to be
9  in.
10   Q. Well, what was different about the setting at
11 Truck Nations versus the situation at the Arrow Truck
12 Houston branch?
13   A. At Truck Nation, $1,000 is all I could ever
14 make. The way they run the business is different, the
15 way they do things is different, the way that --
16 everything is different. It's totally different from
17 what I was accustomed to.
18   Q. Did you understand that no matter how
19 successful you were as a salesperson at Truck Nations,
20 the most you could make was a thousand dollars per
21 month?
22   A. That's correct.
23   Q. Did you ever apply anywhere else before you
24 took the job at Truck Nations to find the job based
25 solely on commissions?

38 (Pages 146 to 149)

Page 158

1   Volvo stock.
2         Is that from when you worked for Sweeten
3   Trucks?
4       A. No, sir.  From Arrow Truck Sales I had stock.
5       Q. All right.  And did you and your wife make a
6   decision that you were going to sell your Volvo stock?
7       A. No.  I believe Volvo itself did the -- I don't
8   know what they call it.  And so they sent me a check
9   minus taxes.
10      Q. Do you understand or did you understand that at
11  the time you left your employment with the Los Angeles
12  Arrow Truck branch that any stock you owned in the
13  company would be purchased by Volvo upon your
14  termination of employment?
15      A. If it was so, I don't recall, but apparently
16  that's what happened.
17      Q. And did you ever check into it and find out why
18  Volvo sent you a check for the stock?
19      A. No, sir.
20      Q. And so you received the money from Volvo for
21  the purchase of your stock; correct?
22      A. Yes.
23      Q. And you don't know whether or not that was a
24  condition of your employment with Arrow Truck?
25      A. No, I don't recall.

Page 159

1       Q. You stated that you weren't hired by Houston
2   Freightliner.
3         Did you ever form the opinion that you
4   weren't hired at Houston Freightliner because you were
5   Hispanic?
6       A. No, sir.
7       Q. You went to Peterbilt, you said, in September,
8   October of 2007 and were told that they had just hired
9   someone.
10        Did you believe that Peterbilt didn't hire
11  you because you were Hispanic?
12      A. No, I didn't.  I have no reason to.
13      Q. Do you believe as we sit here today that the
14  reason Mr. Stricker didn't hire you is because you're
15  Hispanic?
16      A. I have reasons to believe.
17      Q. And what are those reasons?
18      A. That people were hired after I was told no, too
19  many people, no; next visit, no; let's talk about it
20  later.
21      Q. And do you know who those people are?
22      A. No, sir.  I never went as far as find out who
23  was --
24      Q. So is it your testimony to the jury as we sit
25  here today that after you asked Mr. Stricker for a job

Page 160

1   in late January or early February 2007, Arrow Truck had
2   not hired anybody else except for a Hispanic person?
3       A. Possibly but --
4       Q. Do you know?  Is that your testimony?
5       A. Say that again?
6       Q. Is it your testimony that after you asked
7   Mr. Stricker for a job in late January or early February
8   of 2007, the only person Mr. Stricker could hire was a
9   Hispanic person?
10      A. Hispanic?  I'm not sure.  I don't know.
11      Q. If Mr. Stricker had hired someone after January
12  or February of 2007 that had previously worked in the
13  Houston branch of Arrow Truck, do you believe that was
14  improper for Mr. Stricker to do?
15            MR. SANCHEZ: I'm going to object to that
16  because he has no way of knowing what Mr. Striker's
17  reasons for or against hiring.  It's totally speculative
18  with respect to why he did or why he didn't do it.
19  BY MR. JOHL:
20      Q. If you have an answer, you can answer.
21      A. No.  I have no idea.
22      Q. Well, from your own personal experience in
23  working in the Los Angeles branch and the Fontana
24  branch, would you agree with me that former employees of
25  the branch make for good employees?

