# Exhibit B
# Deposition of Plaintiff Rey Silva

1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

JESUS LOZA, ANTONIO      )
ORTIZ, JOHN GIBBS, JULIO )
SANCHEZ, MICHAEL A.      )
GUZMAN, SR., JUAN TORRES,)
REY SILVA,               )
                         )  CIVIL ACTION
          PLAINTIFFS,    )
                         )  NO.: 4:08 CV 2977
VS.                      )
                         )
                         )
ARROW TRUCK SALES, INC., )
                         )
          DEFENDANTS.    )

----------------------------------------

ORAL AND VIDEOTAPED DEPOSITION OF

REY CARDENAS SILVA

AUGUST 27, 2009

Volume 1

----------------------------------------

ORAL AND VIDEOTAPED DEPOSITION OF REY CARDENAS
SILVA, produced as a witness at the instance of the
Defendant, and duly sworn, was taken in the above-styled
and numbered cause on the 27th day of August, 2009, from
7:30 a.m. to 5:13 p.m., before Kevin J. Bruzewski, CSR
in and for the State of Texas, reported by machine
shorthand, at the law offices of Shook, Hardy & Bacon,
LLP, JPMorgan Chase Tower, 600 Travis, Suite 1600,
Houston, Texas 77002, pursuant to the Federal Rules of
Civil Procedure and the provisions stated on the record
or attached hereto.

**NMA
Compressed
Transcript**

KEVIN J. BRUZEWSKI, CSR
NELL MCCALLUM & ASSOCIATES, INC.

ARB-137792{B49-6-0071es

0089ba5d-218e-4d87-a06b-2aaa3aaa2179

## Page 2

APPEARANCES

FOR THE PLAINTIFFS:
   MS. CONNIE CORNELL
   Cornell, Smith & Mieri, LLP
   1607 West Avenue
   Austin, Texas 78701
   512.328.1540
   MR. TOMMY SANCHEZ
   1617 Fannin, Suite 1904
   Houston, Texas 77002-7652
   713.650.1114

FOR THE DEFENDANT ARROW TRUCK SALES, INC.:

   MR. JUSTIN JOHN
   Shook, Hardy & Bacon, LLP
   2555 Grand Boulevard
   Kansas City, MO 64108-2613
   816.474.6550

ALSO PRESENT:
   Mr. Mike Stricker
   Mr. Ken Courson
   Mr. Jay McClain, Videographer

## Page 3

INDEX

|  |  | PAGE |
|---|---|---|
| Appearances | | 2 |
| Stipulations | | 4 |
| REY CARDENAS SILVA | | |
| Examination by Mr. Johl | | 5 |
| Signature and Changes | | 354 |
| Reporter's Certificate | | 356 |

EXHIBITS

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Copy of email dated October 18, 2007 | 103 |
| 2 | Copy of email dated October 29, 2007 | 143 |
| 3 | Copies of emails | 143 |
| 4 | Copy of Charge of Discrimination | 163 |
| 5 | Copy of email dated May 30, 2008 | 178 |
| 6 | Copy of Plaintiff's Objections and Answers to Defendant's First Set of Interrogatories | 211 |
| 7 | Copy of 2006 US Individual Income Tax Return | 259 |
| 8 | Copy of 2007 US Individual Income Tax Return | 260 |
| 9 | Copy of 2008 US Individual Income Tax Return | 260 |
| 10 | Copy of handwritten notes | 262 |
| 11 | Copy of handwritten notes | 345 |
| 12 | Copy of Plaintiffs' Original Complaint | 346 |

## Page 4

PROCEEDINGS

   VIDEOGRAPHER: We're on the record at 7:30 a.m. Today is Thursday, August the 27th, 2009. It's the beginning of videotape No. 1.

   Would the court reporter please swear in the witness?

   COURT REPORTER: Stipulations for the record?

   MR. JOHL: None.

   **********

   REY CARDENAS SILVA, witness, having been first duly sworn, testified as follows, to-wit:

   EXAMINATION

BY MR. JOHL:

   Q. Can you please state your full name for the record?

   A. Rey Silva.

   Q. Do you have a middle name?

   A. I use my middle initial "C" for my mom's maiden name.

   Q. And what is that?

   A. Cardenas.

   Q. And how do you spell that?

   A. C-A-R-D-E-N-A-S.

## Page 5

   Q. And, Mr. Silva, where are you employed?

   A. Arrow Truck Sales, Houston branch.

   Q. And how long have you been employed at the Houston branch?

   A. Oh, since December 18th of '07.

   Q. And prior to working for the Houston branch, were you employed in the Arrow Truck San Antonio branch?

   A. Yes, sir.

   Q. And when did you start working there?

   A. August 29th of '02.

   Q. Have you ever had your deposition taken before?

   A. No, sir.

   Q. Have you ever been a plaintiff or a defendant in a lawsuit before?

   A. No, sir.

   Q. Have you ever filed a claim against any previous employer for any reason --

   A. No, sir.

   Q. -- whatsoever?

   MS. CORNELL: Wait.

   A. Wait.

BY MR. JOHL:

   Q. One of the rules of the deposition is that you need to wait for me --

   A. Sure.

KEVIN J. BRUZEWSKI, CSR
NELL MCCALLUM & ASSOCIATES, INC.

0089ba5d-218e-4d87-a06b-2aaa3aaa2179

**Page 78**

1　I'm not sure if that's what Albert meant on that last
2　one.
3　　Q. Do you know if at the time that Albert Sanchez
4　submitted his name for the management program if anyone
5　was selected for the assistant branch manager position
6　on that time?
7　　A. I don't know.
8　　Q. Do you know whether or not Mr. Coronado or
9　Albert Sanchez was ever offered a management position
10　but declined to do so because they didn't want relocate
11　to another branch?
12　　A. No, sir.
13　　Q. Do you know if Phil Coronado was ever offered
14　the position of branch manager in the San Antonio branch
15　but turned it down?
16　　A. I don't know.
17　　Q. Did Mr. Sanchez or -- I'm sorry.
18　　　　Did Albert Sanchez or Mr. Coronado ever
19　tell you that they were not promoted because they were
20　Hispanic?
21　　A. They didn't use that word.
22　　Q. What word did they use?
23　　A. They said Mr. Stricker told Albert Sanchez that
24　something to do with his English was not good enough.
25　　Q. Is that what Mr. Sanchez told you -- Albert

**Page 79**

1　Sanchez told you?
2　　A. Yes.
3　　Q. Did you make any notes of that?
4　　A. No, sir.
5　　Q. Do you know when Albert Sanchez told you that?
6　　A. Had to have been once I moved over or after I
7　moved over.
8　　Q. Okay. Did Phil Coronado ever tell you anything
9　that would make you believe that he was not promoted
10　because he is Hispanic?
11　　A. No, sir. He didn't want to be.
12　　Q. He didn't what?
13　　A. He didn't want to be promoted.
14　　Q. Phil Coronado told you he did not want to be
15　promoted to the management program; is that correct?
16　　A. Yes.
17　　Q. Prior to moving to the Houston area, did you
18　ask Mr. Beale to contact Mr. Stricker on your behalf
19　about the position?
20　　A. No, sir.
21　　Q. Did you ask Mr. Kosic to call Mr. Stricker on
22　your behalf about the assistant branch manager position?
23　　A. No, sir.
24　　Q. Did you ask Mr. Kosic or Mr. Beale to write a
25　letter of recommendation to you to give to Mr. Stricker

**Page 80**

1　about your qualities and qualifications to become
2　assistant branch manager?
3　　A. No, sir.
4　　Q. Did you ask anyone at Arrow Truck to do that on
5　your behalf?
6　　A. No, sir.
7　　Q. At the time that you decided to move to
8　Houston, you understood you were going over there as a
9　salesperson?
10　　A. Yes, sir.
11　　Q. And who told you that?
12　　A. Who told me that? It was after Mr. Lee Wallace
13　emailed us and suspended the position for the assistant
14　manager --
15　　Q. In the Houston --
16　　A. -- position.
17　　Q. In the Houston branch?
18　　A. Yes.
19　　Q. So that was in October of 2007?
20　　A. Late October, early November.
21　　Q. All right. So at that point in time, you were
22　willing to move to Houston knowing that you would be a
23　salesperson until an assistant branch manager position
24　opened?
25　　A. Yes, sir.

**Page 81**

1　　Q. And did anyone tell you how long it would be
2　before that position would be filled?
3　　A. Yes, sir.
4　　Q. Who is that?
5　　A. Lee Wallace.
6　　Q. Was that in an actual conversation or an email?
7　　A. Email.
8　　Q. Did you ever speak to Mr. Wallace personally
9　about the assistant branch manager position in October
10　of 2007?
11　　A. No, sir.
12　　Q. Or before you moved to Houston?
13　　A. No, sir.
14　　Q. And so you understood that you would be moving
15　as a salesperson to the Houston branch; correct?
16　　A. It was my request.
17　　Q. Right. And you understood that there was no
18　timetable as to when the assistant branch manager in
19　Houston would be filled?
20　　A. I knew there was a time frame.
21　　Q. What was the time frame?
22　　A. Early spring.
23　　Q. All right. So you knew that from October
24　through early spring that most likely the position for
25　assistant branch manager would not be filled; is that

21 (Pages 78 to 81)

KEVIN J. BRUZEWSKI, CSR
NELL MCCALLUM & ASSOCIATES, INC.

0089ba5d-218e-4d87-a06b-2aaa3aaa2179

1  your understanding?
2     A. That's correct.
3     Q. And you also understood when you moved to
4  Houston that you weren't guaranteed the assistant branch
5  manager position when it would be filled?
6     A. Of course.
7     Q. And what you wanted, I assume, was that you
8  just your -- that your application would be considered
9  for the position once that position was filled?
10    A. Yes.
11    Q. Was it your decision, sir, not to move your
12 family with you to Houston when you went over to the
13 Houston branch?
14    A. Yes.
15    Q. Was that a decision that you and Maria made
16 jointly?
17    A. Yes.
18    Q. And why did you make the decision that your
19 family would not move with you to Houston?
20    A. More so because my wife's employment and my
21 kids still in the school. This would have been October
22 for me to take them out in November. Oh, no, no, no.
23 I'm sorry. When did I move. Late December. Yeah, late
24 December. So I didn't want to mess with them and their
25 friends and whatnot.

1     Q. So was it part of your decision, Mr. Silva,
2  that you wanted your children to finish the entire
3  school year through the spring of 2008 before they moved
4  to Houston?
5     A. Yes, sir.
6     Q. And you said your wife's employment.
7        Where was your wife employed?
8     A. She was a bill collector for a company over
9  there.
10    Q. Do you know the name of the company?
11    A. That was, what, '08, no. God, so many dates
12 here. I moved in '07 so she could have been with -- I
13 think it was called HNC or something like that. It was
14 a health -- health source or something.
15    Q. So part of your decision making process was
16 that you would maintain two residences; one in Houston
17 while you worked there, and then one in San Antonio?
18    A. Yes.
19    Q. And then once the school year ended in the
20 spring of 2008, your family would join you in Houston?
21    A. Yes.
22    Q. And that was your goal and your intent to do
23 that, have your family move to Houston regardless of
24 whether or not you were selected to become the assistant
25 branch manager?

1     A. Yes.
2     Q. So I understand that you moved to the Houston
3  branch in December of 2007 and then the position was
4  filled by Mr. Pryor being selected as the assistant
5  branch manager sometime in February of 2008?
6     A. Yes.
7     Q. So you were at the branch for less than two
8  months before the assistant branch manager position was
9  filled?
10    A. Yes.
11    Q. And basically your claim in this case that you
12 were discriminated against because of your national
13 origin is that you weren't considered for the position
14 for the two months that you had put your name up for
15 consideration?
16    A. Not for the two months.
17    Q. What's the basis of your claim in this case?
18 The way I read it, that you said you were not tested or
19 not selected for the position because you were Hispanic?
20    A. Yes.
21    Q. Okay. And what's the basis of that?
22    A. Well, I was promised that I was -- at least be
23 tested by our vice president of the company. And then I
24 was told that it would have been a waste of time to test
25 me and that the decision had already been made.

1     Q. Anything else?
2     A. As far as...
3     Q. Which forms the basis of your opinion that the
4  reason you weren't appointed to the assistant branch
5  manager position is because you're Hispanic?
6     A. That, and I wasn't -- I had no idea what else
7  could be going on there at that branch, that they would
8  not look at me to begin with and I totally didn't
9  understand how a -- how the answer was given that Ryan
10 Pryor was a quick shot in the arm to help the branch and
11 since they did not know me that they would be better off
12 with him versus another Arrow employee.
13    Q. Would you agree with me that no one at Arrow
14 Truck ever told you that the reason you weren't tested
15 in February of 2008 was because you were Hispanic?
16       No one ever told you that, did they?
17    A. No.
18    Q. Did anyone ever tell you that it would have
19 been a waste of time for you to apply for the position
20 in February of 2008 because you were Hispanic?
21    A. Did they tell me it was a waste of time to
22 apply?
23    Q. Yes, because you were Hispanic?
24    A. Not to apply.
25    Q. Pardon me?

KEVIN J. BRUZEWSKI, CSR
NELL MCCALLUM & ASSOCIATES, INC.

0089ba5d-218e-4d87-a06b-2aaa3aaa2179

## 86

1  A. They didn't tell me that it was a waste of time
2  just because I was Hispanic. No, they didn't say that.
3  Q. I assume when Mr. Kosic was telling you to
4  become part of the management program he knew that you
5  were Hispanic?
6  A. Definitely.
7  Q. Did Mr. Kosic ever do anything to dissuade you
8  from participating in the management program?
9  A. He encouraged me.
10  Q. All right. You said there was something the
11  decision had been made.
12  Do you believe it was wrong for Arrow Truck
13  to hire Mr. Pryor since he had been employed at that
14  branch for three and a half years before you moved
15  there?
16  A. Repeat the question?
17  Q. Do you believe it was wrong for Arrow Truck to
18  promote Ryan Pryor to the position of assistant branch
19  manager due to the fact that he had worked at the
20  Houston branch for three and a half years before you
21  moved there?
22  A. Yeah. They are looking for good managers, yes.
23  Q. And you felt that Ryan Pryor would not be a
24  good manager?
25  A. Yes.