Page 161

1       A. Sometimes.
2       Q. Okay.  I mean, just like you were hired by
3   Mr. Bruce Brancato after you were hired from the Fontana
4   branch, do you believe that was a good decision by
5   Mr. Brancato to hire you back?
6       A. Yes.
7       Q. And you've seen that with other people as well;
8   correct?
9       A. I have.
10      Q. I want to turn your attention to Page 9 of your
11  interrogatory answers.
12      A. Okay.
13      Q. We're looking at interrogatory No. 11, but at
14  the top of the page you see No. 9?
15      A. Yes.
16      Q. And you stated that you left your resume with
17  several dealers in the Houston area but no one was
18  hiring?
19      A. Yes.
20      Q. Is the reason no one was hiring at that time
21  because of the economy and because of the decline in the
22  sales of used trucks?
23      A. I wasn't sure.  All I know was they had a lot
24  of salesmen is what they were saying and they were not
25  hiring anybody because they didn't need anybody.

41 (Pages 158 to 161)

KEVIN J. BRUZEWSKI, CSR
NELL MCCALLUM & ASSOCIATES, INC.

3a3e1dd9-a14e-467b-80c3-b8f6cecbda5c

Page 174

1   income went down by 13,000 in that one year?
2       A. I don't --
3       Q. Okay.
4       A. -- have an explanation. No, I don't recall
5   why.
6       Q. Then let me show you -- go ahead.
7       A. Selling trucks -- oh, Fontana store might have
8   opened and began to go much stronger than us and so we
9   were losing a lot of business to them.
10      Q. Well, we know the Fontana store opened in 2000
11  because that's when you worked there; correct?
12      A. That's 2001. But it began selling more and
13  more and more and more while we were going down lower
14  and lower in Los Angeles.
15          MR. SANCHEZ: Just for the record, you
16  stated the difference with the number as 11,000, I think
17  it's 7,000.
18          MR. JOHL: You might -- if I made the wrong
19  math, whatever it is, it is.
20          THE WITNESS: 11,000.
21          MR. JOHL: I apologize.
22          MR. SANCHEZ: That's okay.
23          (Exhibit No. 5 marked.)
24  BY MR. JOHL:
25      Q. Then I'm going to show you what's been marked

Page 175

1   as deposition Exhibit 5, and purport to you this is your
2   income tax return for 2006, your last full year in Los
3   Angeles; is that correct?
4       A. Yes.
5       Q. And on your W-2 form which is on the front
6   sheet of the deposition Exhibit 5, it shows your wages,
7   tips at $48,619 which is similar to what you made in
8   2005?
9       A. Yes.
10      Q. So you had a flat year from 2005 to 2006?
11      A. Yes.
12      Q. And so for -- your salary had gone down about
13  $11,000 from the high in 2004 to 2006?
14      A. Yes. Well, by then it was 9.
15      Q. Pardon me?
16      A. By then it's 9,000 from one to the other.
17      Q. Well, in 2005 --
18      A. It is 11, but in 2006 to 2004.
19      Q. From 2006 to 2004 it's 11,000, your salary had
20  gone down; correct?
21      A. 9,000.
22      Q. $9,000?
23      A. Actually 8,500.
24          (Exhibit No. 6 marked.)
25  BY MR. JOHL:

Page 176

1       Q. I'm going to show you what's been marked as
2   Guzman deposition Exhibit 6, and ask you if this is a
3   copy of your tax return for the year 2008?
4       A. Yes.
5       Q. And does that show your income for the years
6   being $59,501?
7       A. Yes.
8       Q. Is that all your income?
9       A. No, sir.
10      Q. And how much of that income was earned by you?
11      A. Mine was -- I think it is the 41,371.
12      Q. Would you agree with me that if you were
13  earning a thousand dollars a week from Coiling
14  Technologies, that was the same or a little bit more
15  than what you had earned the last two years while you
16  were working at Arrow Truck Sales in Los Angeles?
17      A. Yes, I would say.
18      Q. And the reason why you have only $41,371 of
19  income in 2008 is because you had several jobs at
20  different companies during that time period?
21      A. Correct.
22          MR. JOHL: Keep track of those for me.
23          MR. STRICKER: You got it, Mr. Johl.
24          (Exhibit No. 7 marked.)
25  BY MR. JOHL:

Page 177

1       Q. Okay. I've shown you what's been marked as
2   deposition Exhibit 7, and ask you is this an On Target
3   award for Arrow Truck in November of 2006?
4       A. Yes, sir.
5       Q. At the time that you had left your employment
6   with Arrow Truck in the Los Angeles branch, were you a
7   member of either the bronze, silver or gold level?
8       A. This year I was not.
9       Q. 2006 you were not?
10      A. No.
11      Q. And then if we look at the Los Angeles branch
12  of the -- there was six employees there at the time that
13  you left?
14      A. Yes.
15      Q. How many of those were Hispanics?
16      A. Tony, Jose, Eduardo and Dan, uh-huh, with me.
17  Five of us.
18      Q. So five of the six employees were Hispanics at
19  that company?
20      A. Yes.
21      Q. How many of those six employees were over the
22  age of 50 if you know?
23      A. Tony and Charles.
24      Q. And Tony is Velez, V-E-L-E-Z, and Charles
25  Schoenfeld, S-C-H-O-E-N-F-E-L-D; is that correct?

45 (Pages 174 to 177)

Page 178

1    A. Correct.
2    Q. And then if we look at the Fontana branch in
3  Los Angeles, how many of those employees were Hispanic
4  or other minorities that you're aware of?
5    A. Hispanic, Rene and Albert even though his name
6  is not --
7    Q. It's Rene, R-E-N-E, Delcid, D-E-L-C-I-D, is one
8  Hispanic?
9    A. Yes.
10   Q. How many others?
11   A. Jorge Moreno, Jorge Jiminez and Herbert Allen.
12   Q. Was Mr. Allen Hispanic?
13   A. Yes.
14   Q. And what about Mr. Singh, S-I-N-G-H?
15   A. No, he's from India.
16   Q. So would you agree with me of the seven
17  employees, five of seven are minorities?
18   A. Yes.
19   Q. And how many of those seven employees are over
20  the age of 50?
21   A. None.
22   Q. All right.  In looking at the Houston branch in
23  November of 2006, were all these people employed by
24  Arrow Truck as of the time that you were still working
25  for the Los Angeles branch?

Page 179

1    A. Yes, sir.
2    Q. And that was one, two, three, four, five, six,
3  seven, eight -- nine --
4    A. Yes.
5    Q. -- employees?
6      Do you have any reason to dispute if I were
7  to tell you that in May of 2006 the Houston branch had
8  11 employees at that branch?
9    A. If that's what the count on the Target award
10  is, that's correct.
11       COURT REPORTER'S NOTE:  (Telephone
12  ringing.)
13       (Discussion off the record.)
14  BY MR. JOHL:
15   Q. So from the time that you first told
16  Mr. Stricker that you wanted to go to work in the
17  Houston office until the time that you actually came to
18  Houston in December of 2006, the number of employees had
19  decreased in the Houston branch from 11 to 9; is that
20  correct?
21   A. That's correct.
22       COURT REPORTER'S NOTE:  (Telephone
23  ringing.)
24       (Discussion off the record.)
25  BY MR. JOHL:

Page 180

1    Q. And I want to direct your attention to in May
2  of 2006.  We have one, two, three, four, five, six,
3  seven, eight -- nine employees, sales people in the Los
4  Angeles branch; is that correct?
5    A. That's correct.
6    Q. And then in looking at deposition Exhibit 7,
7  the number of sales people went down to six; isn't that
8  true?
9    A. That is correct.
10   Q. So both the Houston and the Los Angeles branch
11  were letting people go or weren't hiring any new
12  employees during that time period you were wanting to
13  transfer to Houston; isn't that a correct statement?
14   A. People were quitting, however that may be.
15   Q. However --
16   A. There are less people.
17   Q. However that may be, there were less sales
18  people in both those offices; isn't that a true
19  statement?
20   A. Yes.
21   Q. And that was happening at the other Arrow Truck
22  branches as well; isn't that true?
23   A. I'm not aware of that.
24   Q. Well, if we look at the Toronto office --
25   A. Yes.