## 87

1  Q. I understand you have your feelings that Ryan
2  Pryor wouldn't be a good manager, but isn't the ultimate
3  decision as to who would be the best manager left up to
4  the management of Arrow Truck?
5  A. Well, yes.
6  Q. And you understood even when you moved to the
7  Houston area that you were not guaranteed the position
8  if it became available whether it was in the spring or
9  earlier; is that correct?
10  A. Yes.
11  Q. Do you know if there was any other people who
12  had expressed an interest in becoming an assistant
13  branch manager that also weren't tested when Mr. Pryor
14  was selected for the assistant branch manager position?
15  A. I knew of no one else.
16  Q. Did you ever ask if anyone else had expressed
17  an interest in the assistant branch manager besides you
18  and Mr. Pryor?
19  A. I believe I did. I think I did in conversation
20  and I understood that Ryan was the only candidate at
21  that time.
22  Q. Who did you ask that question of?
23  A. I think Phil gave me that answer.
24  Q. Phil who?
25  A. Coronado. I'm sorry.

## 88

1  Q. Did you ever ask Mr. Stricker if anyone else
2  had applied for the assistant branch manager position
3  besides you or Mr. Pryor?
4  A. I don't recall if in our conversations if Mike
5  ever said that Ryan would be a candidate. I don't
6  recall that.
7  Q. Well, what I was asking you, did you ever
8  inquire from Mr. Stricker as to whether anyone else had
9  expressed an interest to become an assistant branch
10  manager besides you or Mr. Pryor in February of 2008?
11  A. I don't recall that I asked him that.
12  Q. Do you think any consideration should have been
13  given to Mr. Pryor due to the fact that he had been
14  employed in that Houston office for a considerable
15  amount of time more than you had?
16  A. I don't think that should have been a factor.
17  Q. Okay. Do you think it should have been a
18  factor that he knew the employees at the Houston store a
19  lot more than you did in the two months that you were
20  there?
21  A. Are you saying I only knew them for two months?
22  Q. Pardon me?
23  A. Are you saying I only knew these guys for two
24  months?
25  Q. That you had only worked with them for two

## 89

1  months?
2  A. Okay. Rephrase the question -- repeat the
3  question.
4  Q. Do you think it should have been a factor for
5  management to consider that Mr. Pryor knew the employees
6  at the Houston branch much more than you did since you
7  had only worked there for two months?
8  A. He did know them, yes.
9  Q. Do you think that's a factor that management
10  could consider in determining which candidate they would
11  want to have as the assistant branch manager?
12  A. I guess that's their call.
13  Q. Well, I mean, is that a valid factor for
14  management to consider?
15  A. It could go either way. I mean, because they
16  didn't consider the last assistant we had there as if he
17  knew either one of us.
18  Q. Okay. I'm asking if you felt that was a valid
19  factor for management to consider when making its
20  decision?
21  A. I guess not, no.
22  Q. Okay. Tell me then what factors do you think
23  that management should have considered in your opinion
24  in determining whether or not you or Mr. Pryor should
25  have received the job?

KEVIN J. BRUZEWSKI, CSR
NELL MCCALLUM & ASSOCIATES, INC.

0089ba5d-218e-4d87-a06b-2aaa3aaa2179

1    A. No, sir.
2    Q. You told us that someone had told you it was a
3  waste of time for you to have taken the test; is that
4  correct?
5    A. Yes.
6    Q. Who told you that?
7    A. Mike Stricker.
8    Q. And when did Mr. Stricker tell you that?
9    A. The afternoon, the evening that he called me
10 into his office before he left for the day.
11   Q. Is this the day he called you into the office
12 to let you know that Mr. Pryor had been selected to the
13 position of assistant branch manager?
14   A. Same day.
15   Q. And so Mr. Stricker was taking the time to
16 notify you personally of the decision?
17   A. Yes.
18   Q. Do you know anyone by the name of Justin Bryan,
19 B-R-Y-A-N?
20   A. Yes.
21   Q. Was he employed at Arrow Truck in the Houston
22 branch at the time you started working there?
23   A. Yes.
24   Q. And do you know whether or not Mr. Bryan had
25 expressed an interest in the assistant branch manager

1  position that was ultimately given to Mr. Pryor?
2    A. No.
3    Q. If he had, do you know whether or not Mr. Bryan
4  was also tested for the position?
5    A. No.
6    Q. Would it make a difference to you if Mr. Bryan
7  had expressed an interest in the position but he also
8  wasn't tested as you weren't tested?
9    A. Repeat the question?
10   Q. Would it make a difference to you if Mr. Bryan
11 expressed an interest in the assistant branch manager
12 position but like you he also wasn't tested before the
13 decision was made to give the position to Mr. Pryor?
14   A. No.
15   Q. Now, I'm trying to get a time frame here in my
16 mind.
17       When did you notify anyone at Arrow Truck
18 that you had made the decision to move to Houston for
19 promotion?
20   A. That would have been '07. And it was probably
21 -- I don't think it was September. I think it had to
22 have been like October.
23   Q. October of '07?
24   A. Yeah. Late September, mid-October, somewhere
25 in there.

1    Q. Had Mr. Ortiz and Mr. Loza already been
2  terminated from their employment at Arrow Truck when you
3  notified anyone at management that you wanted to move to
4  Houston?
5    A. I don't know.
6    Q. And who did you notify that you wanted to be
7  considered for a management position in October of 2007?
8    A. My manager, Rick Beale.
9    Q. And what did you tell Mr. Beale?
10   A. Basically told him that I was ready to move
11 forward and see what the possibilities were about going
12 to the assistant management program.
13   Q. And would it be safe to say that prior to the
14 time that you had that conversation with Mr. Beale in
15 October of 2007 you had not come to the decision that
16 you were ready to move forward and move to Houston?
17   A. Repeat the question?
18   Q. Would it be safe to say that prior to your
19 conversation with Mr. Beale, you had not made the final
20 decision that you were willing to move to Houston to
21 become part of the management program?
22   A. No, that wouldn't be correct.
23   Q. When did you make the decision then that you
24 wanted to be part of the management program and move to
25 Houston?

1    A. I had been thinking and making plans on whatnot
2  all of '07.
3    Q. Okay. But the only time you ever notified
4  anyone in management would have been in October of 2007?
5    A. Yes, sir.
6    Q. And that's when you had your conversation with
7  Mr. Beale?
8    A. Yes, sir.
9    Q. Did Mr. Beale say or do anything to you to
10 discourage you from putting your name in for an
11 assistant branch manager position in the Houston branch?
12   A. I believe so.
13   Q. What did he do to discourage you?
14   A. He mentioned that in our previous conversations
15 throughout the years, I guess it would go back
16 throughout the years, that the numbers we've seen
17 Houston accomplish and whatnot that maybe they're not
18 all there or something to the fact that for me to maybe
19 rethink that it's -- you know, maybe it's not going -- I
20 don't know. He was just trying to tell me that maybe
21 those numbers aren't all correct or, you know, they are
22 not that busy, for me to look at that.
23   Q. Was Mr. Beale trying to discourage you from
24 applying for a management position in the Houston
25 branch?

25 (Pages 94 to 97)

KEVIN J. BRUZEWSKI, CSR
NELL MCCALLUM & ASSOCIATES, INC.

1    A. Very loud.
2    Q. I mean, when he was on the phone?
3    A. Whether he was on the phone or not.
4    Q. Was that just his personality to be louder than
5 some people?
6    A. I don't know if that's his personality. He was
7 doing that.
8    Q. Well, do you think he was being loud to be
9 offensive towards you?
10    A. No.
11    Q. All right. And when you went to talk to
12 Mr. Stricker about your concerns relating to Mr. Pryor's
13 conduct, what did Mr. Stricker tell you?
14    A. I think if he said anything was maybe something
15 to the fact that I'll look into it or I'll talk to him.
16    Q. Can you recall anything else he might have
17 said?
18    A. That's Ryan.
19    Q. Anything else?
20    A. That's pretty much it.
21    Q. And would it be correct to state that your
22 meeting with Mr. Stricker about Mr. Ryan's --
23 Mr. Pryor's conduct occurred before Mr. Pryor was
24 selected to be the assistant branch manager?
25    A. Yes.

1    Q. Okay. Did you ever ask Mr. Stricker if he
2 looked into the situation with Mr. Pryor?
3    A. No, sir.
4    Q. Did you ever follow-up with Mr. Stricker to see
5 what, if anything, he did about your complaint?
6    A. No, sir.
7    Q. Do you know whether or not Mr. Stricker ever
8 talked to Mr. Pryor about your complaint?
9    A. Excuse me. Repeat the question?
10    Q. Do you know if Mr. Stricker ever talked to
11 Mr. Pryor about your complaints?
12    A. No, sir.
13    Q. So it's quite possible Mr. Stricker did talk to
14 Mr. Pryor, you're just not aware of it --
15    A. Yes.
16    Q. And when he -- when Mr. Stricker told you
17 that's Ryan, did you ask him what he meant by that?
18    A. No, sir.
19    Q. Within the first two and a half months of your
20 employment at the Houston Arrow Truck facility, did you
21 complain about any other employee besides Mr. Pryor?
22    A. Repeat the question?
23    Q. Within your first two and a half months of
24 employment at the Houston office, did you complain to
25 Mr. Stricker or to anyone else about any other

1 employee's conduct or about Mr. Pryor?
2    A. I'm not sure if I talked to Mr. Stricker about
3 other issues with other salesmen within that time frame.
4 I'm not sure, it was two or three months or six months
5 later.
6    Q. Did you have issues with other salesmen within
7 a short period of time after you started working in the
8 Houston branch?
9    A. Nothing that we couldn't clear up and make sure
10 we are all understanding how Houston works.
11    Q. Right. But you -- but within a short period of
12 time you said within up to six months or less you had
13 complaints to Mr. Stricker about the conduct of other
14 Houston salespeople?
15    A. Not complaints, no, sir.
16    Q. There were concerns?
17    A. Yes.
18    Q. Okay. Were any of your concerns with any of
19 the Hispanic sales representatives of Arrow Truck?
20    A. I don't believe so.
21    Q. Do you think Mr. Pryor's conduct towards you
22 was based upon the fact that you were Hispanic?
23    A. I don't know.
24    Q. Did you form that opinion?
25    A. No.

1    Q. Do you believe that now?
2    A. No.
3    Q. Do you believe that the other concerns you had
4 with these other salespersons that you told us about
5 within your first six months were directed towards you
6 because you were Hispanic?
7    A. No.
8    Q. Did you ever have any complaints with any of
9 the Hispanic sales representatives at the Houston Arrow
10 Truck branch?
11    A. Repeat the question?
12    Q. Did you ever have any complaints or concerns
13 about the conduct of the Hispanic sales representatives
14 at the Houston Arrow Truck branch?
15    A. No, I don't recall.
16    Q. Okay. So you told us that in February
17 Mr. Pryor was selected to be the assistant branch
18 manager of the Arrow Truck facility in Houston and that
19 Mr. Stricker called you into his office the day the
20 decision had been made; correct?
21    A. Yes, sir.
22    Q. And Mr. Stricker explained to you that
23 Mr. Pryor had been selected?
24    A. Yes, sir.
25    Q. And you said that Mr. Stricker also told you

KEVIN J. BRUZEWSKI, CSR
NELL MCCALLUM & ASSOCIATES, INC.

0089ba5d-218e-4d87-a06b-2aaa3aaa2179

1 during that conversation it would have been a waste of
2 time for you to have taken the test?
3    A. Yes, sir.
4    Q. What test is it that you were wanting to take?
5    A. The Brooks test.
6    Q. And did you ask Mr. Stricker why it would have
7 been a waste of time for you to take the Brooks test?
8    A. I believe I did.
9    Q. Okay. And what did Mr. Stricker say?
10    A. That he had already made a decision.
11    Q. That Mike Stricker had already made the
12 decision?
13    A. Yes.
14    Q. Through the comment that Mr. Stricker made to
15 you, did it appear to you that the decision as to who
16 was going to be the assistant branch manager was made by
17 Mr. Mike Stricker?
18    A. Yes.
19    Q. Okay. Did you say anything to Mr. Stricker
20 about his decision?
21    A. I believe I came back with what else is it
22 based on.
23    Q. And what did Mr. Stricker tell you?
24    A. I believe his first word was that Ryan had a
25 track record. And I asked what track are we talking

1 about. And he mentioned that he had been in sales
2 before, something with cars or something and something
3 to that effect.
4    Q. Did he tell you that Mr. Pryor had prior
5 management experience in the car industry?
6    A. I don't recall him recall saying he had prior
7 management experience to me.
8    Q. What else did Mr. Pryor say to you other
9 than Mr. Pryor had a track record and had sales in the
10 car industry?
11    A. He said that not just because you're a good
12 salesman you can be a good manager. He also said that
13 it's okay to feel disappointed and that it's okay if I
14 talk to anybody else in corporate about it.
15    Q. Anything else that he said?
16    A. That he wanted me to have a first heads up
17 before the email goes out the next morning to Arrow
18 Truck Sales.
19    Q. Anything else?
20    A. On that day, let's see. I don't recall. But
21 that was that one day that afternoon I was blown away so
22 I don't recall.
23    Q. Did you make any notes following your
24 conversation with Mr. Stricker?
25    A. I did.