Page 181

1    Q. -- if I were to tell you that in May of 2006
2  there were ten employees but that on deposition
3  Exhibit 7 there were only eight employees in the Toronto
4  branch, would you have any reason to dispute that?
5    A. No.
6       COURT REPORTER'S NOTE:  (Telephone
7  ringing.)
8       MS. CORNELL:  Let's go off the record.
9       VIDEOGRAPHER:  We're off the record -- do
10  y'all agree to go off the record?
11       (Discussion off the record.)
12  BY MR. JOHL:
13   Q. If I were to purport to you that in May of 2006
14  the Atlanta branch had nine employees but on deposition
15  Exhibit No. 7 that the Atlanta branch only had five
16  sales people in November 2006, would you have any reason
17  to dispute that?
18   A. No, that's pretty accurate.
19   Q. I also want to talk to you about at the time of
20  November 2006 on deposition Exhibit 7 next to your name
21  on the Los Angeles column it says 193.
22       What does that mean?
23   A. It's the total points.
24   Q. Total points.
25       And if you look at the total points that

46   (Pages 178 to 181)

KEVIN J. BRUZEWSKI, CSR
NELL MCCALLUM & ASSOCIATES, INC.

3a3e1dd9-a14e-467b-80c3-b8f6cecbda5c

Page 182

1  you had as of November 19, 2006 and compare that to the
2  Houston branch, would it be correct to state the seven
3  of the salespersons in the Houston branch had
4  significantly higher numbers than you did?
5      A. Yes.
6      Q. And only two employees in the Houston branch
7  had worse numbers than you did in 2006 at that time?
8      A. Yes.
9      Q. And with respect to your sales, if we were to
10 compare your numbers as of November 2006, out of the
11 total sales representatives of all the Arrow Truck Sales
12 representatives employed at that point in time, you were
13 about at the 60 percent mark as to how you were doing in
14 sales?
15     A. I don't know that.
16     Q. Well, if we were to add up the numbers, if I've
17 done the numbers, if I found that you -- there were 66
18 of the salespersons doing better than you --
19     A. Okay.
20     Q. -- at the time that your employment ended in
21 2006 and only 50 doing worse --
22     A. Okay.
23     Q. -- would you have any reason to dispute those
24 numbers?
25     A. No, sir. This reflects points and that's what

Page 183

1  they are.
2      Q. And points are determined by the sales of
3  trucks; correct?
4      A. Yes. And actual amount of money made per truck
5  and actual, you know, income.
6      Q. But all the sales people are judged on the same
7  criteria at Arrow Truck as you were; correct?
8      A. Yes. I had more points in '05. Then '06, I
9  made more in '06 than in '05.
10     Q. I understand that.
11     A. Yeah.
12     Q. Well, you made about the same amount of money
13 in 2006 as you did in 2005.
14         It was less than $1,500 difference; isn't
15 that true?
16     A. But I had a lot more points in '05.
17     Q. Yes.
18     A. So its -- points are just depending upon the
19 trucks you sell, the type of truck you sell.
20     Q. But based upon the criteria that you knew you
21 were working under at Arrow Truck, you were about middle
22 of the road when it comes to sales?
23     A. On this particular years.
24     Q. And if you look -- we'll, I'm just going to
25 show you. I'm not going to mark this as an exhibit

Page 184

1  because I have notes on it.
2          This is an On Target award for May of 2006.
3  Do you see that?
4      A. Yes.
5      Q. And you see the Los Angeles branch in May when
6  you first called Mr. Stricker for a job --
7      A. Uh-huh.
8      Q. -- or to tell him that you were thinking about
9  moving, of the nine sales people in the Los Angeles
10 branch, four of the salesmen had better points than you
11 did at that point in time?
12     A. Yes.
13         (Exhibit No. 8 marked.)
14 BY MR. JOHL:
15     Q. Mr. Guzman, I've shown you or handed you what's
16 been marked as deposition Exhibit 8. And is this the On
17 Target award, the November 2006 truck ranking for all
18 salesmen in the retail section of Arrow Truck as of the
19 time that you were about ready to sell your home in Los
20 Angeles?
21     A. Yes, November 2006.
22     Q. And does this show your ranking on the
23 right-hand column as having 193 points?
24     A. Yes, sir.
25     Q. And all of the sales people on the left-hand

Page 185

1  side of the column had more points than you did?
2      A. Yes, sir.
3          (Exhibit No. 9 marked.)
4  BY MR. JOHL:
5      Q. I'm showing you what's been marked as
6  Deposition Exhibit 9.
7          And is this the On Target awards for
8  November of 2005?
9      A. Yes.
10     Q. And does it show on the left-hand column down
11 on the bottom that you had total points as of
12 November 2005 of 228 points?
13     A. Yes.
14     Q. Was the point system the same from year 2005 to
15 the year 2006?
16     A. To the best of my recollection.
17     Q. So in a year, your points have gone from 228 to
18 193?
19     A. Uh-huh.
20     Q. Is that a "yes"?
21     A. Yes, sir.
22     Q. So about a 10 percent decrease in the amount of
23 points you had from one year to the next?
24     A. Yes, sir.
25         (Exhibit No. 10 marked.)