1    Q. And do you know where those notes are?
2    A. I'm sure y'all have a copy.
3    Q. All right. And so you -- is that the first
4 time you ever made any notes of a conversation you had
5 with Mr. Stricker?
6    A. Yes. Yes.
7    Q. And why did you decide to make notes of your
8 conversation with Mr. Stricker on that occasion?
9    A. Because I felt something wasn't right.
10    Q. What did you feel wasn't right?
11    A. That my mindset was that when the position
12 opened again they were going to invite me to it and test
13 me and let me know what was going on and --
14    Q. Had you been notified the position being
15 available and had you taken the Brooks test and still
16 not been promoted in February of 2008, would you still
17 feel the same way you do today?
18    A. I don't know.
19    Q. Were you upset that Ryan Pryor of all people
20 got the job and not you?
21    A. Not necessarily, having told Mike in that
22 conversation I am not mad of who got it. I am mad and
23 disappointed how this went down.
24    Q. Did Mr. Stricker say anything during this
25 conversation that made you believe that his decision was

1 based on the fact that you were Hispanic or because of
2 your age?
3    A. I believe somewhere in that evening
4 conversation he mentioned something about it had nothing
5 to do with anything else and he also said that there is
6 always going to be a loser.
7    Q. And would you find that to be a correct
8 statement that if two people are up for a job and only
9 one of them gets it, the person is basically a loser for
10 that position?
11    A. I answered him with saying well, at least there
12 should be a race.
13    Q. Okay. But what I've asked you, did
14 Mr. Stricker say anything during that conversation that
15 made you believe that the decision was based on you
16 being Hispanic or of your age?
17    A. No.
18    Q. Did you form the opinion at that conversation
19 that you were denied the promotion because you were
20 Hispanic?
21    A. No.
22    Q. Or because of your age?
23    A. No.
24    Q. When Mr. Stricker told you that he wanted to
25 give you advanced notice of Mr. Pryor had been appointed

KEVIN J. BRUZEWSKI, CSR
NELL MCCALLUM & ASSOCIATES, INC.

0089ba5d-218e-4d87-a06b-2aaa3aaa2179

**126**

1  to the position, did you feel that was an appropriate
2  response by management to let you know in advance of the
3  other people that Mr. Pryor had been selected?
4      A. Yes.
5      Q. Would that be a good management tool to tell
6  the other person whose name was up for consideration .
7  that they are not going to be selected before it became
8  public knowledge?
9      A. Yes.
10     Q. So you didn't find anything wrong with that by
11 Mr. Stricker, by him telling you that, making that
12 comment?
13     A. Not that.
14     Q. Okay. When Mr. Stricker told you it was okay
15 to talk to corporate office in Kansas City, did you find
16 there was anything wrong or inappropriate about that?
17     A. No.
18     Q. And as a manager, if you felt that one of your
19 employees had a concern that you couldn't deal with, you
20 would tell them to go up to higher management?
21     A. Sure.
22     Q. You said they also told you it was okay to feel
23 disappointed.
24         Do you think that was an appropriate
25 response by Mr. Stricker?

**127**

1      A. Appropriate?
2      Q. Yes.
3      A. Yes.
4      Q. And because obviously the person who is not
5  selected may be disappointed and it's okay to express
6  those type of feelings; isn't that true?
7      A. Yes.
8      Q. He also told you that just because you were a
9  good salesman doesn't mean you would necessarily make a
10 good manager.
11         Did you find anything wrong with that
12 concept that just because someone is a good salesman
13 doesn't necessarily mean they would make a good manager?
14     A. Repeat your question?
15     Q. Do you find there is anything wrong with the
16 concept that just because someone is a good salesman, it
17 doesn't mean that they would be a good manager?
18     A. Yes.
19     Q. And I want to make sure it's clear.
20         You would agree that there are people who
21 are good salesmen that you don't think would be a good
22 manager?
23     A. I'm just answering on for my thoughts and
24 myself.
25     Q. I know on yourself. I'm talking about as a

**128**

1  concept that there are people who might be good salesmen
2  but might not necessarily make a good manager.
3         Would you agree with that?
4      A. It could be, yes.
5      Q. He told you that Mr. Pryor had a prior track
6  record.
7         Did Mr. Stricker tell you that Mr. Pryor
8  had a prior track record in the Houston branch?
9      A. No.
10     Q. Did that even come up that Mr. Pryor had worked
11 at the Houston branch for a longer period of time than
12 you did?
13     A. I believe that did. I think he said something
14 to the fact he's been here longer, something like that.
15     Q. Do you know how long Mr. Pryor had been
16 employed in the Houston branch before he was promoted?
17     A. About three years, more or less.
18     Q. Did you ask Mr. Stricker what he meant about
19 Mr. Pryor's experience in the car industry?
20     A. No.
21     Q. Did Mr. Stricker tell you that based upon
22 Mr. Pryor's track record and length of employment in the
23 Houston office, he knew the other employees better than
24 you did and it would make a smoother transition for him
25 to be the assistant branch manager?

**129**

1      A. No.
2      Q. Did Mr. Pryor tell you during this — I'm
3  sorry.
4         Did Mr. Stricker tell you during this
5  conversation anything that would dissuade you not to
6  apply for the next position that became available for
7  assistant branch manager?
8      A. Repeat the question?
9      Q. Did Mr. Stricker tell you anything during this
10 conversation in his office to try to discourage you from
11 applying for the next position for assistant branch
12 manager?
13     A. This conversation meaning the first day?
14     Q. Yes.
15     A. No.
16     Q. Have you now told us everything you can recall
17 you telling to Mr. Stricker and Mr. Stricker saying to
18 you during this first conversation you had with him?
19     A. I would think that's it, unless something --
20 you bring up something that I don't remember.
21     Q. When was the second time you had a conversation
22 with Mr. Stricker about Mr. Pryor being promoted to the
23 assistant branch manager position?
24     A. Tuesday night, the next day.
25     Q. Tuesday night?

KEVIN J. BRUZEWSKI, CSR
NELL MCCALLUM & ASSOCIATES, INC.

0089ba5d-218e-4d87-a06b-2aaa3aaa2179

1     A. Did I tell him those --
2     Q. No.
3     A. -- items?
4     Q. Is there anything else that you said to
5 Mr. Stricker that you haven't told us about during the
6 second conversation?
7     A. Oh, I don't know. I mean, I just got to get my
8 mind refreshed.
9     Q. Okay. You said that Mr. Stricker told you to
10 shake it off and that you need to go back to doing what
11 you do best and that's selling trucks.
12     Did you find that comment to be
13 inappropriate?
14     A. No.
15     Q. You said that you felt that it was not a
16 surprise to everyone else in the office that Mr. Pryor
17 had the position.
18     Did you feel that they knew about the
19 position before you did the night before?
20     A. Yes.
21     Q. And how did they tell you they knew about the
22 position before Mr. Stricker told you?
23     A. Let me go back and change my answer to was it
24 inappropriate for the comment to go do what you do best.
25 Yes, it was somewhat inappropriate.

1     The reason that I felt that most -- most
2 workers there knew or if not all was that two weeks
3 prior to when Ryan Pryor went to KC, his demeanor had
4 changed and I would know because he sits next to me.
5 Because all of a sudden he was quiet and not the normal
6 Ryan Pryor that I had seen.
7     And that next morning, usually every time
8 we come in everybody is talking, exchanging notes,
9 talking about sports, whatever, for the first part of
10 the morning. And that morning it was so quiet. It was
11 very quiet. Nobody said anything. I, of course, you
12 know, went straight to my desk and I was upset and I was
13 like, you know --
14     Q. Could the other employees have observed that
15 you were upset when you came in that morning?
16     A. No, sir.
17     Q. Did any of the other employees of Arrow Truck
18 tell you they were aware that Ryan Pryor had been
19 selected to the assistant branch manager before you
20 became aware of the fact?
21     A. I think in one of our conversations I believe
22 Phil Coronado said something about like he had a feeling
23 for it.
24     Q. Other than the fact that he had a feeling --
25     A. Yeah.

1     Q. -- did Mr. Coronado tell you that he knew for
2 certain that Mr. Pryor had been selected to the
3 assistant branch manager position before Mr. Stricker
4 told you that?
5     A. No, sir.
6     Q. So no one ever told you at Arrow Truck that
7 they were aware for certain that Mr. Pryor was appointed
8 to the position before Mr. Stricker told you?
9     A. No, sir.
10     Q. Had you been quiet that day after your first
11 conversation with Mr. Stricker? Had you been quiet at
12 work?
13     A. Before?
14     Q. No.
15     After Mr. Stricker told you that Mr. Pryor
16 had been selected the next day at work, had you been
17 quiet?
18     A. I'm sorry. I'm losing your question.
19     Q. I guess it's not a good question then.
20     You told us that Mr. Stricker called you
21 because he felt you had been quiet at work that day.
22     A. Yes.
23     Q. Had you, in fact, been quiet at work that day?
24     A. Yes.
25     Q. Did you find it inappropriate for Mr. Stricker

1 to call you and talk to you about you being quiet at
2 work?
3     A. To some extent.
4     Q. Did you tell him that you felt it was
5 inappropriate for him --
6     A. No.
7     Q. -- to call you to talk about your demeanor at
8 work that day?
9     A. No, sir.
10     Q. As a manager, would you expect him to follow up
11 with the person who wasn't selected with the job to make
12 sure that he or she would get back on track?
13     A. Yes.
14     Q. Did you ever tell anyone in Kansas City
15 corporate that it was inappropriate for Mr. Stricker to
16 call you at home and talk to you about your demeanor?
17     A. No, sir.
18     Q. Did you ever tell anyone in Kansas City
19 corporate that it was inappropriate for Mr. Stricker to
20 tell you that you're going to have to go back to what
21 you do best and that is to sell trucks?
22     A. No, sir.
23     Q. You said that Mr. Stricker talked to you about
24 you might need to rethink the management program because
25 there were three young managers.

KEVIN J. BRUZEWSKI, CSR
NELL MCCALLUM & ASSOCIATES, INC.

0089ba5d-218e-4d87-a06b-2aaa3aaa2179

1       Which managers was he referring to?
2       A. Brent in Dallas, Rick Beale in San Antonio, and
3    Michael Stricker in Houston.
4       Q. And how old was Brent in Dallas?
5       A. I believe all three are right in their mid
6    Thirties.
7       Q. Would it be correct to state that as long as
8    those people stayed in their branches in San Antonio,
9    Houston and Dallas there would be no branch manager
10   position available in those locations?
11      A. Repeat your question?
12      Q. Would it be correct to state that whether they
13   were young or old, as long as they remained employed
14   with their current positions with Arrow Truck, there
15   would not be need for another branch manager in those
16   locations?
17      A. Yes.
18      Q. Did you ask Mr. Stricker what he meant by three
19   young managers?
20      A. No.
21      Q. Did you ask Mr. Stricker if he had any
22   intention of leaving the Houston branch at any time
23   soon?
24      A. No.
25      Q. Did Mr. Beale ever express to you an intention

1    to leave the San Antonio job at any time in the near
2    future?
3       A. Yes.
4       Q. Who did he tell you he was going to do that?
5       A. I guess when I was there he had questioned
6    other outlets that would be coming up but he couldn't
7    take them.
8       Q. Why wouldn't he take them?
9       A. The city. He was trying to find something
10   comfortable for him and his family life.
11      Q. So unless Mr. Beale was going to take another
12   job, he was going to stay in the San Antonio branch?
13      A. Yes.
14      Q. Had you ever talked with Brent in the Dallas
15   office about his intentions of leaving that job?
16      A. No, sir.
17      Q. Mr. Stricker also told you that it would be at
18   least another two years before an assistant branch
19   manager position opened in the Houston area?
20      A. Yes.
21      Q. Did you ever tell Mr. Stricker that you were
22   only interested in becoming a assistant branch manager
23   in the Houston branch?
24      A. No, sir.
25      Q. Was there anything wrong that you felt with

1    Mr. Stricker's statement that it would be at least two
2    years before another assistant branch manager position
3    opened in the Houston area?
4       A. No, sir.
5       Q. So basically you didn't find anything wrong or
6    inappropriate with the comments that Mr. Stricker made
7    to you during the second conversation, did you?
8       A. The one part that he said that he didn't think
9    I would be ready to or be willing to move out of state.
10      Q. And were you willing to move out of state if an
11   assistant branch manager position became available?
12      A. An assistant branch manager position?
13      Q. Yes.
14      A. Not for the assistant branch manager position.
15      Q. Okay. Well, you understood you had to become a
16   branch manager -- you had to become an assistant branch
17   manager before you become a branch manager?
18      A. Yes.
19      Q. Okay. So if there wasn't a position available
20   in the Houston office for assistant branch manager for
21   the next two years if you wanted to become assistant
22   branch manager, you would have to relocate to another
23   city; correct?
24      A. Or wait.
25      Q. Or wait.