KEVIN J. BRUZEWSKI, CSR
NELL MCCALLUM & ASSOCIATES, INC.

3a3e1dd9-a14e-467b-80c3-b8f6cecbda5c

Page 190

1   sale of used trucks?
2       A. Yes.
3       Q. Okay. If you go down to the column there where
4   it says Arrow Truck Sales.
5           Do you see that?
6       A. Uh-huh.
7       Q. Is that a "yes"?
8       A. Yes, sir, I have.
9       Q. You put down for your final salary a salary of
10  $75,000 a year.
11          Do you see that?
12      A. Yes, I see that.
13      Q. Is that your handwriting?
14      A. That is my handwriting.
15      Q. Is that a correct statement, sir?
16      A. I made up to $74,000 so...
17      Q. Well, in your --
18      A. My final would have been 50. Final, last year,
19  yes.
20      Q. When you filled out this application in 2007,
21  did you understand that when it says your final salary
22  at Arrow Truck it was talking about your last year
23  working at Arrow Truck?
24      A. I said my best year is this so I put that
25  but...

Page 191

1       Q. When looking at this particular document, does
2   it ask you what your best year was or your final salary?
3       A. It says final salary.
4       Q. And you knew at the time you filled this out
5   that your final salary at Arrow Truck was $50,000; isn't
6   that true?
7       A. Yes.
8           (Exhibit No. 11 marked.)
9   BY MR. JOHL:
10      Q. Mr. Guzman, I'm going to hand you what's been
11  marked as deposition Exhibit 11.
12          Is this an Arrow Truck Sales termination
13  form?
14      A. Yes.
15      Q. And at the bottom, do you see your signature on
16  that document?
17      A. Yes.
18      Q. And is this dated January 10th, 2007?
19      A. That's correct.
20      Q. Would this indicate to you about the last day
21  you worked at Arrow Truck?
22      A. Yes.
23      Q. If we go up, reason for termination, it says
24  ATS, which I am going to purport to you stands for Arrow
25  Truck Sales --

Page 192

1       A. Yes.
2       Q. -- and Michael Guzman are moving in a different
3   direction?
4       A. That's what it says there.
5       Q. Was this language written on the document at
6   the time you signed it?
7       A. I imagine it was, but I don't recall.
8       Q. Okay. Do you have any idea what it means that
9   you and Arrow Truck Sales are moving in a different
10  direction?
11      A. I guess I quit, right, so I had -- so something
12  had to be written.
13      Q. You had determined that you were going to
14  voluntarily leave the employment of Arrow Truck in Los
15  Angeles to move to find a job in Houston?
16      A. In Houston, right.
17      Q. And you understood that if you wanted to stay
18  at the Los Angeles branch, you were under no pressure to
19  quit at the time you decided to terminate your
20  employment?
21      A. Right.
22          (Exhibit No. 12 marked.)
23  BY MR. JOHL:
24      Q. I'm going to show you what's been marked as
25  No. 12, and ask you if this is a document from Sweeten

Page 193

1   Trucks?
2       A. Yes.
3       Q. And if we turn to Page 2 of the deposition
4   Exhibit 12, is your signature contained on that
5   document?
6       A. Yes.
7       Q. And is it dated September 5th, 2007?
8       A. Yes.
9       Q. Does it show that the reason for job separation
10  was unsatisfactory job performance?
11      A. Yes, that is written in there.
12      Q. Is that what you understood the reason why you
13  were being terminated from Sweeten Trucks as of
14  September 5th, 2007?
15      A. I remember the conversation sales were slow,
16  too many salesmen, I was the last one there, but I was
17  recommended for reassignment.
18      Q. Would it be correct to state, sir, you were
19  told that you were terminated because of an
20  unsatisfactory job performance and you signed off as
21  that being the reason why your employment was
22  terminated?
23      A. Yeah, I signed off on that. I see that.
24      Q. And does it also show that you had received
25  previous verbal written counseling or warnings prior to

49 (Pages 190 to 193)

KEVIN J. BRUZEWSKI, CSR
NELL MCCALLUM & ASSOCIATES, INC.