1       And you weren't willing to relocate to
2    another city to become an assistant branch manager; is
3    that true?
4       A. Not at that time.
5       Q. So you were willing to wait up to two years for
6    an assistant branch manager position to become available
7    in Houston?
8       A. Anything was possible.
9       Q. All right. Was there anything that
10   Mr. Stricker said in this second conversation you felt
11   was directed to you being Hispanic or your age?
12      A. No.
13      Q. Okay.
14      VIDEOGRAPHER: We're off the record. It's
15   10:59 a.m. This is the end of videotape No. 3.
16      (Recess from 10:59 to 11:14 a.m.)
17      VIDEOGRAPHER: We're on the record. It's
18   11:14 a.m. This is the beginning of videotape No. 4.
19   BY MR. JOHL:
20      Q. Mr. Silva, we're back on the record.
21      Anything you would like to change from the
22   testimony you have previously given us?
23      A. No, I don't think so.
24      Q. You told us that during the second conversation
25   you had with Mr. Stricker where he called you on your

1 claims?
2    A. He felt -- I think he was saying that, you
3 know, I believe it was Loza had a possibility getting a
4 program but he wasn't accepted.
5    Q. Was that all Mr. Sanchez said that Mr. Loza had
6 a possibility of getting into the program but wasn't
7 accepted?
8    A. Right, yes, sir.
9    Q. And what did Mr. Sanchez feel was inappropriate
10 about that?
11    A. He felt he was capable of handling the
12 position.
13    Q. Other than that Mr. Albert Sanchez felt that
14 Mr. Loza was capable of handling the position, did he
15 say anything else?
16    A. No, sir.
17    Q. Did Mr. Albert Sanchez tell you that the reason
18 Mr. Ortiz didn't get the position was because he was
19 Hispanic?
20    A. No, sir.
21    Q. Did the lot person, I think you said Jose was
22 his name, did he make any comments about the claims
23 filed by Mr. Ortiz or Mr. Loza?
24    A. I believe he mentioned that they left on
25 unhappy terms and didn't want to say much more because

1 they were friends.
2    Q. Okay. Did Mr. -- okay. Did Jose say anything
3 that he felt that there was any validity to the claims
4 filed by Mr. Ortiz or Mr. Loza with the EEOC?
5    A. No, sir.
6    Q. At the time you wrote your email to Mr. Wallace
7 on February 27, 2008, had you formed the opinion that
8 the reason you weren't promoted was because either your
9 age or because you were Hispanic?
10    A. No. No, sir.
11    Q. Who had told you that you would be given an
12 opportunity to submit a resume during the evaluation
13 process?
14    A. Rick Beale.
15    Q. And when did Rick Beale tell you that?
16    A. When we first started discussing about my
17 possibilities of getting into the program.
18    Q. Was that in 2006?
19    A. No.
20    Q. When was that?
21    A. 2007.
22    Q. Did you have a resume prepared in 2007?
23    A. Yes.
24    Q. Did you ever give a copy of your resume to
25 Mr. Beale?

1    A. No.
2    Q. In October when you received the email from
3 Mr. Wallace, did you ever send a copy of your resume to
4 Mr. Wallace, Mr. Kosic or Mr. Courson?
5    A. No, sir.
6    Q. Have you ever provided a copy of your resume up
7 to this date to anyone at Arrow Truck?
8    A. No, sir.
9    Q. You state, what I don't understand is the
10 manner that I was told that the decision had already
11 been made and that Ryan was already in Kansas City for
12 that reason.
13        When Mr. Stricker told you that Mr. Pryor
14 was getting the promotion, was Mr. Pryor already in
15 Kansas City?
16    A. Yes, sir.
17    Q. And how long had he been in Kansas City?
18    A. I understood one day.
19    Q. And do you know what day it was?
20    A. That Monday.
21    Q. The Monday that Mr. Stricker informed you that
22 the decision had been made to promote Mr. Pryor?
23    A. Yes, sir.
24    Q. You said you were given different reasons of
25 why the decision was made.

1        Who gave you different reasons was to why
2 the decision was made to promote Michael Stricker?
3    A. Michael Stricker.
4    Q. When you say gave you different reasons, he
5 gave you reasons why Mr. Pryor was promoted; isn't that
6 correct?
7    A. Yes.
8    Q. Okay. So would it be a correct statement, sir,
9 that up until the time you wrote your email to
10 Mr. Wallace, you had not spoken to anyone else about
11 Mr. Pryor's promotion except for Mr. Stricker?
12    A. Yes.
13    Q. And you've told us everything about your
14 conversations with Mr. Stricker up until this point in
15 time?
16    A. For the most part, yes.
17    Q. When you say for the most part, I want to know
18 anything that you can recall at this point in time.
19    A. Again, it was -- it was -- it was a disturbing
20 moment for me those two days, three days, whatever, so I
21 can't recall everything right now.
22    Q. Okay. Well, this is dated -- your email is
23 dated Wednesday, February 27th.
24        Can we assume that Monday, February 25th
25 was when you were notified by Mr. Stricker of the

KEVIN J. BRUZEWSKI, CSR
NELL MCCALLUM & ASSOCIATES, INC.

0089ba5d-218e-4d87-a06b-2aaa3aaa2179

158

1    Q. Do you know if those three individuals ever
2  discussed their concerns about Mr. Pryor with
3  Mr. Stricker?
4    A. I don't know.
5    Q. Do you know if any of the employees at Arrow
6  Truck in the Houston office had any problems with your
7  professionalism or the way you dealt with co-workers
8  after you went to work there?
9    A. No.
10   Q. Is there anywhere in deposition Exhibit 3 where
11 you stated that you felt that you did not get the
12 promotion based upon the fact that you were -- are
13 Hispanic or because of your age?
14   A. No.
15   Q. And were you also notifying the people that you
16 sent the email to that you wanted to be considered for
17 the next position that became available in the Houston
18 branch?
19   A. Yes.
20   Q. Did you ever notify the corporate office in
21 Kansas City that you were willing to be relocated to
22 another branch if an assistant branch manager position
23 became available?
24   A. No, sir.
25   Q. I notice you didn't sent a copy of your email

159

1  to Mr. Stricker; is that correct?
2    A. We're talking about this one here --
3    Q. Yes.
4    A. -- Exhibit 3? Yeah, I didn't send it to
5  Mr. Stricker.
6    Q. Did you ever give a copy of your email to
7  Mr. Stricker?
8    A. No.
9    Q. Okay. And then the response that we received
10 from Mr. Wallace, were you satisfied with the response
11 that you received from Mr. Wallace to your email?
12   A. No.
13   Q. Did you send him an additional email with any
14 questions that you wanted answered by Mr. Wallace?
15   A. I don't recall that I did.
16   Q. Did you ever contact Mr. Kosic or Mr. Courson
17 for further explanation of the reason why you weren't
18 considered for the promotion?
19   A. Aside when Mr. Ken Kosic returned my email,
20 that was it.
21   Q. Well, didn't Mr. Kosic just tell you
22 Mr. Wallace was traveling, that he would get back with
23 you in a few days?
24   A. Yes, that was it.
25   Q. Did you ever follow-up with Mr. Kosic or

160

1  Mr. Courson in any way to get any additional explanation
2  as to the reason why you weren't considered for the
3  promotion?
4    A. No.
5    Q. Did you ever try contacting by phone
6  Mr. Wallace, Mr. Courson or Mr. Kosic to get further
7  explanation as to why you weren't promoted?
8    A. No, sir.
9    Q. Have you ever tried contacting Mr. Courson
10 where he didn't respond to your attempt to
11 communication?
12   A. When he didn't respond?
13   Q. Yes.
14   A. No. I didn't contact him because he didn't
15 respond.
16   Q. Okay. I didn't ask the question right.
17     Did you ever make an effort to contact
18 Mr. Courson where he didn't respond to you?
19   A. I would have to say no.
20   Q. Is there anything in Mr. Wallace's email that
21 led you to believe that the reason you didn't get the
22 promotion was because you are Hispanic or because of
23 your age?
24   A. No, sir.
25   Q. Is there anything in Mr. Wallace's email to you

161

1  of March 3rd, 2008 that you feel is inappropriate or
2  offensive to you?
3    A. No, sir.
4    Q. In Mr. Wallace's email he states in the second
5  sentence when we make a decision to promote an
6  individual, we take many factors into consideration.
7     Do you think that's an appropriate comment?
8    A. Yes.
9    Q. And you would do so as well if you were in
10 management?
11   A. Yes.
12   Q. He states that we look not only at the
13 attributes of the people involved, but also how they
14 would fit in with the team that they well manage and
15 assist with?
16   A. Yes.
17   Q. Do you feel that's an appropriate comment?
18   A. Yes.
19   Q. Do you think management should take into
20 account who would be the best person in their opinion to
21 fit in with the current personnel when they make a
22 decision to promote someone?
23   A. Yes.
24   Q. Did you find it was inappropriate for
25 Mr. Wallace to tell you that senior management felt that

41 (Pages 158 to 161)

KEVIN J. BRUZEWSKI, CSR
NELL MCCALLUM & ASSOCIATES, INC.

0089ba5d-218e-4d87-a06b-2aaa3aaa2179

## 166

1  get the promotion?
2     A. If that's the number, yes.
3     Q. Well, I mean, if it's 10 and 4 of the
4  employees --
5     A. Right. Yeah, you're right.
6     Q. Okay. And of the staff, Ms. Sauceda and
7  Ms. Sanchez were also Hispanic; correct?
8     A. Yes.
9     Q. Were there any other office staff besides those
10 two?
11    A. In the office, no.
12    Q. So there were 12 -- approximately 12 employees
13 and six of those 12 employees were Hispanic at the time
14 you were not given the promotion?
15    A. Yes.
16    Q. Were you aware from the time that you came to
17 the Houston office in December of 2007 through February
18 of 2008 of Hispanics looking for jobs in the Houston
19 office that weren't hired?
20    A. No.
21    Q. From the time that you started work in December
22 of 2007 through February of 2008, were any additional or
23 new salesmen hired during that time period?
24    A. February, no.
25    Q. When you say that you felt that your promotion

## 167

1  after talking to Loza and Ortiz was based on the fact
2  that you were Hispanic, isn't it true there was only one
3  position that became available during this entire time
4  before you filed your EEOC complaint and that was when
5  Mr. Pryor was promoted?
6     A. Well, I moved and I was there? Yes, one time.
7     Q. And you felt that because you weren't promoted,
8  it had to do with the fact that you were Hispanic and
9  that's why you filed your complaint?
10    A. Yes.
11    Q. And has anyone told you any facts which would
12 substantiate your opinion in this case?
13    A. Has anyone told me?
14    Q. Yes.
15    A. No.
16    Q. Are you aware of any facts that would
17 substantiate your claim that Mr. Pryor was promoted to
18 the position of assistant branch manager solely because
19 he was not Hispanic?
20    A. No.
21    Q. Or that you were denied the promotion because
22 you are Hispanic?
23    A. No.
24    Q. You said you went and talked with Loza and
25 Ortiz.

## 168

1        Did you make any notes of your conversation
2  with them?
3     A. No.
4     Q. How many times did you speak with Loza and
5  Ortiz before you decided to file your EEOC claim?
6     A. Just that once.
7     Q. And where did that conversation take place?
8     A. I believe we went to a -- it was Bennigan's, I
9  believe.
10    Q. And do you know when that occurred?
11    A. I don't. It was a Saturday afternoon.
12    Q. Do I know what month?
13    A. It would have to have been -- I think it was
14 almost -- well, no. It would have been April, May --
15 April maybe, somewhere in there.
16    Q. May?
17    A. April or May.
18    Q. April, May.
19       Between March 3rd when you received the
20 email from Mr. Wallace and the meeting with Mr. Ortiz
21 and Loza in April or May, had you made any request to
22 Arrow Truck for additional information about Mr. Pryor's
23 promotion that you had not received?
24    A. No, sir.
25    Q. To the best of your knowledge, did the people

## 169

1  in Kansas City corporate and Mr. Stricker believe that
2  you were satisfied with the response that you had
3  received from them?
4     A. Repeat the question?
5     Q. To the best of your knowledge, did Kansas City
6  corporate or Mr. Stricker believe that you were looking
7  for any additional explanation or reasons as to why
8  Mr. Pryor had been promoted and not you to the assistant
9  branch manager position?
10    A. Yes. No, I didn't ask any more.
11    Q. And did you contact Mr. Ortiz and Mr. Loza to
12 set up this meeting at Bennigan's?
13    A. No.
14    Q. Did they contact you?
15    A. No.
16    Q. How did you get in touch with them?
17    A. I went over there.
18    Q. When you say you went over there where --
19    A. I'm sorry. I went over to where they were
20 working at Texas, Texas Trucks or -- I believe that's
21 the name, and I just went and talked to them.
22    Q. Had you previously told Mr. Stricker that you
23 had been contacted by Mr. Loza or Mr. Ortiz to file a
24 claim and that you didn't think a claim was justified?
25    A. No.

KEVIN J. BRUZEWSKI, CSR
NELL MCCALLUM & ASSOCIATES, INC.

0089ba5d-218e-4d87-a06b-2aaa3aaa2179

170

1    Q. Did you ever tell Mr. Stricker you had been
2  contacted by Mr. Ortiz or Mr. Loza about filing a claim?
3    A. No.
4    Q. In looking at deposition Exhibit 4, who wrote
5  your EEOC complaint?
6    A. I believe her name was Patricia.
7    Q. Did anyone go with you to the EEOC office to
8  file your complaint?
9    A. No, sir.
10   Q. Did Mr. Ortiz and Mr. Loza tell you where to go
11  to file a complaint?
12   A. No, sir.
13   Q. Did they tell you they had already retained a
14  lawyer to represent them in claims against Arrow Truck?
15   A. Yes.
16   Q. Did you talk with their counsel prior to filing
17  the EEOC complaint?
18   A. I don't recall if it was before or after.
19   Q. Had you decided by the time that you filed your
20  EEOC complaint, that based upon your conversations with
21  Mr. Ortiz and Mr. Loza that you were going to file a
22  lawsuit against Arrow Truck?
23   A. Repeat your question, please?
24   Q. Had you decided by the time you filed your EEOC
25  complaint that you were going to file a lawsuit against

171

1  Arrow Truck?
2    A. No, sir.
3    Q. Did Mr. Ortiz or Mr. Loza tell you that it was
4  their intention that they were going to file a lawsuit
5  against Arrow Truck to collect money based upon their
6  claims?
7    A. I don't recall them using the word money.
8    Q. Do you know why they were going to file a
9  lawsuit then?
10   A. They felt they were treated unfairly.
11   Q. And do you understand that by filing a lawsuit
12  what they were trying to recover was money from Arrow
13  Truck?
14   A. I can understand that.
15   Q. You said that you started to hear that Arrow
16  Truck was not hiring Hispanics or promoting Hispanics.
17       Did you do anything to check out the rumors
18  that you heard about Arrow Truck used to not hire
19  Hispanics or promoting Hispanics?
20   A. No.
21   Q. You stated at the bottom of Page 1 of
22  deposition Exhibit 4, there are two sales individuals,
23  parenthesis, both Hispanic, end of parenthesis, in
24  Houston with more than ten years with the company and
25  were not considered.