3a3e1dd9-a14e-467b-80c3-b8f6cecbda5c

Page 194

1    the date of separation?
2    A. It says I was and I don't recall, but more than
3    likely, you know, we were told we got to sell more
4    trucks, we got to sell more trucks. It was difficult to
5    sell them.
6    Q. You don't -- it was difficult to sell them
7    because of the economy; isn't that true?
8    A. I was selling Volvos and it was difficult to
9    sell Volvos where I was going, the territory I was
10   given.
11   Q. Okay. And so you're not disputing that you did
12   receive some type of counseling before you were
13   terminated for unsatisfactory job performance?
14   A. Right. I must have been told that, you know,
15   let's get more, let's get more.
16   Q. Other than being told that you had to sell more
17   trucks, were you given any other warnings or other
18   reasons at Sweeten Trucks?
19   A. Yes.
20   Q. What was that?
21   A. If I recall, it had something to do with some
22   forms, a credit app, I believe, that guys asked me to --
23   told me to get into a clearer form.
24   (Exhibit No. 13 marked.)
25   BY MR. JOHL:

Page 195

1    Q. I'm going to show you what's been marked as
2    deposition Exhibit 13.
3    Is the disciplinary action dated August 15,
4    2007?
5    A. Yes.
6    Q. And this is while you were employed at Sweeten
7    Truck?
8    A. While, yes.
9    Q. And is your signature on this document
10   deposition Exhibit 13 dated August 15th, 2007?
11   A. Yes.
12   Q. And it says disciplinary action taken.
13   Is the box that's marked second reminder?
14   A. Yes, it says second reminder.
15   Q. Would this indicate to you that you had been
16   previously counseled for some other reason while you
17   were employed at Sweeten Truck?
18   A. Yes.
19   Q. And do you deny that?
20   A. I don't deny it.
21   Q. All right. And then company policy, violated
22   the unauthorized modifications of corporate documents.
23   Was that the reason why you had this
24   counseling and disciplinary action taken against you?
25   A. Yes.

Page 196

1    Q. And it says the details of incidents you
2    changed corporate credit application and other forms
3    without authorizations; is that correct?
4    A. Yes.
5    Q. And did you, in fact, do that?
6    A. Yes. I edited a form to include a little more
7    space for things in the boxes to be -- how you say -- as
8    you fill them out better.
9    Q. And had you previously received a verbal
10   warning against doing that less than a week before then
11   on August 9, 2007?
12   A. I was.
13   Q. So even though you had received a verbal
14   warning some six days previously, you still went ahead
15   and changed corporate applications and other forms after
16   that?
17   A. I believe this was already done like -- I don't
18   recall specifically but --
19   Q. Well, you signed off --
20   A. -- that's what they said.
21   Q. Well, you signed off on this document, so I
22   assume that if it was incorrect, you would have changed
23   it, wouldn't you?
24   A. I don't remember the details of that, but
25   it's --

Page 197

1    Q. Do you have any reason to dispute what's
2    written on this document, sir?
3    A. Well, if I were to say no, no reasons.
4    Q. Were you also told that you could only use your
5    company computer for work related issues?
6    A. Yes, I see that.
7    Q. And then the consequences of the expectations
8    have not been met would be termination of employment?
9    A. Right. Yes, sir.
10   Q. And, in fact, that's what happened some three
11   weeks later you were terminated for unsatisfactory job
12   performance?
13   A. That's what -- that's what is written, yes.
14   (Exhibit No. 14 marked.)
15   BY MR. JOHL:
16   Q. I want to show you what's been marked as
17   deposition Exhibit No. 14.
18   Is this a copy of an On Target Award for
19   mid-November 2004?
20   A. Yes.
21   Q. And if we look under Michael Guzman on the
22   left-hand corner at the bottom, does it show you had 256
23   points as of that date?
24   A. Yes.
25   Q. And was the same point system in effect in 2004

50 (Pages 194 to 197)