172

1       Do you see that?
2    A. Yes.
3    Q. Are you talking about Albert Sanchez and Phil
4  Coronado?
5    A. Yes.
6    Q. Did Mr. Albert Sanchez or Phil Coronado ever
7  tell you that they wanted to be considered for the
8  assistant branch manager position that Ryan Pryor
9  received?
10   A. Repeat your question?
11   Q. Did Albert Sanchez or Mr. Coronado ever tell
12  you that they wanted to be considered for the assistant
13  branch manager position that was received by Mr. Pryor?
14   A. Mario Berto did.
15   Q. Okay. So Mr. Sanchez told you that he had
16  contacted someone about becoming the assistant branch
17  manager that Mr. Pryor received that position?
18   A. He mentioned that he submitted his form.
19   Q. Okay. So at the time that the assistant branch
20  manager position became available, then you understood
21  at least yourself, Albert Sanchez and Mr. Pryor were the
22  only candidates for that position?
23   A. No.
24   Q. Who else were candidates for the position?
25   A. Just Pryor and myself.

173

1    Q. Okay. Well, when did Mr. Sanchez tell you that
2  he wanted to be considered for the assistant branch
3  manager position that was awarded to Mr. Pryor?
4    A. No. He mentioned on the opening before where
5  nobody was --
6    Q. Where no one was selected?
7    A. No one was selected.
8    Q. So when you're talking about there are two
9  sales individuals in Houston with more than ten years
10  with the company and were not considered, you weren't
11  talking about the position that you were applying for;
12  is that correct?
13   A. No, not my position.
14   Q. And to the best your knowledge, Mr. Coronado
15  has never put his name in for the assistant branch
16  manager position at the Houston branch or any other
17  branch?
18   A. He told me he did.
19   Q. Okay. When did Mr. Coronado tell you that he
20  put his name in for the assistant branch manager at any
21  branch?
22   A. It was right -- I believe it was right after we
23  were given a deadline of June 6th or whatever it was,
24  around that time frame. I asked him about it and --
25  because I'm not sure Mr. Stricker told me or somebody

44  (Pages 170 to 173)

KEVIN J. BRUZEWSKI, CSR
NELL McCALLUM & ASSOCIATES, INC.

0089ba5d-218e-4d87-a06b-2aaa3aaa2179

```
                                              174                                                  176
 1  told me there was two names going in alongside me.     1  manager position in Houston until June of 2008; correct?
 2      Q. Okay. Well, let me stop you there.              2      A. I believe so.
 3          Can we agree that May 13th took place          3      Q. All right. Did Albert Sanchez ever tell you
 4  before June of —                                       4  that the reason he did not get the earlier promotion was
 5      A. Yes.                                             5  because he was Hispanic?
 6      Q. — 2008?                                         6      A. Because he couldn't speak well English is what
 7          So at any time prior to your filing the        7  he was told.
 8  EEOC complaint, did Mr. Coronado ever tell you that he  8      Q. Did Mr. Albert Sanchez to the best of your
 9  had put his name in for an assistant branch manager     9  knowledge ever file a complaint with the EEOC?
10  position that he did not receive?                      10      A. I'm not aware.
11      A. He told me — I just don't recall whether he     11      Q. Did you ever tell Mr. Albert Sanchez that he
12  had already told me before this date, and for sure he  12  should file a complaint?
13  told me again after in June.                           13      A. No, sir.
14      Q. Okay. Do you know which position that          14      Q. Okay. If we turn to Page 2, of your charge of
15  Mr. Coronado had put his name in for the assistant     15  discrimination, you state the company is discriminating
16  branch manager?                                        16  against the Hispanic employees in sales when we are
17      A. What position?                                  17  denied the opportunity to test for management positions.
18      Q. What office and when?                          18          Other than yourself, who are you referring
19      A. Oh, HS Houston branch.                          19  to in that statement?
20      Q. And when did he put his name in for the        20      A. I'm only talking about myself to this person
21  assistant branch manager position?                     21  here.
22      A. This last one this June.                        22      Q. Is it your belief that the discrimination
23      Q. Okay. So — okay. But at the time that you      23  against Hispanics in all of the Arrow Truck branches
24  filed your EEOC complaint, Mr. Pryor was still the     24  or only in the Houston branch?
25  assistant branch manager at the Houston facility;      25      A. Repeat your question?

                                              175                                                  177
 1  correct?                                                1      Q. Do you believe that the discrimination against
 2      A. I believe so, yes.                               2  Hispanics that you've set forth in your charge of
 3      Q. All right. What I'm trying to get from you,      3  discrimination is only in the Houston branch or in all
 4  Mr. Silva, and maybe I'm not asking the question        4  of the Arrow Truck branches?
 5  properly --                                             5      A. I can only speak for Houston.
 6      A. Uh-huh.                                          6      Q. You don't know or do you have any firsthand
 7      Q. — at any time prior to filing your EEOC          7  knowledge of whether or not minorities were given the
 8  complaint, did Mr. Coronado tell you that he had ever   8  opportunity to test for system branch manager positions
 9  applied for the position of assistant branch manager in 9  at other facilities?
10  Houston or at any other Arrow Truck branch?            10      A. I don't know.
11      A. Yes, I believe he did.                          11      Q. You stated that on February 27, 2008 you
12      Q. Okay. For which branch and when did he tell    12  attempted to resolve this matter through human resources
13  you that?                                               13  and emailed Ken Courson and no action was taken with
14      A. Houston. And it had to have been in our        14  regard to my concerns. Courson never responded.
15  conversations. You know, I've known Phil back since    15          Is that a true statement?
16  when I started in '04 so and he, you know, would say   16      A. Yes.
17  what he did on the last one. He would start with saying 17      Q. Okay. When did you ask Mr. Courson to do
18  I will not relocate knowing that. He's not going to be 18  anything for you or on your behalf that he did not
19  a good candidate.                                       19  respond to?
20      Q. Right. But did he also tell that you that he   20      A. It was my mistake to believe that me cc'ing him
21  applied for an assistant manager position in the Houston 21  he maybe would have been addressed the issue and answer
22  office he did not receive?                              22  me, but I understand now that being cc'd doesn't mean
23      A. No. No.                                         23  you have to reply.
24      Q. So because Mr. Coronado was not interested in  24      Q. All right. Do you have any reason to believe
25  relocating, he never applied for assistant branch      25  that when Mr. Courson saw that Mr. Wallace had responded
```

KEVIN J. BRUZEWSKI, CSR
NELL MCCALLUM & ASSOCIATES, INC.

0089ba5d-218e-4d87-a06b-2aaa3aaa2179

1 · to your email, that it didn't take care of your
2 concerns?
3     A. Repeat your question?
4     Q. Well, would it be a correct assumption for
5 Mr. Courson to make that when he saw that Mr. Wallace
6 responded to your email and you did not follow-up with
7 any additional emails or attempts to contact him that
8 you were satisfied with the response you had received
9 from Mr. Wallace?
10     A. Yes.
11         VIDEOGRAPHER: About 12 minutes of left.
12         MR. JOHL: Might as well keep going.
13         (Exhibit No. 5 marked.)
14 BY MR. JOHL:
15     Q. Mr. Silva between February 27th and the time
16 that you filed your EEOC complaint on May 13th, 2008,
17 were you talking to Mr. Stricker about your desire to be
18 considered for any future management position in the
19 Houston branch?
20     A. No, sir.
21     Q. Was there anything that Mr. Stricker said to
22 you between February 27th of 2008 and May 13th, 2008
23 that you felt was discriminatory towards you?
24     A. What dates?
25     Q. February 27, 2008 and then the date that you

1 filed your EEOC complaint?
2     A. No.
3     Q. During that time period that you worked from
4 December of 2007 through May 13, 2008, while you were
5 working at the Houston branch, did you observe
6 Mr. Stricker say or do anything that discriminated
7 against any person based upon national origin, gender or
8 age?
9     A. No.
10     Q. I'm going to show you what's been marked as
11 deposition Exhibit 5. And ask if this is an email that
12 you received on or about May 30 of 2008 about an opening
13 for an assistant branch manager in the Houston office?
14     ·A. Yes.
15     Q. And when you received this email from
16 Mr. Stricker, were you under the impression that it was
17 being sent to everyone else in the Houston branch?
18     A. Yes.
19     Q. Were you aware of anyone outside of the Houston
20 branch given an opportunity to apply for the position?
21     A. No.
22     Q. To the best of your knowledge, who notified
23 Mr. Stricker that -- or management at Arrow Truck that
24 they were interested in this opening?
25     A. Who let Mr. Stricker know that they were

1 interested?
2     Q. Yes.
3     A. I heard that Phil Coronado and Justin Bryan had
4 their name in there.
5     Q. And did you immediately contact Mr. Stricker
6 after receiving deposition Exhibit 5 and tell him that
7 you were interested in the position?
8     A. No.
9     Q. Isn't it true that Mr. Stricker came to you and
10 asked you if you were still interested in applying for
11 the assistant branch manager position?
12     A. Yes.
13     Q. And that was a number of days after you had
14 received deposition Exhibit 5?
15     ·A. No.
16     Q. How long after you had received deposition
17 Exhibit 5 before you spoke with Mr. Stricker about the
18 position?
19     A. I believe it was before he sent this email.
20     Q. So is it your understanding that Mr. Stricker
21 told you in advance of telling the other people in the
22 ·Houston office that there was going to be an assistant
23 branch manager position open?
24     A. Yes.
25     Q. And do you know why Mr. Stricker would have

1 told you before he told the other employees of this
2 opening?
3     A. Basically he said that because I was interested
4 before that this email was going to go out.
5     Q. Did Mr. Stricker say or do anything during that
6 conversation you had with him that would try -- that you
7 · felt tried to dissuade you or prevent you from applying
8 for the position?
9     A. No, sir.
10     Q. How soon before May 30th, 2008 when this email
11 was sent out did Mr. Stricker have this conversation
12 with you?
13     A. Before May 30th?
14     Q. Yes.
15     A. This was at 10:44. ·It could have been that --
16 early that morning.
17     Q. Did you tell Mr. Stricker after he contacted
18 you that you were interested in applying for the
19 position?
20     A. No, sir.·
21     Q. Did you tell him anything about your interest
22 in the position?
23     A. Yes.
24     Q. What did you say?
25     A. I said that -- I made a comment about that he

KEVIN J. BRUZEWSKI, CSR
NELL McCALLUM & ASSOCIATES, INC.

0089ba5d-218e-4d87-a06b-2aaa3aaa2179

## 182

1  knew how I felt about the -- what had happened before
2  and that I had to think about it.
3      Q. Okay. And then how many days after this
4  conversation on May 30th was it before you got back with
5  Mr. Stricker and told him that you were interested in
6  the position?
7      A. I believe he came by my office or walked by my
8  office like on -- this was Friday -- on a Tuesday or
9  Wednesday and he asked me was I going to reply. And I
10 said something to the fact, yes, I will, I've got till
11 Friday afternoon to make up my mind.
12     Q. So it was necessary for Mr. Stricker to come by
13 your office to see if you were going to submit your
14 application or your name for the position some three or
15 four days after the email had been sent out to the other
16 employees?
17     A. I don't know if it was necessary.
18     Q. Well, I mean, certainly you hadn't gone to his
19 office before he came by your office to tell him whether
20 or not you were interested?
21     A. I had till June 6th.
22     Q. All right. And did you take until June 6th to
23 notify Mr. Stricker of your interest in applying for the
24 position?
25     A. Yes.

## 183

1      Q. If you were so interested in the assistant
2  branch manager position, why did it take you a week to
3  notify Mr. Stricker that you wanted the -- to apply for
4  the position?
5      A. I just wanted to think about it.
6      Q. Did you talk to your family about whether or
7  not you should apply?
8      A. Definitely.
9      Q. And did they agree that you should apply?
10     A. We had mixed emotions.
11     Q. Was there anything that Mr. Stricker or anyone
12 else in management at Arrow Truck did during the week
13 between May 30 and June 6th to prevent you or dissuade
14 you from submitting your name for consideration for the
15 assistant branch manager position?
16     A. No, sir.
17     Q. Did you understand by submitting your name for
18 the assistant branch manager position that you were not
19 guaranteed of getting the job?
20     A. Yes.
21     Q. Did you understand there might be other
22 qualified candidates --
23     A. Yes. Sorry.
24     Q. -- who were going to apply for the job?
25     A. Yes.

## 184

1      Q. Did you know when you submitted your name on
2  June 6th that Phil Coronado had already submitted his
3  name?
4      A. Yes.
5      Q. Did you think he was a qualified candidate for
6  the job?
7      A. He could be, yes.
8      Q. Do you think that would have been appropriate
9  for him to have been promoted to that position?
10     A. Yes.
11     Q. Do you know whether or not he took the Brooks
12 test?
13     A. I don't know.
14     Q. Do you know who else --
15     A. I think I know that they didn't.
16     Q. They did not give him the Brooks test?
17     A. I believe I was told that by Mike Stricker.
18     Q. Okay. Do you know why Mr. Coronado was not
19 given the Brooks test?
20     A. I believe Mike Stricker told me that there was
21 some -- there was some signs, I guess. I'm not sure how
22 he worded it, but that they weren't going to be
23 candidates to go as far as testing.
24     Q. When did Mr. Stricker make those comments to
25 you?