**Page 198**

1  as it was in 2006?
2      A. To the best of my recollection, yes.
3      Q. So can we agree that from 2004 where you had a
4  total points of 256 that by two years later your sales
5  had decreased -- your points had decreased to 193?
6      A. Uh-huh.
7      Q. Is that a "yes"?
8      A. Yes, that's correct.
9      Q. So that would be somewhere about a 23 percent
10  decrease in your points over a two-year period?
11      A. Yes.
12      Q. In fact, it's closer to about a 25 percent
13  decrease in points in a two-year period?
14      A. Okay.
15          MR. JOHL: I want to take a quick break.
16          VIDEOGRAPHER: Off the record. It's 2
17  minutes after 3:00 p.m.
18          (Recess from 3:02 to 3:21 p.m.)
19          VIDEOGRAPHER: We're back on the record.
20  It's 3:21 p.m. This is the beginning of videotape
21  No. 6.
22  BY MR. JOHL:
23      Q. Mr. Guzman, I just have a few more questions I
24  want to ask you.
25          The first one is, since we last went off

**Page 199**

1  the record, is there anything about your testimony that
2  you would like to change or amend in any manner?
3      A. No, sir.
4      Q. At one point in time you told us about a
5  conversation you had with Mr. Stricker where you told
6  him that you had been contacted by Mr. Loza and/or
7  Mr. Ortiz.
8          Do you recall that?
9      A. Yes.
10      Q. Okay.
11      A. I do.
12      Q. During that conversation with Mr. Stricker, did
13  you tell him that you did not believe the claims of
14  either Mr. Loza or Mr. Ortiz?
15      A. I don't recall saying that.
16      Q. Okay. Did you tell Mr. Stricker during that
17  conversation that there was no merit to -- you did not
18  believe there was any merit to the claims of Mr. Loza or
19  Mr. Ortiz?
20      A. I didn't -- I did not say that. I don't recall
21  saying that.
22      Q. Can you think of any reason why if Mr. Stricker
23  was discriminating against you because you were Hispanic
24  that he would give you the names of other companies to
25  apply for or switch over the Arrow Truck service to

**Page 200**

1  Empire Waste because you called upon him?
2      A. Ask the question again?
3      Q. Well, if Mr. Stricker was discriminating
4  against you because you were Hispanic, do you know why
5  he would give you the names of other places to apply for
6  employment?
7      A. Since I wasn't going to work there, I don't
8  know, maybe he said, well, try here but I don't know --
9      Q. Not only --
10      A. -- specifically.
11      Q. Not only did Mr. Stricker give you the names of
12  places where you might try to apply for a job, but he
13  also called one or more places on your behalf, didn't
14  he?
15      A. I believe he called one, yeah.
16      Q. Okay. Can you think of any reason why he would
17  do that if he was discriminating against you because you
18  were Hispanic?
19      A. No, I don't know why.
20      Q. Did you say, no, I don't know why?
21      A. No, I don't know why.
22      Q. You told us about conversations with Mr. Ortiz.
23          He was the only person who contacted you
24  about becoming a plaintiff in this lawsuit?
25      A. Of the group, yes.

**Page 201**

1      Q. Yes.
2          Did you ever meet in person with Mr. Ortiz
3  before you decided to become a plaintiff in this
4  lawsuit?
5      A. Not that I recall. It was phone.
6      Q. And you said you had two conversations with
7  Mr. Ortiz; one where you told him you would think about
8  it with your wife?
9      A. Yes.
10      Q. And then the second one is you called him back.
11          Did you call him back and tell him you had
12  spoken to your wife about it?
13      A. I don't know if I called him or if he called me
14  to check back with me because he said he would. But in
15  the end, I told him I spoke with my wife and we agreed,
16  we're going to join.
17      Q. Was there only two conversations with Mr. Ortiz
18  before you decided to become a plaintiff in this
19  lawsuit?
20      A. I might have mentioned there was a third one
21  but it's hard to determine whether it was two. For sure
22  two, possibly three.
23      Q. Do you recall how much time had elapsed from
24  the first conversation with Mr. Ortiz until the second
25  conversation you had with him?

51 (Pages 198 to 201)

KEVIN J. BRUZEWSKI, CSR
NELL MCCALLUM & ASSOCIATES, INC.

3a3e1dd9-a14e-467b-80c3-b8f6cecbda5c