## 185

1      A. I believe it was after my testing that we
2  discussed some of this.
3      Q. Was there anything that Mr. Stricker said that
4  in his comments that some candidates weren't going to be
5  tested that the reason Phil Coronado wasn't being tested
6  was because he was Hispanic?
7      A. No, sir.
8      Q. Did Mr. Coronado ever tell you after he did not
9  get the promotion that the reason he didn't get promoted
10 was because he is Hispanic?
11     A. No, sir.
12     Q. You said Justin Bryan also applied for the
13 position?
14     A. He raised his hand.
15     Q. Okay. Did anyone else apply for the position
16 besides yourself, Mr. Coronado and Mr. Bryan?
17     A. That I know of, that's all I was told.
18     Q. And do you think Mr. Bryan was qualified for
19 the position?
20     A. I didn't know whether yes or no. I mean, he is
21 just another candidate. If he had it, he had it. I
22 don't know.
23     Q. At the time --
24     A. It's not my call.
25     Q. At the time he applied, do you feel he wasn't

KEVIN J. BRUZEWSKI, CSR
NELL MCCALLUM & ASSOCIATES, INC.

0089ba5d-218e-4d87-a06b-2aaa3aaa2179

1    Q. Do you know for certain what his
2  responsibilities and duties were?
3    A. I've read.
4    Q. Where did you read it?
5    A. On the internet.
6    Q. Pardon me?
7    A. On our internet.
8    Q. On the internet.
9        Did Mr. Stricker ever have a meeting where
10 he told the other sales representatives at Arrow Truck
11 in the Houston branch what Mr. Pryor's job duties and
12 responsibilities would be?
13   A. I don't know if he went that far. I mean,
14 probably some things that's to like we can go to Ryan
15 for some issues but not to detail it.
16   Q. Okay. All right. Sometime in June of 2008 you
17 took the Brooks test; is that correct?
18   A. Correct.
19   Q. Did you ever see the results of the Brooks
20 test?
21   A. Yes, I did.
22   Q. And how did you see those results?
23   A. I would not ever see a test like that. I was
24 -- I wanted to know what they were looking for because
25 when I first read the test, I figured I did well. And I

1  understand where they were coming from. And it seemed
2  like one of my lowest points, if you want to say low
3  points, of the rest of the test was having to do more
4  with customer service which I believe my superiors
5  before Houston have always said I've aced, and my
6  customers, too, to this day.
7    Q. How did you see a copy of your -- the results
8  of your Brooks test?
9    A. I believe they sent them to me --
10   Q. Who is "they"?
11   A. -- emailed them.
12       Ken Courson and Brooks or somebody.
13   Q. Did you ever call Ken Courson or anyone in
14 management and ask to discuss the results of your Brooks
15 test?
16   A. Yes. I had to call Mr. Courson because Mike
17 told me a conversation that I was not selected because
18 it had to do with my Brooks testing. And he, again,
19 started saying, look, I don't have any answers for you
20 on that and that's something for Mr. Courson and, you
21 know, I went ahead and I asked Mike, well, what is it
22 they are looking for or something like that, and again,
23 he said I can't answer you that, get with Mr. Courson.
24   Q. Okay. You know, it might be easier, Mr. Silva,
25 if you take the mint out of our mouth --

1    A. Sorry.
2    Q. -- it's hard to understand. Thank you.
3    A. Excuse me.
4    Q. Thank you.
5        Did you believe that you were not promoted
6  to assistant branch manager in June of 2008 because of
7  either your age or the fact that you are Hispanic?
8    A. In June I felt more towards that way, yes.
9    Q. And what was it that made you believe that your
10 promotion -- you were not given the promotion because
11 you were either Hispanic or because of your age?
12   A. I think by then, by June, I kept seeing that
13 there was incidents, issues, that would come up that I
14 felt, you know, I wasn't acknowledged as for what I've
15 done for this company and also was seen that only or
16 rather, non -- or minorities were not being interviewed.
17   Q. Okay. What minorities applied to Arrow Truck
18 in Houston that were not being interviewed?
19   A. That were not?
20   Q. Yeah, they were not being interviewed?
21   A. Oh, I saw a African American come in. I saw --
22 I heard of one Hispanic that they were talking to.
23 Other than that, they were Anglos and there was at least
24 four or five.
25   Q. Okay. Did you -- were you present every time

1  someone came in to be interviewed by Mr. Stricker?
2    A. I can't say I was.
3    Q. So you don't know the number of people who came
4  in to be interviewed during any time period and what
5  nationality those people were, would that be a correct
6  statement?
7    A. It could be, yes.
8    Q. You said there were incidents occurring that
9  helped form your belief that you were discriminated
10 against because you're being Hispanic or because of your
11 age for not getting this promotion in June.
12       Did you ever call Mr. Courson or
13 Mr. Wallace or Mr. Kosic to discuss your concerns?
14   A. No.
15   Q. Did you ever raise those concerns with
16 Mr. Stricker?
17   A. I don't think I did.
18   Q. Did Mr. Stricker ever talk to you about his
19 concerns that you were having problems getting along
20 with your co-workers?
21   A. That's how he felt, yes.
22   Q. Okay. You said that's how he felt.
23       Is he entitled to his opinion --
24   A. Sure.
25   Q. -- as to your job performance?

KEVIN J. BRUZEWSKI, CSR
NELL MCCALLUM & ASSOCIATES, INC.

0089ba5d-218e-4d87-a06b-2aaa3aaa2179

## 222

1 -- I guess it turned out to be a two hour test drive and
2 I thought we were just going around the block and I
3 couldn't find myself in the hour that he was talking and
4 talking about the trucks and other stuff that I wanted
5 to get in there and say, hey, we need to go back. And I
6 was just shaking out there. Then he was in the middle
7 lane going maybe 60 or 55 and everybody else, all these
8 tractor trailers are going 70 around us and I would go
9 like this till he would say what's wrong with you. And
10 I said, man, you know, I had an accident here not too
11 long ago and I just can't handle this.
12    Q. Are you blaming Arrow Truck for the fact that
13 you were involved in that truck accident?
14    A. No, sir.
15    Q. Were you at work or working at the time of the
16 truck accident?
17    A. Yes, sir.
18    Q. Did you make a workers' compensation claim as a
19 result of the truck accident?
20    A. No, sir.
21    Q. Do you believe these emotional issues you've
22 talked about are related in any way to your employment
23 at Arrow Truck?
24    A. On the road, no, but the combination of stress
25 and that and issues at work.

## 223

1    Q. You're still having those same concerns about
2 driving a truck and afraid to get in a truck?
3    A. Its -- it's got a little better.
4    Q. And the medication has helped your condition?
5    A. I guess it is helping because I mean, you know,
6 I get in them now.
7    Q. How much does it cost for you to buy your
8 medication?
9    A. Well, I think I was paying -- I was paying --
10 was it $36 per month till I got into this group thing or
11 this offer they offer you. And it's 90 days for, well,
12 $12, but that one for depression doesn't fall under
13 that. It would just be the high blood pressure and the
14 cholesterol.
15    Q. So it's $36 a month for your medication for
16 depression?
17    A. I believe so.
18    Q. How many times have you seen Dr. Susan Wallace
19 for this condition?
20    A. I've gone back -- I've gone back -- I guess, I
21 go back at least every three months because for refills
22 and I need to go back and get my levels checked.
23    Q. Do you meet with Dr. Wallace when you go back
24 on each occasion?
25    A. Yes.

## 224

1    Q. And how long do your visits with Dr. Wallace
2 take?
3    A. You know, I'll go back. There was one time she
4 was on vacation so I used another doctor that just
5 filled in for that day.
6    Q. And basically the doctor would ask you how the
7 medication is going, how you're feeing and then they
8 would issue you a new prescription?
9    A. Yes. But that's not why I went for the other
10 doctor.
11    Q. Right.
12    A. I think I had a cold or something I needed --
13 oh, I had a bad cough and I needed some medicine.
14    Q. Are there any side effects from taking the
15 medication for depression?
16    A. My wife noticed -- noticed it right off the
17 top --
18    Q. Noticed what?
19    A. -- from the beginning.
20       That for the first few weeks I was more
21 calm and I was talking a lot. And it was a different
22 person, I was a little different. She noticed it. She
23 told me straight up, hey, you know, what's up.
24    Q. After the first two weeks did your wife notice
25 that you went back to your old self?

## 225

1    A. It was a gradual decline so I just remember
2 that the first two weeks she mentioned that and I don't
3 know how long it took to where it's just off and on.
4    Q. After the first two weeks did your wife ever
5 make any other comments to you that you weren't your old
6 self?
7    A. No. Not in regards to that, no.
8    Q. Is it your position, Mr. Silva, that just
9 because you applied for the assistant branch manager in
10 June of 2008 you should have been awarded the position
11 of assistant branch manager?
12    A. No.
13    Q. Is it your position that just because you're
14 Hispanic that you should have been awarded the position
15 in either February or June of assistant branch manager?
16    A. No.
17    Q. Do you think your nationality or ethnicity
18 would make any difference or should play any difference
19 on whether or not you get promoted to the position of
20 assistant branch manager?
21    A. Should not.
22    Q. You state in your interrogatory answers, sir,
23 that after Mr. Pryor was promoted several of the Houston
24 salesmen told you that they did not agree with Mr. Pryor
25 being selected as assistant branch manager.

57 (Pages 222 to 225)

0089ba5d-218e-4d87-a06b-2aaa3aaa2179

## Page 226

1    Who told you that?
2    A. Larrick French.
3    Q. Anyone else?
4    A. Phil Coronado. And I always turn his name
5    around, Mr. Sanchez, Alberto Sanchez.
6    Q. Okay.
7    A. And Jose Oshey -- Ozuna. Ozuna is his last
8    name.
9    Q. Jose was the maintenance person in the yard?
10   A. Right, lot coordinator.
11   Q. So two of the three salespersons who told you
12   that they did not agree with the decision were
13   Hispanics?
14   A. Two, yes.
15   Q. Okay. And would it be correct to state that
16   the other sales representatives at the time did not tell
17   you that they did not agree with the selection of
18   Mr. Pryor as the assistant branch manager?
19   A. I never discussed anything with anybody except
20   those three guys that came up to me with it.
21   Q. During the time that you've worked at the
22   Houston branch, how many Houston branch managers have
23   there been?
24   A. Two.
25   Q. Mr. Pryor and who else?

## Page 227

1    A. Mr. Miranti.
2    Q. And do you know where Mr. Miranti is from?
3    A. Yes, Houston.
4    Q. Is he Hispanic?
5    A. No, sir.
6    Q. Is he Italian?
7    A. No, sir.
8    Q. Do you know what his national origin is?
9    A. I guess he's Anglo.
10   Q. Did you apply for the position that was filled
11   by Mr. Miranti?
12   A. Did I apply?
13   Q. Yes.
14   A. Yes.
15   Q. And that's the position that was filled in June
16   of 2008?
17   A. Yes.
18   Q. Do you believe that Mr. Miranti is a good
19   assistant branch manager?
20   A. Yes.
21   Q. You state in your interrogatory answers that
22   you've been treated as an outcast at the Houston office.
23   Why do you believe that's the case?
24   A. Basically when I got there, since I got there
25   everything was, well, that's not how we do it here and

## Page 228

1    they shared I go back to San Antonio and go back to the
2    Riverwalk. Many of those comments were thrown at me.
3    Q. Who made those comments to you?
4    A. Connie, Larry MacDaniel, Yvonne. I think
5    basically those were the loudest in saying stuff like
6    that.
7    Q. Were any of those comments ever made in jest or
8    as a joke?
9    A. Maybe at first, but then it continued so it's
10   like that's how they feel, that's how they want to talk.
11   Q. Did you ever complain to Mr. Stricker about
12   those comments being made to you that you should go back
13   to San Antonio?
14   A. I believe I addressed the issue with Larry
15   MacDaniel because it happened right in front of Mike's
16   office. And both answers again, like for when Yvonne
17   would tell me about Mr. Pryor, Connie and Mike both said
18   that's Larry. You know, that's it.
19   Q. What did Mr. Stricker say when you raised those
20   concerns about the comments being made directed to you
21   to go back to San Antonio?
22   A. I didn't approach Mike with that. It was just
23   that he heard it right then and there. And I believe if
24   he didn't hear it all because Larry yelled it at me
25   right outside Mike's office. I repeated to him what he

## Page 229

1    told me. He told me to take my "F" ass back to San
2    Antonio.
3    Q. And who told you to do that?
4    A. Told me to do what?
5    Q. Take --
6    A. Larry.
7    Q. Larry MacDaniel?
8    A. Yes, sir. He was an ex-manager.
9    Q. Okay. And did you go and talk to Mr. Stricker
10   about the comments that Mr. MacDaniel made?
11   A. It took me three steps to get into his office.
12   Q. And did you go into his office?
13   A. Yes.
14   Q. And what did you say to Mr. Stricker about the
15   comments?
16   A. I told him what's the problem, what's his
17   problem, why would he address me like that. And Mike
18   said, oh, Larry, behave, and Larry's like that.
19   Q. Okay. Was Mr. MacDaniel in Mr. Stricker's
20   office at the same time?
21   A. He was right outside.
22   Q. And did Mr. Stricker direct his comment to
23   Larry MacDaniel to behave and not to make similar
24   comments?
25   A. Yes.

KEVIN J. BRUZEWSKI, CSR
NELL MCCALLUM & ASSOCIATES, INC.

0089ba5d-218e-4d87-a06b-2aaa3aaa2179

## 230

1  Q. And did Mr. MacDaniel make any similar comments
2  to you after that date?
3  A. I don't think he ever spoke to me again.
4  Q. Okay. And certainly since he didn't speak to
5  you, he never made any derogatory comments towards you
6  after that, did he?
7  A. That's -- yes, sir.
8  Q. Did you ever ask Mr. Stricker to talk to you
9  about Yvonne or Connie Sanchez' comments to you that you
10  should go back to San Antonio?
11  A. No, sir.
12  Q. Did you ever contact anyone in corporate
13  Kansas City about their comments?
14  A. No, sir.
15  Q. Did you ever report the incident with Larry
16  MacDaniel to anyone in Kansas City corporate?
17  A. No, sir.
18  Q. Other than the fact that some people have made
19  comments -- strike that.
20      When is the last time anybody made a
21  comment that you should go back to San Antonio?
22  A. It's been a while.
23  Q. How long?
24  A. God, I don't know. Let's see. I don't know,
25  at least four or five months.

## 231

1  Q. Did you ever document in any diary or calendar
2  dates when someone made a comment that you should go
3  back to San Antonio?
4  A. No, I didn't document that.
5  Q. How many times do you think Yvonne has told you
6  to go back to San Antonio?
7  A. I don't know, seven, eight, nine times.
8  Q. Was anyone else present on any of those
9  occasions when she made those comments?
10  A. I'm sure.
11  Q. On how many of those seven or eight comments do
12  you think she was kidding you before you felt that she
13  became serious?
14  A. I don't know which was kidding or which one was
15  serious so...
16  Q. Well, do you believe some of them were kidding
17  at one point in time?
18  A. Yes, definitely.
19  Q. And how many times did Connie Sanchez make
20  comments about you going back to San Antonio?
21  A. I don't know, maybe 10 or 12.
22  Q. And do you believe that some of those comments
23  were also made as a joke?
24  A. Yes.
25  Q. And Mr. MacDaniel only made the comment once to

## 232

1  you about going back to San Antonio; correct?
2  A. Directly, yes.
3  Q. Has anyone else made any comments to you while
4  you were employed in the Houston office that make you
5  feel like an outcast?
6  A. Comments? Those were the ones that always kept
7  being repeated. There was others -- you know, jokes
8  going around and stuff because I was from there. I also
9  felt as a outcast was that I was hardly acknowledged on
10  things I was doing for the company.
11  Q. And were other people being acknowledged for
12  things they were doing for the --
13  A. Yes. I'm sorry.
14  Q. -- company?
15  Such as -- how were you not being
16  acknowledged?
17  A. There was incidents where in our meetings Mike
18  would bring up somebody and say this person is working
19  on a multi truck deal, we don't know if it's a sure deal
20  yet but I would, you know, prefer working on a multi
21  truck deal to show that you're doing something, right.
22  And then I think another meeting, another
23  guy was doing that, too. And there was like three times
24  at least that I remember. And there was a time that I
25  was working on a 26 truck deal then another seven, then

## 233

1  another four or five and stuff like that and that never
2  came up in the meetings.
3  Q. Did you ever contact Mike and talk to him about
4  your concerns that he wasn't acknowledging the efforts
5  you were making?
6  A. No, sir.
7  Q. Did you ever contact anyone at corporate and
8  tell them that Mr. Stricker wasn't acknowledging your
9  efforts?
10  A. No, sir.
11  Q. Did you think that the fact Mr. Stricker wasn't
12  acknowledging your efforts was in retaliation for your
13  filing of the EEOC complaint?
14  A. It could be.
15  Q. Did you form that opinion?
16  A. Yes.
17  Q. And your opinion was that he wasn't
18  acknowledging you because you had filed the EEOC
19  complaint?
20  A. That, and I believe nobody at the branch, you
21  know, was respecting me for what I had done already for
22  Arrow. And I was in Houston now, this is a totally
23  different turf and, you know, they have different ways
24  in Houston so...
25  Q. But did you feel from moving from San Antonio

KEVIN J. BRUZEWSKI, CSR
NELL MCCALLUM & ASSOCIATES, INC.

0089ba5d-218e-4d87-a06b-2aaa3aaa2179

1  you believe that weren't being followed in the Houston
2  office?
3     A. Oh, what else. I remember one time when I just
4  gotten there and this is what make me -- I would hear
5  things and I was like why does this branch operate this
6  way like they are their own company.
7        Mike was out on either vacation or maybe
8  managers' meetings and Phil and Connie always go out to
9  lunch or whatever, hang out. They have been there, you
10  know, for a long time together. So they came back from
11  lunch and Connie emails the branch and says, hey, Phil's
12  got a great idea. He wants us to start a prehold on our
13  three day policy hold, meaning that internally in
14  Houston we would hold our trucks within ourselves so no
15  sales from another branch could -- well, they would see
16  it being on hold. And when I read the email, I was
17  like, oh, my goodness, you know, how can they go around
18  corporate policy. And immediately after that,
19  Mr. Stricker sent an email to everybody back, big N-O.
20     Q. Okay. So Mr. Stricker, when he found out about
21  the email from Ms. Sanchez, sent out another email
22  correcting the problem?
23     A. Yes, sir.
24     Q. Do you think that was an appropriate response?
25     A. That was appropriate, yes.

1     Q. And that only happened on the one occasion with
2  respect to the preholds?
3     A. That was send out an email, yes.
4     Q. So now have you told us all the situations in
5  which you feel corporate policy has not been followed by
6  the Houston branch?
7     A. The corporate policy thing, more so. We -- we
8  get reminded of our holds and stuff frequently.
9     Q. Is there something improper about reminding you
10  of your holds?
11     A. Not improper, just made it -- he's making sure
12  he reminds everybody because there was an incident where
13  one truck was held for a week or ten days and they were
14  waiting on the customer which we are being told at one
15  point or another if it's three days or maybe four or
16  five, if there is no money, we got to let it go.
17     Q. So was Mr. Stricker applying the company policy
18  to all salespeople?
19     A. He's mentioned it to everybody.
20     Q. Okay. So there's nothing improper about that,
21  is there?
22     A. No. Just that he has to keep reminding us.
23     Q. Okay.
24     A. You know.
25     Q. Is that because the salespeople aren't

1  following corporate policy?
2     A. Exactly.
3     Q. And have you found it to be true that when
4  Mr. Stricker becomes aware of situations where the
5  employees aren't following company policies, he reminds
6  them to follow company policy?
7     A. Yes, because we keep addressing it.
8     Q. Okay. You talked about you were upset because
9  you felt that you weren't being acknowledged in some
10  sales meetings, do you remember, because of your
11  accomplishments at the company?
12     A. Yes, sir.
13     Q. At any of these sales meetings, did
14  Mr. Stricker ever acknowledge the accomplishments of any
15  of the other Hispanic salespeople?
16     A. Hispanic?
17     Q. Yes.
18     A. Only Hispanics?
19     Q. Or did he -- no, not only, but did he also
20  acknowledge the accomplishment of some of the Hispanic
21  people as well?
22     A. Yes.
23     Q. So you're not -- it's not your opinion that
24  Mr. Stricker didn't acknowledge your accomplishments
25  solely because you were Hispanic, is it?

1     A. No. I'm not sure it's that, retaliation
2  because of my charges and/or because I'm from
3  San Antonio.
4     Q. How many times do you think that you should
5  have been acknowledged in the last year and a half for
6  your accomplishments that you weren't acknowledged?
7     A. Basically it's been like in our meetings where
8  a new member comes onboard and Mike will go down and
9  around and he'll say Johnny's been diamond so many
10  times, Coronado has been here 15 years, diamond once.
11  And then they will skip me, not say anything about me,
12  and then say, for example, Justin wasn't even there and
13  Larrick will put in his opinion and say, oh, yeah,
14  Justin is not here but he was also diamond that last
15  year and blah, blah, blah.
16     Q. At these meetings, are you the only one that
17  Mr. Stricker skips over?
18     A. As far as accomplishments --
19     Q. Yes.
20     A. -- to show accomplishments, yes.
21     Q. How many times has Mr. Stricker acknowledged
22  the accomplishments of everyone else present at one of
23  these meetings except for you?
24     A. It was that one time there. I think that was
25  at least two times that we talked about it.

KEVIN J. BRUZEWSKI, CSR
NELL MCCALLUM & ASSOCIATES, INC.

0089ba5d-218e-4d87-a06b-2aaa3aaa2179

**246**

1  Q. Did you make a note of these two meetings
2  where --
3  A. No.
4  Q. -- Mr. Stricker did not acknowledge you when he
5  acknowledged everyone else present?
6  A. I don't recall --
7  Q. Okay.
8  A. -- if I did or not.
9  Q. Did you ever complain to Mr. Stricker that he
10 had acknowledged everyone else in the meeting except for
11 you on either of those two occasions?
12 A. No.
13 Q. Did you ever tell anyone in Kansas City
14 corporate?
15 A. No, sir.
16 Q. Have you ever sent an email to anyone in
17 Kansas City corporate where you felt or advised
18 Kansas City corporate that you were being retaliated
19 against for filing an EEOC complaint?
20 A. No, sir.
21 Q. Have you ever called anyone in Kansas City
22 corporate dealing with your concerns that you're being
23 retaliated against by anyone at the Houston branch
24 because you had filed an EEOC complaint or lawsuit
25 against Arrow Trucks?

**247**

1  A. No, sir.
2  Q. Pardon me?
3  A. No, sir. I will retract that answer about how
4  many times did they skip me. I said a couple of times,
5  but the second time was really not there. It was where
6  one of the new salesmen, and it was related to
7  acknowledgements.
8      He went by my office and he stops and he
9  looks in my office and he says, damn, how long have you
10 been with Arrow, 40 years. And, you know, I didn't say
11 anything, you know. What I accomplished was in four and
12 he thought I was there a longer time for what I've --
13 Q. Did you find something offensive about the fact
14 that he made a comment that --
15 A. No. But if he would have addressed it at the
16 meeting alongside everybody else that I was from San
17 Antonio and I achieved diamond level in four years or
18 whatever and I've only been there six years then he
19 would not have reacted that way when he went to my
20 office.
21 Q. Do you think some of your concerns are because
22 you're too sensitive about the situation?
23 A. I'm not sensitive about it. No, I --
24 Q. Not at all?
25 A. No.

**248**

1  Q. Okay. Who was the new employee who came by and
2  made that comment to you?
3  A. His name was Jerry -- Jerry Lohan or something.
4  Q. Logan?
5  A. Lohan, Logan -- I don't recall his last name.
6  He wasn't there long enough.
7  Q. Did you make a note in your diary about the
8  comment that he made?
9  A. No. I just passed it on as just another day at
10 Arrow.
11 Q. Is it your opinion that every day that you've
12 been working at Arrow since June of 2008, someone has
13 made an offensive or inappropriate comment to you?
14 A. Not so much offensive.
15 Q. Inappropriate?
16 A. Maybe inappropriate.
17 Q. Every day?
18 A. I can't say every day.
19 Q. Well, have you felt that inappropriate comments
20 were made to you on a regular almost daily basis, why
21 didn't you go over Mr. Stricker's head and contact
22 Kansas City corporate and notify them of your
23 conditions?
24 A. I feel that I'm not getting a way when I
25 approach Mr. Stricker with everything and I don't want

**249**

1  -- like I've told you before, look, I don't want to -- I
2  don't want you to think that I'm a snitch because I see
3  something different than what I'm used to and -- you
4  know, like somebody picking up parts from one truck to
5  satisfy his truck so he won't have to pay for the
6  repairs and it's one of us that's going to pay for it.
7  I made -- I sent Mike -- he called me in on --
8  Q. Well, you're beyond my question.
9      What I'm asking you is, you said that
10 Mr. Stricker wasn't able to resolve your issues in the
11 Houston office. Why didn't you contact Mr. Courson,
12 Mr. Wallace, Mr. Kosic or someone else from Kansas City
13 corporate to deal with your issues?
14 A. Because of everything that had been going on
15 and still going on, I felt that they're going to say I'm
16 whining about everything. So what I'm having to do is
17 just tough it up and deal with these guys here the way
18 they do it and maybe just, you know, go with the flow or
19 something.
20 Q. Well, didn't you have a hard time adjusting to
21 the way things were doing in Houston as being different
22 from the way things were done in San Antonio?
23 A. Oh, I didn't have a hard time adjusting.
24 Q. But you felt that the way things were being
25 done, business was being conducted in Houston was

KEVIN J. BRUZEWSKI, CSR
NELL MCCALLUM & ASSOCIATES, INC.

0089ba5d-218e-4d87-a06b-2aaa3aaa2179

262

1    Q. Would you attribute also some of the decline in
2  your income to the fact that by moving from Houston --
3  moving from San Antonio to Houston you haven't been able
4  to build up the same customer base that you had in
5  San Antonio?
6    A. Yes.
7    Q. Would you agree with me that so far since
8  you've moved to Houston, you do not have the same
9  customer base as you had when you left the San Antonio
10 branch?
11    A. Yes.
12    Q. Do you think Arrow Truck is responsible in any
13 way for the decline of your income from 2007 to 2008?
14    A. Not fully.
15        (Exhibit No. 10 marked.)
16 BY MR. JOHL:
17    Q. Mr. Silva, I'm going to show you what's been
18 marked as Silva deposition Exhibit 10. And this is a
19 document that you produced last week and I want you to
20 look at the bottom right-hand corner. And it says Silva
21 0105 and it goes through Silva 0126.
22    A. Yes, sir.
23    Q. Are these your handwritten notes that you made
24 of conversations with various people at Arrow Truck over
25 a period of time?

263

1    A. More than likely, yes.
2    Q. Okay. Well, do you have any other notes
3  regarding conversations with Mike Stricker or anyone
4  else at the Arrow Truck Houston branch or Kansas City
5  office that you did not produce?
6    A. I don't know. I looked at everywhere that I
7  would put paperwork away and this is what I could come
8  up with.
9    Q. So you're not aware of any other documents
10 where you've made notes or comments about conversations
11 you've had with anyone at Arrow Truck?
12    A. Else where, no, I don't know, you know.
13    Q. Let's look at the first page which is Silva
14 0105.
15        What is the date of the first entry there?
16    A. It says 5-05 of '08.
17    Q. May 5th, '08; correct?
18    A. Yes.
19    Q. You told us earlier that you had made some
20 notes after your conversation with Mr. Stricker in
21 February of 2008 when he advised you that Mr. Pryor had
22 been promoted to the assistant branch manager.
23        Do you recall that statement?
24    A. What was the statement?
25    Q. That you had made some handwritten notes within

264

1  a day or two of the conversation --
2    A. Oh, yes.
3    Q. -- with Mr. Stricker.
4        Do you know where those notes are?
5    A. I believe they should be here.
6    Q. Can you look through deposition Exhibit 10 and
7  tell me where those notes are?
8    A. 0123.
9    Q. Okay. 0123?
10    A. Yes.
11    Q. And this is the notes -- is this your
12 handwriting on 0123?
13    A. Yes.
14    Q. Are these the notes that you made on or about
15 February 25th --
16    A. Yes.
17    Q. -- 2008?
18    A. Yes.
19    Q. And do those notes accurately reflect what was
20 said by you and Mr. Stricker on the date of
21 February 25th?
22    A. I would believe they are more accurate than
23 anything else now because it was right then and there.
24    Q. You stated that the morning after your
25 conversation with Mr. Stricker he didn't say good

265

1  morning to you?
2    A. He did not.
3    Q. Okay. Did you say good morning to him?
4    A. I don't recall.
5    Q. You said not even a sign of sympathy for how I
6  might be feeling after bomb was dropped on me.
7        Do you see that comment?
8    A. Yes.
9    Q. Didn't Mr. Stricker show a sign of sympathy
10 when he called you that night at home to see why you had
11 been so quiet?
12    A. Right. That was that evening.
13    Q. When Mr. Stricker called at home, did you ever
14 express to him a willingness to move out of the state if
15 a position became available?
16    A. Did I express?
17    Q. Yes.
18    A. Not to him.
19    Q. You said in your notes that criticized my
20 religion?
21    A. Uh-huh.
22    Q. What did Mr. Stricker say that criticized your
23 religion?
24    A. Well, you know, it was his opinion obviously
25 and, you know, we all have our opinions. But I

67 (Pages 262 to 265)

KEVIN J. BRUZEWSKI, CSR
NELL MCCALLUM & ASSOCIATES, INC.

0089ba5d-218e-4d87-a06b-2aaa3aaa2179

1  mentioned something about the church I was going to and
2  he just said something to the effect that he didn't
3  believe how the pastor there preaches, something to that
4  effect.
5      Q. Well, did you take that as a criticism of your
6  religion?
7      A. Well, at that point, I was very frustrated with
8  everything going on so I didn't know what he was meaning
9  with that.
10     Q. As you look back on his comment now, do you
11 think he was being critical of your region or just your
12 pastor?
13     A. More so the pastor --
14     Q. Okay.
15     A. -- he didn't believe his ways.
16     Q. Has Mr. Stricker ever made any other comments
17 to you where you think he was being critical of your
18 religion?
19     A. No, sir.
20     Q. Go on page Silva 125. I was told to get my
21 sorry ass back to SA, which I assume stands for
22 San Antonio?
23     A. Yes.
24     Q. When was that comment made by looking at your
25 notes?

1      A. That was the Thursday or Friday before
2  Superbowl of -- that would have been --
3      Q. 2009.
4      A. No, it would be '08.
5      Q. That would have been --
6      A. 2008, January.
7      Q. -- right after you got to work at Arrow Truck?
8      A. Yes, sir.
9      Q. From San Antonio?
10     A. Yes, sir.
11     Q. And what would make you look at your notes that
12 would give you an indication that the comment was made
13 in January of 2008?
14     A. Being a new guy and trying to blend in with the
15 guys and whatnot, Larry MacDaniel put together a
16 football pot and they -- they were asking who wanted to
17 get in on it. So I said, you know what, I'll get in on
18 it just so I could be part of this group here so they
19 don't say I'm just to myself or whatever. So it came to
20 Friday afternoon or mid day or something and he said I
21 need your money now. And I said I just need to get a
22 break from what I'm doing here with my trucks delivering
23 the stuff to go to the ATM. And then he told me, no,
24 you better get it now or I'm going to sell this ticket
25 because he was trying to close it out that Friday

1  afternoon.
2      Q. And "he" is Larry MacDaniel?
3      A. Yes, sir. I'm sorry. Larry MacDaniel.
4          So I said -- and he made the comment like,
5  you know, you do it now or forget it, I'll sell it. So
6  Chet happened to be in Mike's office at the same time
7  and Larrick MacDaniel's (sic) office is right outside
8  Michael Stricker's. So I said, man, I can't believe
9  that I don't have time to go to the ATM. I said that
10 speaking out. And Chet says what do you need, what do
11 you need. I said I need a hundred dollars, I'll give it
12 back to you as soon as I go to the ATM after I finish my
13 deliveries or whatever. Oh, sure, here. He pulls it
14 out and gives it to me, right. I go right there to
15 Larrick, say Larrick, here's my money. He said, no, too
16 late. I already sold it. I said, Larrick, here's my
17 money, take it and then he threw it back at me. He said
18 I don't need your fricken money and blah, blah, blah and
19 take your sorry ass back to San Antonio and, you know,
20 go back to Charlene, this and that.
21     Q. Did you ever report this incident to Mike
22 Stricker?
23     A. He heard it. He was right there.
24     Q. Did you ever report it to Mike Stricker?
25     A. Yes. This is what we talked about earlier.

1      Q. Okay. Did you -- did you discuss -- this is
2  the incident you discussed with -- earlier that you told
3  us about with Mr. MacDaniel?
4      A. Yes.
5      Q. All right. And so after this incident,
6  Mr. MacDaniel didn't say anything else to you during the
7  entire time he remained employed?
8      A. Correct.
9      Q. Did you ever talk or try to talk to
10 Mr. MacDaniel after this incident?
11     A. I would tell him if he had calls or whatever,
12 you know, anything that they were looking for or
13 whatever, yeah, I would still have to tell him.
14     Q. But other than that, you didn't try to strike
15 up any conversations with Mr. MacDaniel?
16     A. Not necessarily.
17     Q. You told us that you didn't start making these
18 notes until after your conversation with Mr. Stricker in
19 February of 2007; is that correct?
20     A. Repeat that question?
21     Q. You told us you didn't start making notes about
22 incidents at Arrow Truck until after your conversation
23 with Mr. Stricker in February of 2008; is that correct?
24     A. That's correct.
25     Q. So did you go back and write down this prior

68 (Pages 266 to 269)

1  A. In Spanish, yes.
2  Q. Okay. Did you know whether or not Mr. Stricker
3  knew what that word meant?
4  A. He guessed it right --
5  Q. All right.
6  A. -- so he knew.
7  Q. That it meant bald head?
8  A. Yes.
9  Q. Who had made the comment originally?
10  A. Mr. Mike Stricker.
11  Q. Did Mr. Stricker just come into the room and
12  make a comment to you and then ask Ms. Sanchez what it
13  meant?
14  A. While we were eating, he was sitting next to
15  Ms. Connie Sanchez.
16  Q. So the three of you were eating in the
17  lunchroom?
18  A. Yes. And if not more people. And he leaned
19  over and asked what does this mean. And she says that's
20  not nice, you know. And I was right there in front of
21  Mike and Connie. And then again he said it again or
22  something and she said it out loud, you know, hey, it
23  means bald headed.
24  Q. Okay. Was this the first time that
25  Mr. Stricker had said anything about you being bald?

1  A. Yes. To my knowledge, yes.
2  Q. Okay. Did you find it offensive that he called
3  you a bald head?
4  A. Sure.
5  Q. Okay. Being bald myself, do you find that --
6  did you ever think that Mr. Stricker was kidding you
7  when he made a reference to your bald head?
8  A. Well, I didn't appreciate it.
9  Q. Okay. Did you tell Mr. Stricker you didn't
10  appreciate --
11  A. No. I just took it in again like other things
12  I've taken comments there.
13  Q. Has Mr. Stricker ever made another comment to
14  you about your being bald since this incident?
15  A. No.
16  Q. Has anyone else besides Mr. Stricker ever
17  mentioned the fact that you're bald?
18  A. Yes.
19  Q. Are you just sensitive when they make those
20  comments?
21  A. I wasn't with Justin.
22  Q. With who?
23  A. With Justin Bryan.
24  Q. Okay. Has anyone outside of Arrow Truck ever
25  commented on the fact that you're bald?

1  A. Not in a whispering mode.
2  Q. Okay. But when you Mr. Stricker made the
3  comment the one time, you did not tell him that you
4  found it to be an offensive comment, did you?
5  A. No, he caught me off guard.
6  Q. Okay.
7  A. And I didn't want to make a scene to how I
8  really felt and I think I just packed my lunch and got
9  out of there.
10  Q. After lunch did you go to Mr. Stricker's office
11  and tell him you found it offensive that he had made a
12  comment about you being bald?
13  A. No.
14  Q. When did this incident happen? Would it be
15  April of 2008?
16  A. Yes, it would be April 2008.
17  Q. So in the 16 months since then, has
18  Mr. Stricker made any comment about you're bald or
19  physical appearance since then?
20  A. Not that I know of.
21  Q. Was this the only time that Mr. Stricker ever
22  made a comment about your physical appearance?
23  A. That I heard of, yes.
24  Q. And you felt it was such a comment you had to
25  make a note of it?

1  A. Yes.
2  Q. Okay. And then underneath that it says April.
3  Read what your comment is there, please. Starts out
4  "just."
5  A. Yes, sir, I see that. Just about every day I
6  get picked on for stupid reasons, sports, San Antonio,
7  diamond level, whenever I had to come back, it's like
8  get back to work. He shows he can't handle the heat.
9  That's my opinion.
10  Q. And this was your comment in April of 2008?
11  A. This was my comment that I wrote down April
12  that was happening since I got there.
13  Q. Did you ever talk to Mr. Stricker about your
14  concerns that every day someone was picking on you?
15  A. I don't recall if I did or not.
16  Q. Did you ever tell any of your co-employees you
17  did not want them to criticize you because of your
18  comments on sports or your opinions on sports?
19  A. No, I didn't because -- I just didn't tell them
20  that in that way like, hey, stop it. No, I didn't.
21  Q. Did you ever tell any of your co-employees that
22  the comments they were making to you were offensive to
23  you?
24  A. No.
25  Q. Let's turn to the last page which is Silva

KEVIN J. BRUZEWSKI, CSR
NELL MCCALLUM & ASSOCIATES, INC.

0089ba5d-218e-4d87-a06b-2aaa3aaa2179

1 meeting with them at Bennigan's?

2    A. No.

3    Q. Did you meet with them a second time after the

4 meeting at Bennigan's to discuss becoming a plaintiff in

5 this lawsuit?

6    A. No.

7    Q. Did you call them after the meeting at

8 Bennigan's to discuss becoming a plaintiff in this

9 lawsuit?

10    A. No.

11    Q. So the way I understand it, sir, you went over

12 to meet with Loza and Ortiz at Truck Center.

13       Is that where they were working?

14    A. Yes.

15    Q. Talked to them -- for how long did you talk to

16 them over at Truck Center?

17    A. Five, ten minutes.

18    Q. And then you met with them at Bennigan's.

19       How long did that meeting last at

20 Bennigan's?

21    A. For the good part of one beer.

22    Q. All right. How long did that take you?

23    A. 20 minutes maybe.

24    Q. All right. And at any time after that meeting

25 at Bennigan's did you have any subsequent or follow-up

1 conversations with Mr. Loza or Ortiz about becoming a

2 plaintiff in this lawsuit?

3    A. No.

4    Q. When did Mr. Loza and Ortiz tell you they had

5 retained Tommy Sanchez and Connie Cornell as their

6 counsel?

7    A. That day.

8    Q. At Bennigan's?

9    A. Yes.

10    Q. Did they give you the telephone number of

11 Mr. Sanchez and Ms. Cornell as well?

12    A. Yes.

13    Q. Had you made up your mind before you left

14 Bennigan's that you were going to file a lawsuit against

15 Arrow Truck?

16    A. No.

17    Q. How did you ever let Mr. Ortiz and Mr. Loza

18 know that you were going to become a plaintiff in this

19 lawsuit?

20    A. I believe through Tommy and Connie.

21    Q. If Mr. Stricker or management at Arrow Truck

22 did not believe you had the skills to be an effective

23 assistant branch manager, do you think they should have

24 promoted you anyway?

25    A. Yes.

1    Q. Why?

2    A. It's a training program.

3    Q. Well, if they didn't think you had the skills

4 to be a good assistant branch manager or branch manager,

5 you still should be promoted?

6    A. They did Ryan.

7    Q. Okay. Is it your testimony, sir, that anyone

8 who gets -- who applies for the management program

9 should be promoted to an assistant branch manager?

10    A. No, that wasn't the question.

11    Q. Okay. My question to you is if Mr. Stricker

12 and other management at Kansas City felt that you did

13 not have the skills to be a good branch manager, should

14 they have promoted you to assistant branch manager

15 anyway?

16    A. No.

17    Q. Do you think someone just because they are

18 Hispanic is entitled to be promoted if they don't have

19 the requisite skills or experience for a position?

20    A. No, sir.

21    Q. Would it be a correct statement to say, sir,

22 that the economy today is still affecting the sale of

23 used trucks?

24    A. Somewhat.

25    Q. And have you known -- you've noticed, sir, from

1 your own experience that in 2009 you're not going to

2 make any more money than you did in 2008; correct?

3    A. If we do, it's very minimal.

4       MR. JOHL: I have no further questions.

5       MR. SANCHEZ: We pass.

6       VIDEOGRAPHER: Are we off?

7       MR. JOHL: We're off.

8       VIDEOGRAPHER: Off the record. It's 5:13

9 p.m. This is the conclusion of the deposition.

10

11

12       (DEPOSITION CONCLUDED AT 5:13 P.M.)

13

14

15

16

17

18

19

20

21

22

23

24

25

KEVIN J. BRUZEWSKI, CSR
NELL MCCALLUM & ASSOCIATES, INC.

0089ba5d-218e-4d87-a06b-2aaa3aaa2179